UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THADDEUS FLETCHER,                    :
     Plaintiff,                  :
                                      :
     v.                          :        Case No. 01-CV-0601 (JDB)
                                      :
U.S. PAROLE COMMISSION, et al.,       :
     Defendants.                 :


THADDEUS FLETCHER,                    :
     Petitioner,                 :
                                      :
     v.                          :        Case No. 01-CV-2058 (JDB)
                                      :
EDWARD F. REILLY, JR., et al.,        :
     Respondents.                :

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S/PETITIONER'S MOTION FOR SUMMARY JUDGMENT
ON THE MERITS OF EX POST FACTO CLAIM**

The D.C. Board of Parole (the "Board") had a longstanding policy and practice,

spanning at least from the 1970's to the 1990's, for making reparole decisions for D.C.

Code offenders. This reparole policy and practice has now been established by Mr.

Fletcher through multiple admissions by the United States Parole Commission (the

"Commission")[1] and a review of every obtainable document concerning D.C. Board

reparole practices. Pursuant to this reparole policy and practice the Board determined,

based on an assessment of a parolee's violation conduct and underlying sentence, that

some parolees who had violated the conditions of their release and had had their parole

revoked needed to return to prison for an interim period of time, known as a "set-off,"

generally no more than 24 months. The avowed and actual purpose of this discrete set-

off period was to provide the prisoner with an opportunity to prove through his post-

incarceration conduct that he was sufficiently rehabilitated and ready to return to the community.  If the parolee's post-incarceration conduct met the Board's standards, he was invariably released by the Board at the end of his set-off period.  If the parolee's conduct did not meet the Board's standards – because the parolee committed serious or multiple disciplinary violations or otherwise failed to follow the Board's instructions regarding what he must accomplish during the set-off period – the Board imposed another set-off period to give the parolee a fresh opportunity to prove himself ready for reparole, again solely through his rehabilitative conduct while incarcerated.

The Board applied this reparole policy and practice consistently at least from the time of plaintiff/petitioner and D.C. parolee Thaddeus Fletcher's 1978 underlying offense through October 1998 when Mr. Fletcher came before the Board for a parole violation involving new criminal conduct.  Pursuant to the Board's reparole practice and policy, the Board determined at the 1998 hearing that Mr. Fletcher's parole should be revoked and imposed a 24-month set-off for the violation.  Pursuant to the Board's reparole policy and practice, Mr. Fletcher's post-incarceration rehabilitative conduct would have been the exclusive basis on which Mr. Fletcher's readiness for reparole would have been assessed 24 months later.

By all accounts, Mr. Fletcher's institutional conduct between October 1998 and October 2000 was exemplary.  But in August 2000, 22 months into Mr. Fletcher's service of his Board-imposed set-off period and just 2 months away from an assured grant of reparole under the Board's policy and practice, the reparole rules applied to Mr. Fletcher abruptly changed in such a way as to preclude his forthcoming release.  In August 2000,

---

[1] At all times referred to herein, the Commission includes the individual members of the

the Commission, of whom the individual defendants/respondents are or were Commissioners, assumed responsibility for all parole and reparole decisions for D.C. Code offenders and instituted a new reparole policy and practice. This new reparole policy and practice, dictated by the Commission's published regulations, prospectively calculates a reparole date, known as "presumptive release date," at the time of revocation by exclusive reference to offender characteristics and revocation conduct; any post-incarceration rehabilitative conduct subsequent to the initial calculation of a presumptive release date is, at best, given no more than token consideration. The Commission retroactively applied this new, harsher reparole policy to all D.C. Code offenders still serving paroleable sentences, including Mr. Fletcher.

Pursuant to the Commission's new harsher reparole policy and practice, Mr. Fletcher was not granted reparole in October 2000 at the conclusion of his 24-month set-off period as he would have been under the Board's policy and practice. Instead, the Commission informed Mr. Fletcher at a hearing in November 2000 that his new presumptive release date was ten years (later reduced to seven) in the future. Mr. Fletcher's rehabilitative conduct was completely irrelevant in this calculus. The Commission's subsequent consideration of Mr. Fletcher's post-incarceration conduct was token, resulting in a mere six-month advancement of his presumptive release date.

Under these undisputed facts, there can be no doubt that defendants/respondents' retroactive application of their new reparole policy created at least a "significant risk of increased punishment," the requisite threshold showing for an Ex Post Facto violation under *Garner v. Jones*, 529 U.S. 244, 257 (2000). Under the Board's old reparole policy,

_____

Commission sued in their official capacity.

Mr. Fletcher would inevitably have been granted reparole in October 2000.  Under the Commission's new reparole policy, however, he was ultimately ordered to serve almost seven additional years in prison, where he lingers to this day.  In the language of the United States Court of Appeals for the District of Columbia Circuit (the "Circuit") in this very case, there is simply no doubt that the retroactive application of the Commission's reparole policy has "created a significant risk that [Mr. Fletcher] will be subjected to a lengthier incarceration than he would have been if the Commission had adhered to the rules and practices of the D.C. Board."  *Fletcher v. Reilly ("Fletcher III")*, 433 F.3d 879, 879 (D.C. Cir. 2006).[2]

For these reasons, Mr. Fletcher is entitled to judgment as a matter of law affirming that his rights under the Ex Post Facto Clause were violated.  Accordingly, Mr. Fletcher should be granted a Writ of Habeas Corpus and a judgment against the defendants to his suit under § 1983 and *Bivens*, and he should be afforded injunctive and declaratory relief, specifically immediate reconsideration for reparole pursuant to the Board's reparole policy and practice and a clarification that henceforth any reparole decisions based on his 1978 underlying offense will be made  pursuant to the Board's reparole policy and practice.[3]

---

[2] Indeed, because there can be no dispute that at all times relevant to this case the controlling Ex Post Facto law – the Supreme Court's March 2000 decision in *Garner* – was clear and the disparity between the impact of the Board's and the Commission's reparole policies on Mr. Fletcher was entirely foreseeable and patently obvious, the individual defendants sued in their personal capacity are not legitimately entitled to qualified immunity to shield themselves from liability for their violation of Mr. Fletcher's rights.  *See* Motion for Reconsideration of the Dismissal of Plaintiff's Damages Claims and the accompanying Memorandum of Law ("Motion for Reconsideration").

[3] In the event that Mr. Fletcher's Motion for Reconsideration is granted and the Court rejects the asserted defense of qualified immunity by the individual defendants sued in

## FACTUAL BACKGROUND

Two convictions led to Mr. Fletcher's current incarceration.  In 1980 he was convicted of rape in the Superior Court for the District of Columbia, for an offense committed on August 13, 1978.  He was sentenced to 12 to 36 years of imprisonment, and he served ten years on that sentence before the Board released him on parole.[4]  In 1995, Mr. Fletcher was convicted in Maryland for Use of a Handgun and Assault with Intent to Kill and received a ten-year sentence of imprisonment which was later reduced to a five-year sentence; he served 48 months of that sentence before being released from Maryland state custody.[5]

Based on the conduct underlying his already-completed Maryland sentence, the Board revoked Mr. Fletcher's parole on his 1980 conviction in October 1998.[6]  Pursuant to its reparole policy and practice, the Board determined that Mr. Fletcher was eligible for reparole, but that he first needed to return to prison for a period of time to prove he was ready to return to the community.  The Board ordered Mr. Fletcher to serve a 24-month

---

their personal capacity, Mr. Fletcher will request the opportunity to prove his damages at trial.

[4]  *See* Superior Court for the District of Columbia Judgment and Commitment Order for Thaddeus Fletcher, attached as Exhibit 22 [hereinafter "Fletcher Commitment Order"]; District of Columbia Department of Corrections Face Sheet for Thaddeus Fletcher, attached as Exhibit 23 [hereinafter "Fletcher Face Sheet"]; D.C. Board of Parole Certificate of Parole for Thaddeus Fletcher, dated October 23, 1990, attached as Exhibit 24; *Fletcher III*, 433 F.3d at 872.

[5] *See* Circuit Court for Prince George's County, Maryland Commitment Record for Thaddeus Fletcher, dated February 28, 1995, attached as Exhibit 25; Circuit Court for Prince George's County, Maryland Order of Court for Thaddeus Fletcher, dated January 27, 1997, attached as Exhibit 27.

[6] D.C. Board of Parole Revocation Hearing Record for Thaddeus Fletcher, dated October 6, 1998 at 5-8, attached as Exhibit 28 [hereinafter "October 6, 1998 Revocation Hearing Record"]; D.C. Board of Parole Notice of Board Order for Thaddeus Fletcher, dated October 27, 1998, attached as Exhibit 29 [hereinafter "October 27, 1998 Board Order"]; *Fletcher III*, 433 F.3d at 872.

set-off period before being considered for reparole. *See* October 27, 1998 Board Order; *Fletcher III*, 433 F.3d at 872. This 24-month set-off was within the Board's guidelines for a parolee who had been charged or convicted of a felony while on parole for a conviction where he had five or more years remaining on his sentence. D.C. Mun. Regs. Tit. 28 § 104.8-104.9; D.C. Board of Parole "Setoff Guideline Recommendations" table, attached as Exhibit 9 [hereinafter "Set-off Guideline Table"]. Also pursuant to its policy and practice, the Board directed Mr. Fletcher to "program" – that is, to take advantage of the available self-improvement opportunities at the prison facility during the 24-month set-off period in order to prepare himself for release to reparole. *See* October 27, 1998 Board Order.

Between October 1998 and August 2000, Mr. Fletcher followed the Board's instructions and worked to rehabilitate himself as manifested both by his maintenance of an unblemished institutional record and his affirmative (and successful) efforts to further his education and to obtain useful new skills.

Mr. Fletcher served the entirety of his set-off period without incurring a single disciplinary report, itself an impressive accomplishment. *See* U.S. Parole Commission D.C. Revocation Rehearing Hearing Summary for Thaddeus Fletcher, dated November 6, 2000 at 3, attached as Exhibit 34 [hereinafter "November 6, 2000 Commission Rehearing Summary"]; Declaration of Howard Croft, dated November 21, 2006 at ¶14, attached as Exhibit 7 (The "Board members recognized that it was very difficult to serve time in prison and not receive a single infraction.").

In addition, while serving his set-off period, Mr. Fletcher took advantage of virtually every self-improvement opportunity available in his prison facility. *See*

Documentation of Thaddeus Fletcher's 1998-2000 institutional accomplishments, attached as Exhibit 30 [hereinafter "Mr. Fletcher's 1998-2000 Institutional Accomplishments"].  He earned a Bachelor of Arts degree in Urban Studies from the University of the District of Columbia.  *Id.*  He also acquired certificates for successfully completing (1) Life Skills training, (2) all three level of the Alternative to Violence Project Nonviolent Conflict Resolution Program, (3) all five levels of the Communication and Conflict Resolution Program, including the trainers' course, (4) the Employment Techniques and Awareness Preparation Program, (5) the Life Skills Wholistic Man class, (6) HIV/AIDS education training, (7) multiple Narcotics Anonymous and Alcoholics Anonymous courses, and (8) several Correspondence Bible Study Courses.  *Id.*  Apart from classroom instruction, Mr. Fletcher sought to develop other skills that he could use upon his return to the working world.  In May 1999, Mr. Fletcher began a work detail as a Clerk in the Metro Shop.  *Id.*  By November 2000 he had been promoted to the position of Assistant to the Squad Leader and Fabric Cutter.  November 3, 2000 Memorandum from Danny Minter, General Foreman of the Metro Shop, regarding Thaddeus Fletcher, attached as Exhibit 31.  Mr. Fletcher received a Certificate of Performance for work performed at the Industries Division and was described by one of his primary supervisors as a "very conscientious" employee who "work[ed] hard" and had, over the course of his employment, "matured – both in his work ethics and personal character," and become an asset to the squad. *Id.*; Mr. Fletcher's 1998-2000 Institutional Accomplishments.

　　　Lastly, Mr. Fletcher pursued artistic endeavors, in particular, writing poetry.  In 1999, Mr. Fletcher received the Editor's Choice Award for Outstanding Achievement in

Poetry for his contribution to an anthology published by the International Library of Poetry. *Id.*

During the time that Mr. Fletcher was serving his Board-imposed set-off, paroling authority for D.C. Code offenders transferred from the Board to the Commission, per Congress' passage of the National Capital Revitalization and Self-Government Improvement Act of 1997 ("the Revitalization Act"); this transfer was finalized on August 5, 2000.[7]

Mr. Fletcher completed his 24-month Board-imposed set-off in October 2000 but he was not granted reparole at that time as he would have been under the Board's policy and practice "to grant reparole at the rehearing if the [parole] violator has a good institutional record." August 21, 1992 memo from the U.S. Parole Commission's General Counsel to the Commission's Acting Chairman at 6, attached as Exhibit 11 [hereinafter "1992 Commission Memo"]; *see also* D.C. Board of Parole Rehearing Summary Transcript for parolee [REDACTED] at 2, attached as Exhibit 8 [hereinafter "[REDACTED] Rehearing Summary"] ("The Board's usual policy is that the person is penalized at the time of the revocation hearing for all past indiscretions, leaving over the matter to be viewed between the revocation and the next hearing to be his adjustment during the interim period"). Instead, the Commission scheduled a hearing for Mr. Fletcher in November 2000 to set his presumptive release date under its new reparole policy and practice for D.C. Code offenders. *See* U.S. Parole Commission D.C.

---

[7] *See* Paroling, Recommitting, and Supervising Federal Prisoners:  Prisoners Serving Sentences Under the District of Columbia Code ("Final Parole Regulations"), 65 Fed. Reg. 45,885 (proposed July 26, 2000) (codified at 28 C.F.R. §§ 2.70-2.107 (2001)); *See* also Revitalization Act, Pub. L. No. 105-33 § 11231, 111 Stat. at 745 (codified at D.C.

Revocation Rehearing Hearing Summary for Thaddeus Fletcher, dated November 6, 2000

at 3, attached as Exhibit 34 [hereinafter "November 6, 2000 Commission Rehearing

Summary"]; 28 C.F.R. § 2.20; *Fletcher III*, 433 F.3d at 873.

The Commission's distinct and much harsher reparole policy and practice for

D.C. Code offenders, dictated by its published regulations for U.S. Code offenders, are

based in part on actuarial assessments of risk and are designed to punish parolees who

fail to abide by the conditions of their release to parole supervision. Report of the United

States Parole Commission (October 1, 2001-September 30, 2003) at vi, attached as

Exhibit 18 [hereinafter "Commission Report"] (The Commission's "guiding principle is

to apply the least restrictive sanction that is consistent with public safety and the

appropriate punishment of the offense.").[8]  Pursuant to this new reparole policy and

practice, the Commission reassessed Mr. Fletcher's suitability for reparole.  The

Commission entirely disregarded Mr. Fletcher's significant rehabilitative

accomplishments, because its new reparole policy and practice simply did not permit

consideration of such factors at this stage.  *Fletcher III,* 433 F.3d at 873 ("Neither the

salient factor score nor the offense severity category takes into account Fletcher's post-

incarceration behavior.").  Instead, the Commission looked exclusively to the severity of

Mr. Fletcher's revocation offense (categorized as "eight," the most severe) and his salient

factor score (a numerical aggregation of offender characteristics where the higher

---

Code §§ 24-101 *et seq*. (2001 & Supp.2005)); § 11231, 111 Stat. at 745-46.  *See also Fletcher III*, 433 F.3d at 872.

[8] *See also* 28 C.F.R. § 2.20; U.S. Parole Commission Desk Book of Training and Reference Materials, dated June 1, 1995 at 7.2, attached as Exhibit 20 [hereinafter "Commission Desk Book"]  (explaining that guidelines are founded on "actuarial predictions of recidivism," not "predictions based entirely on individual judgment or prison performance").

number, the better the actuarial assessment of risk; the Commission initially incorrectly

scored Mr. Fletcher a five out of a possible eleven). *See* U.S. Parole Commission D.C.

Revocation Rehearing Hearing Summary for Thaddeus Fletcher, dated November 6, 2000

at 3, attached as Exhibit 34 [hereinafter "November 6, 2000 Commission Rehearing

Summary"]; *Fletcher III*, 433 F.3d at 873.

      Given these scores, the Commission' policy and practice required it to

reincarcerate Mr. Fletcher for a minimum of 180 months before reparoling him.  *See* 28

C.F.R. § 2.20.  The Commission opted to exceed the 180 month minimum by 48 months,

and set a presumptive release date of October 29, 2010.[9]  *See* U.S. Parole Commission

Notice of Action for Thaddeus Fletcher, dated December 12, 2000, attached as Exhibit 33

[hereinafter "December 12, 2000 Commission Notice of Action"]; *Fletcher III,* 433 F.3d

at 873.  In so doing, the Commission required Mr. Fletcher to serve ten more years in

prison than he would have been ordered to serve under the Board's policy and practice.

      In 2002, the Commission acknowledged that it had miscalculated Mr. Fletcher's

salient factor score.  *See* U.S. Parole Commission Notice of Action for Thaddeus

Fletcher, dated August 14, 2002, attached as Exhibit 35 [hereinafter "August 14, 2002

Commission Notice of Action"]; *Fletcher III*, 433 F.3d at 874.  Mr. Fletcher's new score

of "six" out of a possible eight improved his parole prognosis "fair" to "good."  *See*

August 14, 2002 Commission Notice of Action; 28 C.F.R. § 2.20.  Even so, the

Commission was still required pursuant to its reparole policy and practice to impose a

minimum of 120 months of reincarceration.  28 C.F.R. § 2.20.  Again, the Commission

---

[9] In calculating Mr. Fletcher's presumptive release date the Commission, pursuant to its
regulations, gave Mr. Fletcher credit for time served on his Maryland conviction that
resulted in his parole revocation.  *See* 28 C.F.R. § 2.21(c).

opted to exceed the minimum, and ordered Mr. Fletcher to serve 158 months before his presumptive release date of October 29, 2007.  *See* August 14, 2002 Commission Notice of Action.  This was still many years more than Mr. Fletcher would have served under the Board's policy and practice.  The Commission's decision prompted Mr. Fletcher to write the Chairman of the Commission, Edward F. Reilly, Jr.  In his letter, Mr. Fletcher questioned his continued incarceration, explaining that he had satisfied all of the requirements the D.C. Board of Parole and thus had been "expecting to be reparoled." *See* April 25, 2003 letter from Thaddeus Fletcher to Office of the Chairman, U.S. Parole Commission at 3, attached as Exhibit 36.

In May 2004, the Commission held one of its regularly-scheduled, biennial, interim hearings for Mr. Fletcher.  *See* U.S. Parole Commission Statutory Interim Hearing Summary for Thaddeus Fletcher, dated May 5, 2004, attached as Exhibit 37 [hereinafter "May 5, 2004 Commission Interim Hearing Summary"].  At that time, the record before the Commission included four additional years of Mr. Fletcher's exemplary post-incarceration conduct.  In addition to his continued maintenance of an unblemished disciplinary record, between July 2002 and May 2004 Mr. Fletcher completed 4000 hours of vocational training as a cook, 662 hours of vocational training in Woodworking Technology, 104 hours of vocational training in Food/Plant Pesticide and 100 hours of vocational training in FCI Serve Safe (a Food Service Special Program).  *Id.* at 2.  During this two year period, Mr. Fletcher also received certificates in nearly a dozen courses, including Business Math, Computer Fundamentals, and Character Building I and II.  *Id.* On top of all of these accomplishments, Mr. Fletcher had voluntarily participated in and completed a series of self-help groups - including Stress Management, Anger

Management and Communication Skills.  *Id.*  Shortly before Mr. Fletcher's 2004 interim hearing, a BOP Staff Psychologist submitted a letter on Mr. Fletcher's behalf informing the Commission of Mr. Fletcher's "excellent participation in [these] groups and sincere interest in improving himself."  *Id.*

Notwithstanding his continued exemplary institutional conduct, under the its reparole policy and practice, the Commission could still only advance Mr. Fletcher's presumptive release date based on "superior program performance" by no more than 24 months.  *See id.*; 28 C.F.R. § 2.60.

After examining Mr. Fletcher's outstanding institutional record, the Commission's hearing examiner recommended that he receive the maximum possible reduction of time to serve prior to his presumptive release date.  The Commission's hearing examiner stated that a full 24-month reduction in incarceration time "has been earned," noting that Mr. Fletcher had "completed a phenomenal amount of programs" and that "this prisoner literally could not have done any more than he has done."  *See* May 5, 2004 Commission Interim Hearing Summary.  The Commission did not "doubt[]" that Mr. Fletcher's programming was "superior," *see* 30(b)(6) Dep. at 159:16-20.  Nonetheless the Commission rejected the hearing examiner's recommendation, *see id.*, and gave Mr. Fletcher a mere six-month advancement of his presumptive release date.  *See* U.S. Parole Commission Notices of Action for Thaddeus Fletcher, dated June 5, 2004 and March 1, 2005, attached as Exhibit 38 [hereinafter "June 5, 2004 and March 1, 2005 Commission Notices of Action"].  With this six-month credit, the Commission still required Mr.

Fletcher to serve 152 months in prison prior to his new presumptive release date of April 29, 2007.[10]  *Id.*

At no time since 2000 has the Commission given any indication that it would apply the Board's reparole policy and practice to Mr. Fletcher, despite the fact that Mr. Fletcher has consistently demanded that the Commission do so and despite the fact that the Circuit has twice put the Commission on notice that the failure to apply the Board's reparole policy and practice to Mr. Fletcher could present Ex Post Facto problems.  *See Fletcher v. District of Columbia*, 391 F.3d 250 (D.C. Cir. 2004) ("*Fletcher II"*); *Fletcher III*, 433 F.3d 867.  For this reason, Mr. Fletcher realized that his only avenue to relief would be through the courts and declined a perfunctory Commission hearing in 2006.  The Commission conducted a nonhearing review of Mr. Fletcher's file and ordered "no change" in his presumptive release date, citing as its main reason that Mr. Fletcher "ha[d] substantially maintained good institutional adjustment."  *See* U.S. Parole Commission Notices of Action for Thaddeus Fletcher, dated August 14, 2006 and August 17, 2006, attached as Exhibit 39 [hereinafter "August 14 and 17, 2006 Commission Notices of Action"].

Since completing his board-imposed set-off period in October 2000, Mr. Fletcher has served an additional 79 months in prison.  Pursuant to the Commission's reparole policy and practice, Mr. Fletcher remains in prison today.  He is scheduled to be transferred to a halfway house on April 29, 2007, where he will remain in the custody of

---

[10] Curiously, the Commission later suggested that Mr. Fletcher might have received a larger advancement in his presumptive release date had he taken advantage of programming focusing on alternatives to violence and anger management.  *See* Excerpts of Deposition of the U.S. Parole Commission's 30(b)(6) witness, July 21, 2006 at 161;16-

the Commission as the result of his 1998 Board-ordered parole violation.  August 14 and

17, 2006 Commission Notices of Action.

## ARGUMENT

## I.      THE SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any

material fact and [] the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c); *White v. Fraternal Order of Police*, 909 F.2d 512, 516 (D.C. Cir. 1990).

The essential facts regarding Mr. Fletcher's entitlement to release and the

Commission's and Commissioners' liability are set forth in both the accompanying

Statement of Material Undisputed Facts (filed concurrently) and this pleading.  These

indisputable facts establish that, by retroactively applying the Commission's harsher

reparole policy and practice to Mr. Fletcher in lieu of the Board's rehabilitative policy

and practice, the defendants/respondents increased Mr. Fletcher's punishment for his

1995 parole violation.

The threshold showing in the parole context for an Ex Post Facto violation under

the controlling law, *Garner v. Jones*, 529 U.S. 244, is a demonstration that the retroactive

application of parole policy and practice created "a significant risk" of increased

punishment.  In this case, the defendants/respondents did not merely create "a significant

risk" that Mr. Fletcher would serve more time in prison for his parole violation -- they

guaranteed it.

Accordingly, Mr. Fletcher is entitled as a matter of law to (1) a Writ of Habeas

Corpus ordering his release, and (2) a judgment in his favor in his suit against the

_____

25, excerpts attached as Exhibit 19 [hereinafter "30(b)(6) Dep."].  In fact, Mr. Fletcher

defendants under §1983 and *Bivens*, and (3) an order directing the defendants to immediately reconsider Mr. Fletcher for reparole pursuant to the Board's reparole policy and practice and specifying that henceforth any reparole decisions on his 1980 paroleable conviction will be made pursuant to the Board's reparole policy and practice.

## II.   MR. FLETCHER IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON HIS CLAIM THAT HIS RIGHTS UNDER THE EX POST FACTO CLAUSE HAVE BEEN VIOLATED.

There is no genuine dispute that the Commission's retroactive application of its harsher reparole policy and practice to Mr. Fletcher in lieu of the Board's rehabilitative reparole policy and practice created not merely a "significant risk," but an absolute guarantee of increased punishment in violation of the Ex Post Facto Clause.  The increase in Mr. Fletcher's punishment under the Commission's retroactively applied reparole policy and practice measures almost seven years.

The Ex Post Facto Clause of Article I of the United States Constitution prohibits retroactive increases in punishment for a crime after its commission.  U.S. Const. art. I, § 9, cl. 3; *see also Fletcher III*, 433 F.3d 867 (applying Ex Post Facto Clause to the Commission); *Fletcher II*, 391 F.3d 250 (same).  Under the Supreme Court's decision in *Garner v. Jones*, a retroactively applied parole or reparole regulation or guideline violates the Ex Post Facto Clause if it "creates a significant risk of prolonging [an inmate's] incarceration."  529 U.S. 244, 251 (2000).  A party can show that there is a "significant risk" in one of two ways:  (1) by establishing that there are "facial distinctions between the old and new parole/reparole regimes," *Fletcher III*, 433 F.3d at 877, or (2) "by [introducing] evidence drawn from the rule's *practical implementation by the agency*

had already engaged in that sort of programming.  *See* p. 7, 11-12 *supra*.

charged with exercising discretion, that its retroactive application *will result in a longer period of incarceration than under the earlier rule*." *Id.* (quoting *Garner*, 529 U.S. at 255).

In *Fletcher III*, the Circuit noted that "[o]n their face, the federal reparole regulations applied in [Mr.] Fletcher's case are substantially different from the D.C. Board's regulations that were repealed in August 2000," specifically noting that "the old and new rules diverge most clearly with respect to the weight that post-incarceration behavior is given in reparole determinations . . . ." 433 F.3d at 877-78; *see also id.* at 871 (the Board's reparole regulations "plainly evidence a rehabilitative focus in making parole and reparole decisions").  Mr. Fletcher has already made out a prima facie case of an Ex Post Facto violation based on the facial differences between the Board's and Commission's reparole policies, but because the Board's policy and practice was only gradually memorialized in written regulations and even then incompletely so, a facial comparison of the Board's and Commission's reparole policies ultimately tells only part of the story.

Accordingly, the Circuit remanded Mr. Fletcher's cases for "a searching comparison" of the two parole regimes in application.  *Id.* at 879; *see also id.* ("the facial distinctions between the Board's regulations and the federal regulations that replaced them . . . is sufficient to warrant factual development . . . ."); *Fletcher II*, 391 F.3d at 250 (remanding for "further proceedings consistent with *Garner*").  To this end, the Circuit directed this Court to look at the "weight . . . post-incarceration behavior is given in reparole determinations" by the Board and the Commission and to examine whether, unlike the Board's policy and practice, the Commission's reparole regulations "are

primarily concerned with punishment and recidivism." *Id.* at 878-79.  The Circuit directed this Court to use the information gleaned from such an assessment of the two parole regimes to settle the ultimate question, namely, "whether the U.S. Parole Commission's application of the federal reparole regulations" to Mr. Fletcher "created a significant risk that he will be subjected to a lengthier incarceration than he would have been if the Commission had adhered to the rules and practices of the D.C. Board." *Fletcher III,* 433 F.3d at 879*; see also id*. at 877 (the "controlling inquiry 'is one of practical effect'") (quoting *Fletcher II*, 391 F.3d at 251).

Mr. Fletcher has now conducted the "searching comparison of the old and new reparole regimes" specified by the Circuit.  As demonstrated below, and in supporting documents attached hereto, that comparison proves beyond dispute that (1) under the Board's rehabilitative policy and practice, post-incarceration rehabilitative conduct was determinative of release to reparole, (2) under the Commission's punitive policy and practice, post-incarceration rehabilitative conduct has no value when presumptive release dates are first set, and, any post-incarceration rehabilitative conduct subsequent to the initial calculation of a presumptive release date is, at best, given no more than token consideration thereafter, and (3) the "practical effect" of the retroactive application of the Commission's reparole policy to Mr. Fletcher was to force him to serve nearly seven additional years in prison.  Accordingly, Mr. Fletcher has now demonstrated as a matter of law that the Commission violated his rights under the Ex Post Facto Clause by failing to "adhere[] to the rules and practices of the D.C. Board" in his case.  *Fletcher III*, 433 F.3d at 879.

**A. Under The Board's Reparole Policy And Practice, A Parolee Who Demonstrated Sufficient Rehabilitative Conduct During His First Set-off Was Guaranteed Release On That Basis And That Basis Alone.**

There is no genuine dispute regarding the Board's reparole policy and practice in application:  the Board's reparole decisions were entirely dependent upon its assessment of an offender's conduct during a set-off period.  In fact, those parolees who engaged in sufficient rehabilitative conduct during the initial set-off period were, without exception, granted reparole at its expiration; likewise, those parolees who failed to engage in sufficient rehabilitative conduct during the initial set-off period were given successive set-offs and were granted reparole as soon as they demonstrated a minimum level of rehabilitation during a preceding set-off period.

To begin with, contemporaneous documents authored by the Commission confirm that this was the Board's reparole policy and practice.  Even before the passage of the Revitalization Act, the Commission had an obligation to know what the Board's reparole policy and practice was because it was responsible for making parole and reparole decisions pursuant to the Board's policy and practice for the small number of D.C. Code offenders held in federal prisons.  *See Cosgrove v. Thornburgh*, 703 F. Supp. 995, 1004 (D.D.C.1988).  To educate the Commission about the Board's parole and reparole policy and practice, the Commission's General Counsel and Deputy General Counsel wrote a memo in 1992 in which they acknowledged that it was the Board's policy and practice to grant reparole after the expiration of the set-off if the parolee had "a good institutional record" and "participat[ion] in institutional programs."  1992 Commission Memo at 6.[11]

---

[11] The Commission lawyers also opined that the Board's policy and practice created no rights for D.C. Code offenders, but this opinion was rendered pre-*Garner*.  *Id.*

Commission documents also confirm that it followed the Board's reparole policy and practice of granting reparole to those D.C. Code offenders who had demonstrated sufficient rehabilitative conduct during the preceding set–off period.  In contrast to the Commission's normal policy and practice where post-incarceration rehabilitative conduct was given little or no weight in reparole decisions, *see* Point II.B. *infra*, the Commission followed the Board's reparole policy and practice for these D.C. Code offenders and made post-incarceration rehabilitative conduct determinative of its reparole decisions. *See*, *e.g.*, Summary of June 25, 1991 Review Hearing conducted by the U.S. Parole Commission for D.C. parolee [REDACTED] at 1, attached as Exhibit 15 (noting that the "subject's institutional adjustment during this new violator period has been excellent . . . [and]  [h]e maintains clear conduct," and directing release pursuant to the Board's "guidelines"); Summary of August 11, 1992 Review Hearing conducted by the U.S. Parole Commission for D.C. parolee [REDACTED] at 3, attached as Exhibit 16 (granting reparole within the Board's guidelines because "the subject has maintained clear conduct and is involved in the institution substance abuse program . . . [and] receives good work reports"); *see also* Summary of April 13, 1993 Pre-Review Revocation Hearing conducted by the U.S. Parole Commission for D.C. parolee [REDACTED] at 2, attached as Exhibit 17 (noting that Commission's salient factor score would not be used to calculate the parolee's reparole date:  "This is strictly a DC code sentence . . .The SFS does not apply to DC cases.").

The Commission's express acknowledgement of the Board's reparole policy and practice coupled with its actual implementation of this policy and practice precludes any possible attempt by the Commission to contest this description of the Board's reparole

policy and practice.  *See* Fed. R. Civ. P. 56(c) (summary judgment should be granted

where "admissions on file . . . show that there is no genuine issue as to any material

fact").  In addition, the Board's own documents and records conclusively establish that,

while it was in existence, the Board focused exclusively on rehabilitative conduct when

making reparole decisions.

As demonstrated in its guidelines, rehabilitation and treatment were always the

critical elements of the Board's mission.  *See* Title 9, D.C. R.R. (1972), Sec. 105.1 (e)

(1972 guidelines direct the Board to consider numerous facets of post-incarceration

"institutional experience" and particularly highlight "[a]chievements in accomplishing

goals and efforts put forth in any involvements in established programs to overcome

problems"); *Cosgrove*, 703 F. Supp. at 1003 (holding that the Board's 1985 regulations

"emphasize early release of an offender who responds favorably to rehabilitative

efforts"); D.C. Mun. Regs. Tit. 28 §§ 200.1(a), 204.18(h)-(i), 204.21, 205.1, 207.1 and

Appendix 2-1 and 2-2 (1987) (containing multiple references to the relationship between

positive institutional performance and obtaining release on parole); *Fletcher III*, 433 F.3d

at 871 (holding that the Board's 1987 regulations "plainly evidence a rehabilitative focus

in making parole and reparole determinations"); *see also Davis v. Henderson*, 652 A.2d

634, 636 (D.C. 1995) (noting that the regulations promulgated by the Board in 1987

merely formalized the manner in which the Board already exercised its discretion);

Declaration of Gladys Mack, dated January 31, 2007 at ¶ 5-6, attached as Exhibit 6

(describing how, in 1987, the Board officially started memorializing pre-existing policies

as formal written policies); D.C. Board of Parole Policy Guideline on "Rehabilitation and

Treatment of Offenders," adopted May 8, 1995, attached as Exhibit 5 (reaffirming "that

[the] interests [of both the community and the offender] are best served by incorporating

the goals of rehabilitation and treatment of offenders in its decision[]making;" and that

"[r]ehabilitation and treatment-oriented programs and services . . . in prison . . . are key

stepping stones toward achieving [the] goal" of enabling a D.C. Code offender "to return

to and remain in the community").

Without more, this Court could rightly "presume the Board follow[ed] its

statutory command and internal policies in fulfilling its obligations," *Garner*, 529 U.S. at

256.  Such a presumption is unnecessary in this case, however, because records of the

Board's reparole decisions in hundreds of individual cases provide contemporaneous,

unbiased, and incontrovertible proof that the Board's reparole policy and practice turned

solely on the presence or absence of rehabilitative conduct.[12]  Simply stated, the Board's

---

[12] The files containing the Board's reparole decisions were produced to Mr. Fletcher by the Commission.  After reviewing these files, Mr. Fletcher's counsel summarized the results in a chart.  *See* Chart of D.C. Board of Parole Adult Reparole Decisions Where Parolee Was Directed to Serve Time in Jail/Prison After Revocation, attached as Exhibit 2 [hereinafter "Chart of the Board's Reparole Decisions"].  This chart is admissible pursuant to Federal Rule of Evidence 1006.  In order to introduce evidence under this rule, the proponent must show that:  1) the underlying materials are voluminous; 2) the underlying materials are available for the opposing side to review; 3) the underlying materials are admissible; 4) the summary is accurate; and 5) a proper foundation is laid. *United States v. Bray*, 139 F.3d 1104, 1109-10 (6th Cir. 1998).  There is no question that all five elements are satisfied here:  1) the files provided to Mr. Fletcher consisted of 369,623 unorganized pages; 2) though the defendants/respondents have maintained custody of the paper files throughout this action, Mr. Fletcher has also made available to counsel for the defendants/respondents a copy of an electronic database containing scanned copies of the Commission's files; 3) the defendants produced the underlying documents during discovery in this matter and there is no dispute about their admissibility; 4) the summary is accurate; and 5) Ms. Ogletree's declaration, outlining her participation in the development and oversight of the review process and preparation of the summary, provides a proper foundation.  *See id.* at 1110 ("In order to lay a proper foundation for a summary, the proponent should present the testimony of the witness who supervised its preparation.").  *See generally* Declaration of Rashida Ogletree, dated April 2, 2007 at ¶¶ 8-13, attached as Exhibit 1 [hereinafter "Ogletree Decl."] (outlining the basis for admitting the summary chart pursuant to Rule 1006).

policy and practice did not just "account for evidence of post-incarceration rehabilitation in reparole determinations," *Fletcher III,* 433 F.3d at 878, it made the presence or absence of such evidence determinative of the Board's reparole decisions.[13]

Files produced by the Commission uniformly establish that when the Board determined that reincarceration was needed post–revocation,[14] it ordered a parolee to serve an interim period of time to demonstrate that he was ready to be reparoled to the community.  Indeed, the Board routinely imposed "special instructions" at revocation hearings, in order to provide clear direction to the offender as to which actions during this "set-off" period would help him prepare for release to reparole.  *See* D.C. Board of Parole "Special Instructions for Next Consideration" code list, attached as Exhibit 10; Ogletree Decl. at ¶ 21(b).  To be sure, the length of the interim set-off period was in part punitive and was determined by the seriousness of the revocation conduct and the time remaining on the parolee's sentence.  *See* D.C. Mun. Regs. Tit. 28 § 104.8-104.9; Set-off Guideline Table; *see also* Ogletree Decl. at ¶ 21(a).  But under all circumstances, the maximum set-off period authorized under the guidelines was capped at 24 months. *See* D.C. Mun. Regs. Tit. 28 § 104.8-104.9

The Board's records also show that, after the service of this relatively brief, interim period of reincarceration, the Board's focus markedly shifted.  Pre-incarceration

---

[13] The Commission routinely relies on these Board documents in its current, daily decision-making capacity.  For example, the Commission uses information documented in the Board's records to establish a "salient factor score" for D.C. inmates who currently have hearings before the Commission.  *See, e.g.*, U.S. Parole Commission Pre-hearing Assessment for Thaddeus Fletcher, dated September 18, 2000, attached as Exhibit 32 (using information from the Board's records to determine Mr. Fletcher's salient factor score).

factors (such as a parolee's criminal history, revocation conduct, or prior failures to adjust on parole) became irrelevant, and rehabilitative conduct demonstrated during the preceding set-off became the sole determining factor.[15]

The Board's reparole policy and practice is established not only through its unwaveringly consistent application as reflected by Board records of reparole decisions, but also through explicit statements in the Board's records in which the Board described its reparole policy and practice.  One such statement appears in the Board's records for D.C. Code offender and parolee [REDACTED].  [REDACTED] Rehearing Summary at 2.  [REDACTED] was a recidivist who had a serious underlying conviction – armed robbery – and had been revoked for additional criminal conduct – possession with intent to distribute heroin.  *See* Chart of the Board's Reparole Decisions at #10.  But ultimately none of this mattered to the Board after [REDACTED] successfully completed his first set-off.  In rendering its reparole decision, the Board explained that [REDACTED] had "picked up his usual excellent adjustment in the institution and comes before the Board in pretty much the same stance that he has always come before the Board, and that is while in institutional custody he makes an ideal prisoner."  [REDACTED] Rehearing Summary at 2.  The Board even questioned whether [REDACTED] "past adjustment prophesizes to

---

[14] Demonstrating its interest in returning parolees to the community, the Board only revoked and reincarcerated parolees as a sanction for parole violations about 60% of the time.  *See* Ogletree Decl. at ¶ 17(f).

[15] In *Fletcher III*, the Circuit appeared to be under the misimpression that the Board relied on a parolee's salient factor score at both the revocation and reparole stages.  433 F.3d at 871.  The Board's guidelines might be interpreted to suggest that this was the Board's practice, but, in fact, the documents in the Commission's production show that the Board only relied on a parolee's salient factor score when making its determination to release a D.C. Code offender from imprisonment to *parole* supervision; it did not look to this number when determining whether or not to revoke a parolee's release to supervision or to grant reparole.

any degree what is going to happen to him in the future." *Id.* But in the end, the Board

determined that "*it ha[d] to be true to its general guidelines with reference to setoffs and*

*denials. The Board's usual policy is that the person is penalized at the time of the*

*revocation hearing for all past indiscretions, leaving over the matter to be viewed*

*between the revocation and the next hearing to be his adjustment during the interim*

*period*." *Id.* (emphasis added).  Based on this policy and practice, the Board granted

[REDACTED] reparole.  *Id.*

   [REDACTED] case is only one of hundreds of relevant reparole decisions

documented in the files produced by the Commission that manifests the Board's

unwavering policy and practice of making reparole decisions solely on the basis of the

presence or absence of rehabilitative conduct.  *See* Chart of the Board's Reparole

Decisions; Ogletree Decl. at ¶ 16-18 (defining relevant decisions and noting number of

relevant decisions).

   Pursuant to this policy and practice, the Board weighed favorably (1) "the

presence of positive conduct, usually in the form of efforts to take advantage of

educational and self-help programs," Ogletree Decl. at ¶ 26(a); *see, e.g.,* Chart of the

Board's Reparole Decisions at #83 ([REDACTED]:  granting reparole because he

"completed [substance abuse program] . . . 12 weeks [narcotics anonymous]; he also

completed [Communication and Conflict Resolution Program]"); (2) compliance with the

Board's special instructions during the set-off period, Ogletree Decl. at ¶ 25; *see, e.g.,*

Chart of the Board's Reparole Decisions at #310 ([REDACTED]: granting reparole

because he "made a good effort towards self-improvement…[and] has made every

attempt to follow the Board of Parole's special instructions."); *id. at #74* ([REDACTED]:

"he has complied" with special instructions and "adjustment is considered excellent"); (3)

"the absence of significant negative conduct, including serious disciplinary infractions

and positive drug tests," Ogletree Decl. at ¶ 26(a); *see, e.g.*, Chart of the Board's

Reparole Decisions at #46 ([REDACTED]: granting reparole because "[h]e has not been

a management problem or behavior problem although he did receive two disciplinary

reports"); (4) "the ability to take advantage of further rehabilitation opportunities in the

community, such as out-patient drug treatment programs,"  Ogletree Decl. at ¶ 26(a);

Chart of the Board's Reparole Decisions at #15 ([REDACTED]: granting reparole

because his "[substance abuse] treatment needs could be best addressed through

participation in a short-term (28 day) residential treatment program,"); and (5) "the desire

for self-improvement."  Ogletree Decl. at ¶ 26(a); *see, e.g.,* Chart of the Board's Reparole

Decisions at #203 ([REDACTED]: "he appears to be sincere about his return to the

community"); *id.* at #89 ([REDACTED]: "wants to turn life around").

The Board weighed negatively (1) "the parolee's failure to program," Ogletree

Decl. at ¶ 27(a); *see, e.g.,* Chart of the Board's Reparole Decisions at #263

([REDACTED]: "subject did not participate in any of the [recommended] programs…and

he maintained a lackadaisical attitude regarding self-improvement."); *id.* at #66

([REDACTED]: denying reparole because "[he] has not been involved in any programs"

and "offers no excuse for his non-participation in programs"); *see also Brandon v.*

*District of Columbia Bd. of Parole*, 823 F.2d 644, 645 (D.C. Cir. 1987) (Board "denied

reparole because of [subject's] failure to involve himself fully in institutional academic

and vocational programs"); (2) "multiple or serious disciplinary reports," Ogletree Decl.

at ¶ 27(a); *see, e.g.,* Chart of the Board's Reparole Decisions at #62 ([REDACTED]:

denying reparole because "[he] involved himself with an altercation with a correctional

officer and assaulted the officer"); *id.* at 322 ([REDACTED]: among other things, "needs

to . . . remain [disciplinary report] free."); (3) "new criminal conduct," Ogletree Decl. at ¶

27(a); *see, e.g.,* Chart of the Board's Reparole Decisions at #277 ([REDACTED]:

denying reparole because "subject arrested for assault w/ intent to rape while housed at

[halfway house]."); (4) "positive drug test results," Ogletree Decl. at ¶ 27(a); *see, e.g.,*

Chart of the Board's Reparole Decisions at #87 ([REDACTED]: denying reparole

because "[he] returned dirty urine…Positive with opiates and cocaine"); and (5) a

parolee's "general refusal to change attitude."  Ogletree Decl. at ¶ 27(a); *see, e.g.,* Chart

of the Board's Reparole Decisions at #284 ([REDACTED]:  denying reparole because of

"very unsatisfactory" institutional conduct including 5 disciplinary reports—parolee "has

not attempted true rehabilitation at this point"); *id*. at #66 ([REDACTED]: denying

reparole because "[he] has not done anything of a positive nature to bring about any

change in his life").

     In every single relevant reparole decision reviewed by Mr. Fletcher's counsel

from the Commission's document production, the Board granted parole at the conclusion

of the first set-off period if a parolee had demonstrated sufficient rehabilitative conduct

during that interim period of reincarceration, without regard to any other consideration,

including a parolee's criminal history or revocation conduct.  Chart of the Board's

Reparole Decisions at #s 1-8, 10-18, 21-24, 26-32, 35, 37-41, 43-46, 48-49, 51-55, 57-61,

63-65, 67, 69-80, 82-84, 86, 88, 90-92, 94-97, 99-113, 115-130, 132-149, 151-156, 158-

162, 164-167,169, 171-174, 178, 180-192, 194-208, 211-213, 215-216, 220-222, 224,

226-230, 232-237, 239-252, 255-260, 262, 264-269, 271-272, 274, 276, 278, 280-282,

285-313, 315-321, 323-340 (reparole grants after completion of first set-off period);

Ogletree Decl. at ¶ 26 (in 100% of the cases reviewed, the Board granted reparole as long

as "there was some indication, however slight, that the parolee had been rehabilitated.");

*Id*. at ¶23 (in many cases, the Board employed an automatic presumption of release

unless rebutted by significant negative conduct).

By the same token, in every single relevant reparole decision reviewed, the only

basis on which the Board denied reparole at the conclusion of the first set-off was a

parolee's demonstration of significant negative conduct during that interim time period.

*See* Chart of the Board's Reparole Decisions at #s 9, 19-20, 25, 33-34, 36, 42, 47, 50, 56,

62, 66, 68, 81, 85, 87, 89, 93, 98, 114, 131, 150, 157, 163, 168, 170, 175-177, 179, 193,

209-210, 214, 217-219, 223, 225, 231, 238, 253-254, 261, 263, 270, 273, 275, 277, 279,

283-284, 314, 322, 341; Ogletree Decl. at ¶ 27  (in 100% of the cases reviewed, "the *sole*

basis for denying reparole at the first and any subsequent reparole consideration date was

the absence of any indication that the parolee had been rehabilitated."); *Id.* at ¶ 29 (The

Board never denied reparole after the service of a set-off based on a parolee's revocation

conduct or  a parolee's criminal history); D.C. Board of Parole "Reason For Denial -

Parole Violation Hearing" code sheet, attached as Exhibit 12 (listing the following

reasons for denying reparole:  "repeated or extremely serious negative institutional

behavior"; "made little or no effort toward rehabilitation"; "needs programs and/or

rehabilitative services to minimize risk to the community"; and "failed to comply with

special instructions"); D.C. Board of Parole Parole Determination Record for parolee

[REDACTED] at 5, attached as Exhibit 14 (rejecting the institution's recommendation to

deny reparole because the recommendation "is based on the same information on which

his parole was revoked").  Moreover, in cases where the Board denied reparole after the

completion of the first set-off, it did not grant reparole until the parolee had demonstrated

sufficient rehabilitative conduct during a subsequent set-off period.  *See* Chart of the

Board's Reparole Decisions at #s 9, 19-20, 25, 33-34, 36, 42, 47, 50, 56, 62, 66, 68, 81,

85, 87, 89, 93, 98, 114, 131, 150, 157, 163, 168, 170, 175-177, 179, 193, 209-210, 214,

217-219, 223, 225, 231, 238, 253-254, 261, 263, 270, 273, 275, 277, 279, 283-284, 314,

322, 341; Ogletree Decl. at ¶ 27(c).

    In short, the indisputable evidence establishes that a showing of rehabilitative

conduct during a set-off period – both the occurrence of positive conduct or the absence

of significant negative conduct – was determinative of the Board's decision to release a

parolee to reparole.

> **B.  Under The Commission's Punitive Reparole Policy And Practice, Post-Incarceration Rehabilitative Conduct Has No Value When Presumptive Release Dates Are First Set, And Has, At Best, Only Token Value Thereafter.**

Unlike the Board's rehabilitative reparole policy and practice, which has now

been definitively documented in contemporary admissions by the Commission and by a

review of hundreds of its reparole decisions, the Commission's harsher reparole policy

and practice has never been in question.  Rather, the Commission's reparole policy and

practice for D.C. Code offenders is memorialized in and dictated by its regulations.

*Fletcher III*, 433 F.3d at 869 (the Commission's final rules for D.C. Code Offenders

"presum[ed] that reparole determinations would be based on the federal reparole

regulations"); *see also* 65 Fed. Reg. 45,885 at 45,894; 28 C.F.R. § 2.81 (2001).

The Commission's paroling philosophy has always been distinct from that of the

Board.  The Commission's "guiding principle is to apply the least restrictive sanction that

is consistent with public safety and the appropriate punishment of the offense."
Commission Report at vi. The Commission gives post-incarceration rehabilitative efforts
no weight in this analysis. *See Fletcher III*, 433 F.3d at 872; *Cosgrove*, 703 F. Supp. at
1003 (noting that federal guidelines for an initial parole decision turns on "only two pre-
incarceration factors, thus ignoring any rehabilitative results from reincarceration" and
finding for this reason that the federal parole system is "substantially dissimilar" from the
D.C. system). This is hardly surprising. In the Commission's "Desk Book of Training
and Reference Materials," the Commission explains that its purportedly "scientific"
approach to parole decisions is a rejection of and a studied alternative to "parole decision-
making from the 1930's to 1960's [which] relied heavily . . . upon prisoner's behavior in
prison and response to correctional training programs." Commission Desk Book at 7.2.

　　　The Commission's distinct paroling philosophy is manifested in the new
regulations it promulgated to replace the Board's reparole regulations after it assumed
paroling authority over D.C. Code offenders. Unlike the Board's policy and practice of
imposing a relatively short set-off period after which it evaluated a parolee's readiness
for reparole based on rehabilitative conduct, it is the Commission's policy and practice to
set a "presumptive release date," a date which in many cases is years in the future, at the
time of revocation and in advance of any period of reincarceration. 28 C.F.R. § 2.81(a)
(decision to grant or deny reparole "shall be made by reference" to the reparole
guidelines set forth in 28 C.F.R. § 2.21 and "the Commission shall establish a
presumptive or effective release date pursuant to §2.12(b)"); *see also* 30(b)(6) Dep. at
28;22-25, 29;2-23.

The length of time between an offender's revocation and presumptive release date is, at least at the outset, solely a function of a numerical calculation that looks to the nature of the revocation offense and an offender's criminal history. *Fletcher III*, 433 F.3d at 872 (reparole guidelines "only consider offense and offender characteristics."); *id*. at 871 (noting the "the current federal regulations' singular focus on pre-incarceration factors"). Specifically, the Commission calculates a reparole "guideline range" based on the offender's (1) "offense severity rating," which is intended to account for the nature of the revocation offense and (2) "salient factor score," a numerical value which is supposed to predict the likelihood that an individual offender will recidivate based on a number of factors related to the offender's criminal history. *See* 28 C.F.R. § 2.20(b); Commission Desk Book at 7.2 (guidelines are founded on "actuarial predictions of recidivism"); *see also* 30(b)(6) Dep. at 69;7-25, 70;2-7.

The Commission does not consider positive institutional conduct when it initially sets a parolee's presumptive release date. *See* 28 C.F.R § 2.20 (post-incarceration rehabilitative conduct not a factor in guidelines); 30(b)(6) Dep. at 88;25, 89: 1-10 (the "two parts" that determine the guideline range are the salient factor score and "the severity of the violation."); *Id.* at 133;15-24 ("the salient factor score…estimates the degree of risk that the parole candidate will reengage in new conduct."); *Fletcher III*, 433 F.3d at 871 ("the current federal regulations[] [have a] singular focus on pre-incarceration factors."); Commission Desk Book at 7.2 (guidelines are founded on "actuarial predictions of recidivism," not "predictions based . . . on individual judgment or prison performance"). The timing of the designation of the presumptive release date precludes such consideration because the presumptive release date it set at the time of revocation,

generally before a parolee has served any meaningful period of incarceration as a sanction for the revocation conduct.  Moreover, the guidelines that dictate a parolee's presumptive release date already presume future good conduct.  28 C.F.R. § 2.20 (b) ("time ranges specified by the guidelines are established specifically for cases with good institutional adjustment and program progress.").  In other words, even if a parolee makes an effort to rehabilitate himself while incarcerated, the guidelines generally set forth the *earliest* date a parolee can be reparoled.  *See* August 14 and 17, 2006 Commission Notices of Action (ordering "no change" in Mr. Fletcher's presumptive release date and citing as its main reason its determination that Mr. Fletcher "ha[d] substantially maintained good institutional adjustment").

For a significant number of parolees, including Mr. Fletcher, the Commission's pre-set presumptive release date results in years of incarceration prior to reparole. Whereas 24 months was consistently the maximum interim period of reincarceration under the Board's system for consideration for reparole, 24 months is the very least the Commission would require a parolee to serve if his revocation conduct is characterized as moderately severe.  For example, a parolee with a new conviction for possession with intent to distribute ten grams of crack cocaine, rated "five" out of a possible "eight" would be required to serve 24 to 36 months even if he were accorded the very best parole prognosis based on his salient factor score.  *See* 28 C.F.R § 2.20.  And as either the Commission's severity rating of the revocation conduct increases or its assessment of the parolee's risk of recidivism worsens, the minimum amount of reincarceration time the Commission requires is far higher, possibly numbering in the hundreds of months.  *Id.* (any parolee with revocation conduct categorized as the most serious, regardless of his

parole prognosis, must receive a minimum range of 100 to 180 months imprisonment prior to his presumptive release date).

Finally, although the Commission's regulations provide for periodic hearings prior to the presumptive release date, at which point the Commission may consider "any significant developments or changes in the prisoner's status," 28 C.F.R. § 2.14(a), the presumptive release date that the Commission sets at the time of revocation is, as its name suggests, the presumptive date that the Commission will grant a parolee release to reparole.  At its periodic hearings, the Commission has some discretion to advance a presumptive parole date, but "only for superior program achievement" or "other clearly exceptional circumstances."  28 C.F.R. § 2.14(a)(2)(ii).  In practice, the Commission rarely exercises this power.  Jasper Clay Deposition, July 27, 2006 at 45:19-46:14, excerpts attached as Exhibit 21 (explaining that the presumptive release date is usually not modified at interim hearings, and describing that the purpose of an interim hearing is to make sure an inmate does not get lost in the system); 30(b)(6) Dep. at 62;21-24 (admitting that, in most cases, the interim hearing does not result in a change in the release date).  It is far more common for the Commission to "retard or rescind a presumptive parole date for reason of disciplinary infractions."  28 C.F.R. § 2.14(a)(2)(iii); *see also* 30(b)(6) Dep. at 77;3-25, 78;2-8 (stating that, in practice, rescission and retardation of presumptive release dates "happens fairly frequently").

In the rare case where the Commission determines that a parolee's presumptive release date should be advanced for superior program achievement, the "maximum reward is purposefully kept small."  28 C.F.R. § 2.60-01(a); *see also id*. at § 2.60(a) (allowing only "a limited advancement of a presumptive release date"); *id*. (setting

guidelines that, when applied, provide no more than 15% reductions in length of time a parolee has to serve prior to his presumptive release date).  Nor can an inmate obtain multiple smaller advancements in his presumptive release date that add up to a significant reduction in reincarceration time, because the guidelines for advancement of a presumptive release date limit "the total combined advancement."  *Id.* at 2.60(d) (noting that "advancements may be given at different times; however the limits set forth in the following schedule shall apply to the total combined advancement").

In short, the Commission's reparole policy and practice of setting presumptive release dates based on offense severity and salient factor scores at the time of revocation is a policy and practice "primarily concerned with punishment and recidivism," which does not account for evidence of post-incarceration rehabilitation when presumptive release dates are set, and thereafter, at best, only accords token weight to post-incarceration rehabilitative conduct.  *Fletcher III,* 433 F.3d at 878.

C.   **In "Practical Effect," The Retroactive Application Of The Commission's Reparole Policy To Mr. Fletcher Has Not Merely Created A "Significant Risk" Of Increased Punishment, He Has In Fact Been Forced To Serve Almost Seven Additional Years In Prison.**

To prevail on his Ex Post Facto claim, Mr. Fletcher need show only that the retroactive application of the Commission's reparole policy and practice created a "significant risk" that he would be held in prison longer than he would have been under the Board's reparole policy and practice.  *See Garner*, 529 U.S. at 255; *Fletcher III*, 433 F.3d at 877, 879; *see also Dyer v. Bowlen*, 465 F.3d 280, 288 (6th Cir. 2006) (lower court subjected habeas petitioner to a more exacting standard than established in *Morales* and *Garner* when it required him to prove that he actually received a more serious punishment).  Mr. Fletcher has sustained that burden because the application of the

Commission's harsher reparole regulations to him has not merely "diminished [the] likelihood that he will be reparoled," *Fletcher III*, 433 F.3d at 878, or created a "significant risk" that he will be subjected to a lengthier incarceration; it has, in fact caused him to serve almost seven years more in prison than he would have if the Commission had adhered to the rules and practices of the D.C. Board.

As documented beyond question above, *see* Point II.A. *supra*, it was the Board's reparole policy and practice to look exclusively to post-incarceration conduct to determine whether to grant reparole, and parolees who demonstrated sufficient rehabilitative conduct during a set-off period were invariably released.  By every account, Mr. Fletcher's institutional conduct during his 24-month set-off and at all times since has been exemplary; the Commission's own hearing examiner described it as "phenomenal." *See* May 5, 2004 Commission Interim Hearing Summary at 2; Mr. Fletcher's 1998-2000 institutional conduct.  Accordingly, there is simply no basis to dispute the conclusion that, under the Board's policy and practice, Mr. Fletcher would have been granted reparole in October 2000 at the conclusion of his Board-imposed set-off period.

Likewise, as documented above, there is simply no question that under the Commission's new reparole policy and practice Mr. Fletcher was not even eligible for reparole after successfully serving his Board-imposed set-off in 2000.  The Commission had to follow its guidelines to calculate his presumptive release date.  These guidelines took no account of his post-incarceration rehabilitative conduct and required Mr. Fletcher to serve a minimum of 120 months (ten years) in prison for his parole violation.  *See* pp. 9-10 *supra*.  Worse, the Commission ordered Mr. Fletcher to serve and additional 38 months for a total of 158 months imprisonment.  Subsequently, the Commission declined

to give Mr. Fletcher even the limited, full 24-month credit for his acknowledged "superior program performance," awarding him only a token six-month credit instead and advancing his presumptive release date to April 29, 2007.

In short, Mr. Fletcher went from a guaranteed grant of reparole in October 2000 under the Board's reparole policy and practice to a presumptive grant of reparole in April 2007. This more than satisfies the "significant risk of increased punishment" test of *Garner* and constitutes an Ex Post Facto violation.

## **CONCLUSION**

For the foregoing reasons, Mr. Fletcher respectfully requests that he be granted summary judgment on his Ex Post Facto claim and the following relief: (1) a Writ of Habeas Corpus ordering his release, and (2) a judgment in his favor in his suit against the defendants under §1983 and *Bivens*, and (3) an order directing the defendants to immediately reconsider Mr. Fletcher for reparole pursuant to the Board's reparole policy and practice and a directing that henceforth any reparole decisions on his 1980 paroleable conviction will be made pursuant to the Board's reparole policy and practice.

April 5, 2007                                    Respectfully submitted,


                                                 _____
                                                 Timothy O'Toole, D.C. Bar No. 469800
                                                 Catharine F. Easterly, D.C. Bar No. 484537
                                                 Rashida Ogletree, N.Y. Bar No. _____ [16]
                                                 Nina Chernoff, N.Y. Bar No. _____
                                                 Special Litigation Division
                                                 Public Defender Service

_____

[16] Ms. Ogletree's and Ms. Chernoff's memberships to the D.C. Bar are pending; they have entered an appearance in this case pursuant to LCvR 83.2(g).

633 Indiana Ave, NW
Washington D.C. 20004

Daniel E. Loeb, D.C. Bar No. 386098
Piper M. Hendricks, D.C. Bar No. 490587
FRIED FRANK HARRIS SHRIVER
& JACOBSON LLP
1001 Pennsylvania Ave., NW, Suite 800
Washington, D.C. 20004