# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

THADDEUS FLETCHER,                              :
    Plaintiff,                              :
                                 :
    v.                              :        Case No. 01-CV-0601 (JDB)
                                 :
U.S.. PAROLE COMMISSION, et al.,                :
    Defendants.                         :

THADDEUS FLETCHER,                              :
    Petitioner,                             :
                                 :
    v.                              :        Case No. 01-CV-2058 (JDB)
                                 :
EDWARD F. REILLY, JR., et al.,                  :
    Respondents.                        :

## PLAINTIFF'S/PETITIONER'S STATEMENT OF
## MATERIAL UNDISPUTED FACTS

Pursuant to Local Civil Rule 7(h), Plaintiff/Petitioner Thaddeus Fletcher ("Mr.

Fletcher") hereby submits his Statement of Material Undisputed Facts in support of his

claim that the United States Parole Commission (the "Commission")[1] violated his right

under the Ex Post Facto Clause of Article I of the United States Constitution ("Ex Post

Facto Clause") when it discarded the reparole policy and practice used by the D.C. Board

of Parole (the "Board"), and instead retroactively applied a new, harsher reparole policy

and practice to all D.C. Code offenders, including Mr. Fletcher, thereby subjecting him to

a significant risk of increased punishment.  All material undisputed facts recited herein

are equally relevant to Mr. Fletcher's Motion for Summary Judgment on his Petition for a

Writ of Habeas Corpus, *Fletcher v. Reilly*, 01-CV-2058, and his Motion for Summary

---

[1] At all times referred to herein, the Commission includes the individual members of the
Commission sued in their official capacity.

1

Judgment in his suit under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Federal Narcotics Officers*, 403 U.S. 388 (1971), *Fletcher v. United States Parole Comm'n*, et al., 01-CV-0601.

### The Law Pertaining to Ex Post Facto Claims by Parolees

1.      The Ex Post Facto Clause prohibits retroactive increases in punishment for a crime after its commission.  U.S. Const. art. I, § 9, cl. 3.

2.      The strictures of the Ex Post Facto Clause apply to the Commission. *Fletcher v. Reilly*, 433 F.3d 867 (D.C. Cir. 2006) ("*Fletcher III*"); *Fletcher v. District of Columbia*, 391 F.3d 250 (D.C. Cir. 2004) ("*Fletcher II*").

3.      Under the Supreme Court's decision in *Garner v. Jones,* a retroactively applied parole or reparole regulation or guideline violates the Ex Post Facto Clause if it "creates a significant risk of prolonging [an inmate's] incarceration."  529 U.S. 244, 251 (2000).

4.      Under *Garner*, the existence of discretion in a parole regime does not foreclose an Ex Post Facto challenge; rather, "the controlling inquiry under *Garner* is how the Board or the Commission exercises discretion in practice."  *Fletcher III*, 433 F.3d at 876.

5.      The United States Court of Appeals for the District of Columbia Circuit (the "Circuit") held in *Fletcher III*, that Mr. Fletcher must prevail on his Ex Post Facto claim if "a searching comparison of the [Board's] old and the [Commission's] new reparole regimes" reveals "the U.S. Parole Commission's application of the federal reparole regulations at Fletcher's reparole hearing in 2000 created a significant risk that

he will be subjected to a lengthier incarceration than he would have been if the

Commission had adhered to the rules and practices of the D.C. Board."  433 F.3d at 879.

### The Board's Reparole Policy and Practice

6.        From 1932 to 2000, the Board had final authority for all reparole decisions

for District of Columbia Code ("D.C. Code") offenders incarcerated in the District's

facilities.  *See Cosgrove v. Thornburgh*, 703 F. Supp. 995, 998-999 (D.D.C. 1988).

7.        Rehabilitation and treatment were always critical elements of the Board's

mission.  *See* Title 9, D.C.R.R. (1972), Sec. 105.1 (e) (directing the Board to consider

"institutional experience, including information as to the offender's overall and general

adjustment, his ability to handle interpersonal relationships, his behavior responses, his

planning for himself, setting meaningful goals in areas of academic schooling, vocational

education or training, involvements in self-improvement activity and therapy and his

utilization of available resources of recognized problems," and particularly highlight

"[a]chievements in accomplishing goals and efforts put forth in any involvements in

established programs to overcome problems"); *Cosgrove*, 703 F. Supp. at 1003 (holding

that the Board's 1985 regulations "emphasize early release of an offender who responds

favorably to rehabilitative efforts"); D.C. Mun. Regs. Tit. 28 §§ 200.1(a), 204.18(h)-(i),

204.21, 205.1, 207.1 and Appendix 2-1 and 2-2 (1987) (containing multiple references to

the relationship between positive institutional performance and obtaining release on

parole); *Fletcher III*, 433 F.3d at 871 (holding that the Board's 1987 regulations "plainly

evidence a rehabilitative focus in making parole and reparole determinations"); *see also*

*Davis v. Henderson*, 652 A.2d 634, 636 (D.C. 1995) (noting that the regulations

promulgated by the Board in 1987 merely formalized the manner in which the Board

3

already exercised its discretion); Declaration of Gladys Mack, dated January 31, 2007 at

¶ 5-6, attached as Exhibit 6 (describing how, in 1987, the Board officially started

memorializing pre-existing policies as formal written policies); D.C. Board of Parole

Policy Guideline on "Rehabilitation and Treatment of Offenders," adopted May 8, 1995,

attached as Exhibit 5 (reaffirming "that [the] interests [of both the community and the

offender] are best served by incorporating the goals of rehabilitation and treatment of

offenders in its decision[]making;" and that "[r]ehabilitation and treatment-oriented

programs and services . . . in prison . . . are key stepping stones toward achieving [the]

goal" of enabling a D.C. Code offender "to return to and remain in the community").

8.      At least since 1975, the Board's policy and practice was to employ a "two-

step process" in making a decision to revoke and subsequently release a parolee to

reparole.  Declaration of Rashida Ogletree, dated April 2, 2007 at ¶ 20, attached as

Exhibit 1 [hereinafter "Ogletree Decl."].  *See* Chart of D.C. Board of Parole Adult

Reparole Decisions Where Parolee Was Directed to Serve Time in Jail/Prison After

Revocation, attached as Exhibit 2 [hereinafter "Chart of the Board's Reparole

Decisions"].

9.      Pursuant to this "usual policy," the Board "penalized [the parolee] at the

time of the revocation hearing for all past indiscretions, leaving over the matter to be

viewed between the revocation and the next hearing to be his adjustment during the

interim period."  D.C. Board of Parole Rehearing Summary Transcript for parolee

[REDACTED] at 2, attached as Exhibit 8 [hereinafter "[REDACTED] Rehearing

Summary"].  *See also* Chart of the Board's Reparole Decisions at #10.

10.     First, "the Board held a revocation hearing to determine whether revocation was required and, if so, then whether reincarceration and service of a set-off period was warranted or whether the parolee should be immediately released."  Ogletree Decl. at ¶ 21.

      a.  The Board's guidelines set the standard set-off periods based on the nature of the revocation conduct and the amount of time remaining on the parolee's underlying conviction.  *See* D.C. Mun. Regs. tit. 28, §  104.8-104.9; D.C. Board of Parole "Setoff Guideline Recommendations" table, attached as Exhibit 9 [hereinafter "Set-off Guideline Table"]; *see also* Ogletree Decl. at ¶ 21(a).

      b.  Though, under the Board's guidelines, the maximum set-off period for a revocation violation was 24 months, the Board was permitted to go outside its guidelines in exceptional cases.  *See* D.C. Mun. Regs. tit. 28, §§ 104.8-104.11; Set-off Guideline Table; *see also* Ogletree Decl. at ¶ 21(a).

      c.  When the Board ordered a parolee to serve a set-off period, it "routinely prescribed special instructions to be completed during the set-off period, often including specific programming related to the underlying paroleable conviction or revocation conduct."  Ogletree Decl. at ¶ 21(b).  *See* D.C. Board of Parole "Special Instructions for Next Consideration" code list, attached as Exhibit 10.

11.     In cases where the Board revoked a parolee's parole and directed him to serve a set-off period, the Board reassessed whether or not to release him to reparole at

the end of the set-off period.  *See* Chart of the Board's Reparole Decisions; Ogletree
Decl. at ¶ 22.

      12.      When deciding whether to grant reparole at the end of the set-off period,
the Board focused exclusively on post-incarceration rehabilitative conduct during the
preceding set-off period.  Ogletree Decl. at ¶ 22; August 21, 1992 memo from the U.S.
Parole Commission's General Counsel to the Commission's Acting Chairman at 6,
attached as Exhibit 11 [hereinafter "1992 Commission Memo"] ("[I]t [was] the practice
of the D.C. Board to grant reparole at the rehearing if the [parole] violator has a good
institutional record."); September 19, 1989 "Pre-hearing Assessment" conducted by the
U.S. Parole Commission for D.C. parolee [REDACTED], attached as Exhibit 13
[hereinafter "[REDACTED] Pre-Hearing Assessment] ("The D.C. Rules indicate that it is
the current practice of the D.C. Board to grant parole at the Re-Hearing if the [parole]
violator has a good institutional record and has participated in institutional programs.").

      13.      The Board weighed the following factors favorably at reparole hearings:

    a.   "[T]he presence of positive conduct, usually in the form of efforts to take
        advantage of educational and self-help programs."  Ogletree Decl. at ¶ 26(a).
        *See*, *e.g.*, Chart of the Board's Reparole Decisions at #83 ([REDACTED]:
        grant of reparole because he "completed [a substance abuse program] . . .
        [and] 12 weeks [Narcotics Anonymous]; he also completed [Communication
        and Conflict Resolution Program]");

    b.  Efforts to comply with the Board's special instructions during the set-off
        period.  Ogletree Decl. at ¶ 25.  *See*, *e.g.*, Chart of the Board's Reparole
        Decisions at #310 ([REDACTED]:  granting reparole because he "made a

good effort towards self-improvement . . . [and] has made every attempt to follow the Board of Parole's special instructions");

c. "[T]he absence of significant negative conduct, including serious disciplinary infractions and positive drug tests." Ogletree Decl. at ¶ 26(a). *See, e.g.*, Chart of the Board's Reparole Decisions at #46 ([REDACTED]: granting reparole because "[h]e has not been a management problem or behavior problem although he did receive two disciplinary reports . . . .");

d. "[T]he ability to take advantage of further rehabilitation opportunities out in the community, such as out-patient drug treatment programs." Ogletree Decl. at ¶ 26(a). *See, e.g.*, Chart of the Board's Reparole Decisions at #15 ([REDACTED]: granting reparole because his "[substance abuse] treatment needs could be best addressed through participation in a short-term (28 day) residential treatment program"); and

e. "[T]he desire for self-improvement." Ogletree Decl. at ¶ 26(a). *See, e.g.*, Chart of the Board's Reparole Decisions at #203 ([REDACTED]: "[H]e appears to be sincere about his return to the community"); *id.* at #89 ([REDACTED]: "[W]ants to turn life around").

14.     The Board weighed the following factors negatively at reparole hearings:

a. "[The] parolee's failure to program." Ogletree Decl. at ¶ 27(a). *See, e.g.*, Chart of the Board's Reparole Decisions at #66 ([REDACTED]: denying reparole because "[he] has not been involved in any programs" and "offers no excuse for his non-participation in programs"); *see also Brandon v. District of Columbia Bd. of Parole*, 823 F.2d 644, 645 (D.C. Cir. 1987) (observing that

the Board "denied reparole because of [subject's] failure to involve himself
fully in institutional academic and vocational programs");

b.   "[M]ultiple or serious disciplinary reports."  Ogletree Decl. at ¶ 27(a). *See,
e.g.*, Chart of the Board's Reparole Decisions at #62 ([REDACTED]:  denying
reparole because "[he] involved himself with an altercation with a correctional
officer and assaulted the officer");

c.   "[N]ew criminal conduct."  Ogletree Decl. at ¶ 27(a).  *See, e.g.*, Chart of the
Board's Reparole Decisions at #277 ([REDACTED]:  denying reparole
because "subject arrested for assault w/ intent to rape while housed at
[halfway house]");

d.   "[P]ositive drug test results."  Ogletree Decl. at ¶ 27(a).  *See, e.g.*, Chart of the
Board's Reparole Decisions at #87 ([REDACTED]:  denying reparole because
"[he] returned dirty urine . . . Positive with opiates and cocaine"); and

e.   The "general refusal to change attitude."  Ogletree Decl. at ¶ 27(a).  *See, e.g.*,
Chart of the Board's Reparole Decisions at #284 ([REDACTED]:  denying
reparole because of "very unsatisfactory" institutional conduct including five
disciplinary reports; parolee "has not attempted true rehabilitation at this
point"); *id*. at #66 ([REDACTED]:  denying reparole because "[he] has not
done anything of a positive nature to bring about any change in his life").

15.     At reparole hearings, the Board gave no weight to the underlying criminal
conviction or revocation conduct.  Ogletree Decl. at ¶ 30.  *See also* [REDACTED]
Rehearing Summary (noting his failure to succeed on parole, but still granting reparole
because of positive institutional conduct); Chart of the Board's Reparole Decisions at

#10; *cf.* 1992 Commission Memo at 6 ("[I]t [was] the practice of the D.C. Board to grant reparole at the rehearing if the [parole] violator has a good institutional record."); [REDACTED] Pre-hearing Assessment ("The D.C. Rules indicate that it is the current practice of the D.C. Board to grant parole at the Re-Hearing if the [parole] violator has a good institutional record and has participated in institutional programs.").

16.     The Board granted parole at the conclusion of a parolee's first set-off period if the parolee had demonstrated sufficient rehabilitative conduct during his interim period of reincarceration.  1992 Commission Memo at 6 ("[I]t [was] the practice of the D.C. Board to grant reparole at the rehearing if the [parole] violator has a good institutional record."); [REDACTED] Pre-hearing Assessment ("The D.C. Rules indicate that it is the current practice of the D.C. Board to grant parole at the Re-Hearing if the [parole] violator has a good institutional record and has participated in institutional programs.").  *See also* Chart of the Board's Reparole Decisions at ## 1-8, 10-18, 21-24, 26-32, 35, 37-41, 43-46, 48-49, 51-55, 57-61, 63-65, 67, 69-80, 82-84, 86, 88, 90-92, 94-97, 99-113, 115-130, 132-149, 151-156, 158-162, 164-167,169, 171-174, 178, 180-192, 194-208, 211-213, 215-216, 220-222, 224, 226-230, 232-237, 239-252, 255-260, 262, 264-269, 271-272, 274, 276, 278, 280-282, 285-313, 315-321, 323-340 (cases where the Board granted reparole at the conclusion of the first set-off period); Ogletree Decl. at ¶ 26 (noting that the Board granted reparole in 100 percent of cases where a parolee had sufficient good conduct or did not have significant bad conduct); *id.* at ¶23 (describing how, in many cases, the Board employed an automatic presumption of release unless the presumption was rebutted by bad conduct).

17.     The only basis upon which the Board denied reparole at the conclusion of the first set-off period was if a parolee had demonstrated significant negative conduct during that interim period of reincarceration.  *See* Chart of the Board's Reparole Decisions at ## 9, 19-20, 25, 33-34, 36, 42, 47, 50, 56, 62, 66, 68, 81, 85, 87, 89, 93, 98, 114, 131, 150, 157, 163, 168, 170, 175-177, 179, 193, 209-210, 214, 217-219, 223, 225, 231, 238, 253-254, 261, 263, 270, 273, 275, 277, 279, 283-284, 314, 322, 341 (cases where the Board denied reparole at the conclusion of the first set-off period); Ogletree Decl. at ¶ 27 (noting that, in 100 percent of the Board reparole decisions reviewed, "the *sole* basis for denying reparole at the first and any subsequent reparole consideration date was the absence of some indication that the parolee had been rehabilitated"); D.C. Board of Parole "Reason For Denial - Parole Violation Hearing" code sheet, attached as Exhibit 12 (listing the following reasons for denying reparole:  "repeated or extremely serious negative institutional behavior"; "made little or no effort toward rehabilitation"; "needs programs and/or rehabilitative services to minimize risk to the community"; and "failed to comply with special instructions"); D.C. Board of Parole Parole Determination Record for parolee [REDACTED]at 5, attached as Exhibit 14 (rejecting the institution's recommendation to deny reparole because the recommendation "is based on the same information on which his parole was revoked").

18.     The Board never denied reparole after the service of a set-off period based on a parolee's revocation conduct.  *See* Chart of the Board's Reparole Decisions; Ogletree Decl. at ¶29.

19.     The Board never denied reparole after the service of a set-off period based

on a parolee's criminal history.  *See* Chart of the Board's Reparole Decisions; Ogletree

Decl. at ¶29.

20.     In all cases where a parolee was denied reparole at the conclusion of his

first set-off period, he was granted reparole only after he demonstrated sufficient

rehabilitative conduct during a subsequent set-off period.  *See* Chart of the Board's

Reparole Decisions at ## 9, 19-20, 25, 33-34, 36, 42, 47, 50, 56, 62, 66, 68, 81, 85, 87,

89, 93, 98, 114, 131, 150, 157, 163, 168, 170, 175-177, 179, 193, 209-210, 214, 217-219,

223, 225, 231, 238, 253-254, 261, 263, 270, 273, 275, 277, 279, 283-284, 314, 322, 341;

Ogletree Decl. at ¶ 27(c).

21.     The reparole policy and practice of the Board in cases where a parolee was

revoked and reincarcerated not only "account[ed] for evidence of post-incarceration

rehabilitation in reparole determinations," *Fletcher III*, 433 F.3d at 878, it considered

such evidence determinative of reparole decisions.  *See supra* ¶¶ 12-20.

22.     The Commission's documents confirm that rehabilitative conduct during

the set-off period was determinative of the Board's reparole decision at the end of the set-

off period.  *See* 1992 Commission Memo at 6 ("[I]t [was] the practice of the D.C. Board

to grant reparole at the rehearing if the [parole] violator has a good institutional record.").

23.     The Commission's documents confirm that it followed the Board's

reparole policy and practice of granting reparole to those D.C. Code offenders who had

demonstrated sufficient rehabilitative conduct during the preceding set-off period.  *See*,

*e.g.*, Summary of June 25, 1991 Review Hearing conducted by the U.S. Parole

Commission for D.C. parolee [REDACTED] at 1, attached as Exhibit 15 (noting that the

"subject's institutional adjustment during this new violator period has been excellent . . . [and] [h]e maintains clear conduct," and directing release pursuant to the Board's "guidelines"); Summary of August 11, 1992 Review Hearing conducted by the U.S. Parole Commission for D.C. parolee [REDACTED] at 3, attached as Exhibit 16 (granting reparole within the Board's guidelines because "the subject has maintained clear conduct and is involved in the institution substance abuse program . . . [and] receives good work reports"); *see also* Summary of April 13, 1993 Pre-Review Revocation Hearing conducted by the U.S. Parole Commission for D.C. parolee [REDACTED] at 2, attached as Exhibit 17 (noting that Commission's salient factor score would not be used to calculate the parolee's reparole date: "This is strictly a DC code sentence . . . . The SFS does not apply to DC cases.").

## The Commission's Reparole Policy and Practice

24.     The Commission's "guiding principle is to apply the least restrictive sanction that is consistent with public safety and the appropriate punishment of the offense." Report of the United States Parole Commission (October 1, 2001-September 30, 2003) at vi, attached as Exhibit 18 [hereinafter "Commission Report"].

25.     The Commission's mission does not encompass rehabilitation of parolees. *See* Commission Report at vi; *see also Cosgrove*, 703 F. Supp. at 1003-1004 (finding that the federal guidelines for an initial parole decision turns on "only two pre-incarceration factors, thus de-emphasizing any rehabilitative results from incarceration" and holding that, for this reason, the federal parole system is "substantially dissimilar" from the Board's system).

26.     Pursuant to the National Capital Revitalization and Self-Government Improvement Act of 1997 (the "Revitalization Act"), Congress transferred authority over "any imprisoned felon who is eligible for parole or reparole under the [D.C.] Code" from the Board to the Commission.  Pub.L. No. 105-33 § 11231, 111 Stat. at 745 (codified at D.C. Code §§ 24-101 *et seq*. (2001 & Supp. 2005)).

27.     The Commission promulgated new federal regulations to replace the Board's parole and reparole regulations covering D.C. Code offenders.  *See* Paroling, Recommitting, and Supervising Federal Prisoners:  Prisoners Serving Sentences Under the District of Columbia Code, 65 Fed. Reg. 45,885 (proposed July 26, 2000) (codified at 28 C.F.R. §§ 2.70-2.107 (2001)) [hereinafter "Final Parole Regulations"].

28.     The Commission's final rules took effect August 5, 2000.  *Id* at 45,885; *Fletcher III*, 433 F.3d at 872.

29.     The Commission decided to apply its new reparole policy and practice retroactively – that is, it decided to apply the new policy and practice to inmates whose offenses had been committed before August 5, 2000.  Final Parole Regulations, 65 Fed. Reg. at 45,887.  *See also* Paroling, Recommitting, and Supervising Federal Prisoners: Prisoners Serving Sentences Under the District of Columbia Code, 66 Fed. Reg. 37,136 (July 17, 2001); *Fletcher III*, 433 F.3d at 872.

30.     The Commission's reparole policy and practice is dictated by the federal reparole regulations.  *Fletcher III*, 433 F.3d at 869 (noting that the Commission's final rules for D.C. Code offenders "presum[ed] that reparole determinations would be based on the federal reparole regulations"); *see also* Final Parole Regulations, 65 Fed. Reg. at 45,894 (codified at 28 C.F.R. § 2.81 (2001) and referring to 28 C.F.R. § 2.21).

31.     Pursuant to its reparole policy and practice, the Commission sets a "presumptive release date" at the time of revocation.  28 C.F.R. § 2.81(a) (stating that a decision to grant or deny reparole "shall be made by reference" to the reparole guidelines set forth in 28 C.F.R. § 2.21 and that "the Commission shall establish a presumptive or effective release date pursuant to §2.12(b)").  *See also* Deposition of the U.S. Parole Commission's 30(b)(6) witness, July 21, 2006 at 28:22-29:23, excerpts attached as Exhibit 19 [hereinafter "30(b)(6) Dep."] (explaining that the Commission establishes a D.C. parolee's presumptive or effective release date at the rehearing following a parole revocation by the Board).

32.     The presumptive release date is, at least initially, solely a function of a numerical calculation whereby the parolee's offense severity score is aggregated with his salient factor score.  *See* 28 C.F.R. § 2.20 (parole guidelines); *id*. at § 2.21 (reparole consideration guidelines based on guidelines set forth in 28 C.F.R. § 2.20); *see also Fletcher III*, 433 F.3d at 872 (observing that the reparole guidelines "only consider offense and offender characteristics"); *id*. at 871 (noting "the current federal regulations' singular focus on pre-incarceration factors").

a.   The salient factor score is supposed to determine the likelihood that an individual offender will recidivate based on an actuarial assessment of various factors related to a parolee's criminal history.  *See* U.S. Parole Commission Desk Book of Training and Reference Materials, dated June 1, 1995 at 7.2, attached as Exhibit 20 (explaining that guidelines are founded on "actuarial predictions of recidivism," not "predictions based entirely on individual judgment or prison performance" and that the Commission's guidelines are a

14

rejection of "parole decision-making from the 1930's to 1960's [which] relied heavily . . . upon prisoner's behavior in prison and response to correctional training programs").

b.   The salient factor score assigns point values to an offender for "prior convictions/adjudications," "prior commitment(s) of more than thirty days," "age at time of current offense/prior commitments," "recent commitment free period," "probation/parole/confinement/escape status violator this time," and "older offenders."  28 C.F.R. § 2.20.

c.   The Commission routinely relies on information documented in the Board's records to establish the "salient factor score" for D.C. inmates who currently have hearings before the Commission.  *See, e.g.*, U.S. Parole Commission Pre-hearing Assessment for Thaddeus Fletcher, dated September 18, 2000, attached as Exhibit 32 (using information from the Board's records to determine Mr. Fletcher's salient factor score).

33.   Under the Commission's reparole guidelines, the more serious his revocation offenses and criminal histories are characterized, the more time a parolee must serve before his presumptive release date.  28 C.F.R. § 2.20.

a.   Any parolee with revocation conduct categorized as five (for example, possession with the intent to distribute 10-100 grams of crack cocaine) and a very good parole prognosis (for example, a parolee with no other convictions) must receive 24 to 36 months of imprisonment prior to his presumptive release date.  *Id.*

b.  Any parolee with revocation conduct categorized as more serious (six to seven) or revocation conduct categorized as five but with a less favorable parole prognosis must receive 36-148 months of imprisonment prior to his presumptive release date.  *Id.*

c.  Any parolee with revocation conduct categorized as the most serious (eight), regardless of his parole prognosis, must receive a *minimum* range of 100 to 180 months of imprisonment prior to his presumptive release date.  *Id.*

34.     In calculating the time a parolee must serve prior to his presumptive release date, the Commission gives credit for time served on revocation conduct that resulted in a new criminal conviction and sentence.  28 C.F.R. § 2.21(c).

35.     Under the Commission's guidelines for initial calculations of its presumptive release date, no weight is given to a parolee's post-incarceration rehabilitative conduct because the guidelines already presume future good conduct.  *See* 28 C.F.R § 2.20 (post-incarceration rehabilitative conduct not a factor in guidelines); *id.* at § 2.20(b) ("[T]ime ranges specified by the guidelines are established specifically for cases with good institutional adjustment and program progress."); 30(b)(6) Dep. at 88:25-89:10 (admitting that the only two factors that determine the guideline range are the salient factor score and the offense severity score); *id.* at 134:15-24 (explaining that programming is not a factor in determining the salient factor score); *Fletcher III*, 433 F.3d at 871 ("[T]he current federal regulations' [have a] singular focus on pre-incarceration factors.").

36.     No weight can be given to post-incarceration rehabilitative conduct in calculating the presumptive release date, at least when it is first set, because the

presumptive release date is first set at revocation.  28 C.F.R. § 2.21 (reparole

consideration guidelines based on guidelines set forth in 28 C.F.R. § 2.20).

37.     The Commission's guidelines provide for biennial interim hearings held

prior to the presumptive release date where the Commission considers "any significant

developments or changes in the prisoner's status."  28 C.F.R. § 2.14.

38.     At an interim hearing, the Commission may "[r]etard or rescind a

presumptive parole date for reason of disciplinary infractions."  28 C.F.R. §

2.14(a)(2)(iii).

39.     At an interim hearing, the Commission also has the discretion to advance a

presumptive release date, but "only for superior program achievement" or "other clearly

exceptional circumstances."  28 C.F.R. § 2.14(a)(2).

40.     In practice, presumptive release dates are rarely advanced.  Jasper Clay

Deposition, July 27, 2006 at 45:19-46:14, excerpts attached as Exhibit 21 (explaining that

the presumptive release date is usually not modified at interim hearings, and describing

that the purpose of an interim hearing is to make sure an inmate does not get lost in the

system); 30(b)(6) Dep.) at 62:21-24 (admitting that, in most cases, the interim hearing

does not result in a change in the release date); *id.* at 77:378:8 (explaining that, under the

federal guidelines, a presumptive release date can be rescinded or retarded based on

misconduct within the institution, and stating that, in practice, rescission and retardation

of presumptive release dates "happens fairly frequently").

41.     Where presumptive release dates are advanced for superior program

achievement, the "maximum reward is purposefully kept small."  28 C.F.R. § 2.60-01(a).

*See also id.* at § 2.60(a) (allowing only "a limited advancement of a presumptive release date").

 a. Under the Commission's guidelines, the longer that a parolee has to serve before his presumptive release date, the greater the superior program achievement reduction he can receive.  28 C.F.R. § at 2.60(e).

  i. A parolee who has 49-54 months to serve prior to his presumptive release date may obtain a reduction of up to 6 months.  *Id*.

  ii. A parolee who has 85-90 months to serve prior to his presumptive release date may obtain a reduction of up to 12 months.  *Id*.

  iii. A parolee who has more than 96 months to serve prior to his presumptive release date may obtain a reduction of 13 months plus an additional month for every 6 months he has to serve in excess of 96 months.  *Id.*

 b. Under the Commission's guidelines, the superior program achievement reduction can never exceed 15 percent of the time a parolee must serve prior to a presumptive release date.  *See id*.

 c. Inmates whose program achievement qualifies as superior may also receive partial advancements of their presumptive release dates.  *Id*. at § 2.60(d).  *See, e.g.*, U.S. Parole Commission Notices of Action for Thaddeus Fletcher, dated June 5, 2004 and March 1, 2005, attached as Exhibit 38 [hereinafter "June 5, 2004 and March 1, 2005 Commission Notices of Action"] (confirming grant of six month reduction of Mr. Fletcher's Total Guideline Range for superior program achievement); 30(b)(6) Dep. at 159:16-20 (admitting that the

Commission did not "doubt[] [Mr. Fletcher's programming] was superior"
even though it refused to accord Mr. Fletcher the full 24-month credit for
superior program achievement).

d.   The Commission's guidelines limit the aggregate reduction that a parolee may
obtain in the time he serves prior to his presumptive release date.  28 C.F.R. §
2.60(d) (noting that "advancements may be given at different times; however
the limits set forth in the following schedule shall apply to the total combined
advancement").

42.      The Commission's reparole policy and practice is "primarily concerned
with punishment and recidivism."  *Fletcher III*, 433 F.3d at 870.

43.      The Commission's reparole policy and practice "do[es] not factor
evidence of post-incarceration rehabilitation into reparole determinations."  *Fletcher III*,
433 F.3d at 870.

**Mr. Fletcher's Reparole Experience to Date**

44.      In 1980, Mr. Fletcher was convicted of rape in the Superior Court for the
District of Columbia for an offense committed on August 13, 1978.  *See* Superior Court
for the District of Columbia Judgment and Commitment Order for Thaddeus Fletcher,
attached as Exhibit 22 [hereinafter "Fletcher Commitment Order"]; District of Columbia
Department of Corrections Face Sheet for Thaddeus Fletcher, attached as Exhibit 23
[hereinafter "Fletcher Face Sheet"]; *Fletcher III*, 433 F.3d at 872.

45.      Mr. Fletcher was sentenced to 12 to 36 years of imprisonment.  *See*
Fletcher Commitment Order; Fletcher Face Sheet; *Fletcher III*, 433 F.3d at 872.

46.      In 1990, Mr. Fletcher was paroled by the Board.  *See* D.C. Board of Parole Certificate of Parole for Thaddeus Fletcher, dated October 23, 1990, attached as Exhibit 24; *Fletcher III*, 433 F.3d at 872.

47.      In 1995, Mr. Fletcher was convicted in Maryland of the offense of Use of a Handgun and Assault with Intent to Kill.  *See* Circuit Court for Prince George's County, Maryland Commitment Record for Thaddeus Fletcher, dated February 28, 1995, attached as Exhibit 25.

48.      Mr. Fletcher was sentenced to ten years of imprisonment for his Maryland offense.  *See id.*

49.      Mr. Fletcher's Maryland sentence was subsequently reduced to five years of imprisonment.  *See* Circuit Court for Prince George's County, Maryland Order of Court for Thaddeus Fletcher, dated January 27, 1997, attached as Exhibit 27.

50.      On August 29, 1998, after serving 48 months in prison, Mr. Fletcher completed his Maryland sentence and was released from Maryland state custody to the custody of the Board.  *See* D.C. Board of Parole Revocation Hearing Record for Thaddeus Fletcher, dated October 6, 1998 at 1, attached as Exhibit 28 [hereinafter "October 6, 1998 Revocation Hearing Record"].

51.      In October 1998, the Board revoked Mr. Fletcher's parole on his 1980 conviction based on the conduct underlying his already-completed Maryland sentence and based on technical violations of parole.  *See* D.C. Board of Parole Notice of Board Order for Thaddeus Fletcher, dated October 27, 1998, attached as Exhibit 29 [hereinafter "October 27, 1998 Board Order"]; *Fletcher III*, 433 F.3d at 872; October 6, 1998 Revocation Hearing Record at 5-8.

52.     The Board determined that Mr. Fletcher was eligible for reparole, but only after serving a 24-month set-off period in prison.  *See* October 27, 1998 Board Order; *Fletcher III*, 433 F.3d at 872.

53.     Mr. Fletcher's 24-month Board-ordered set-off period was within the Board's guidelines for a parolee who had been charged or convicted of a felony while on parole for a sentence with five or more years remaining.  *See* D.C. Mun. Regs. tit. 28 § 104.8-104.9; Set-off Guideline Table.

54.     The Board directed Mr. Fletcher to take advantage of the available self-improvement opportunities at the prison facility during this 24-month set-off period.  *See* October 27, 1998 Board Order (instructing Mr. Fletcher to "program").

55.     Mr. Fletcher did not incur a single disciplinary report while serving his 24-month set-off period.  *See* U.S. Parole Commission D.C. Revocation Rehearing Hearing Summary for Thaddeus Fletcher, dated November 6, 2000 at 3, attached as Exhibit 34 [hereinafter "November 6, 2000 Commission Rehearing Summary"].

56.     The "Board members recognized that it was very difficult to serve time in prison and not receive a single infraction."  Declaration of Howard Croft, dated November 21, 2006 at §14, attached as Exhibit 7.

57.     In May 2000, Mr. Fletcher earned a Bachelor of Arts degree in Urban Studies from the University of the District of Columbia.  *See* Documentation of Thaddeus Fletcher's 1998-2000 institutional accomplishments, attached as Exhibit 30 [hereinafter "Mr. Fletcher's 1998-2000 Institutional Accomplishments"].

58.     Between October 1998 and September 2000, Mr. Fletcher acquired certificates for the following rehabilitative programming:

21

a.   the completion of Life Skills training, *id.*;

b.   all three levels of the Alternative to Violence Project Nonviolent Conflict Resolution Program, *id.*;

c.   all five levels of the D.C. Department of Correction's anger management equivalent, "Communication and Conflict Resolution Program," including the trainer's course, *id.*;

d.   the Employment Techniques and Awareness Preparation Program, *id.*;

e.   the Life Skills Wholistic Man class, *id.*;

f.   HIV/AIDS education training, *id.*;

g.   Multiple Narcotics Anonymous and Alcoholics Anonymous courses, *id.*; and

h.   Three correspondence Bible study courses, *id.*

59.      Between October 1998 and November 2000, Mr. Fletcher was employed on a work detail.

a.   In May 1999, he began a work detail as a clerk in the Metro shop.  Mr. Fletcher's 1998-2000 Institutional Accomplishments.

b.   By November 2000, he was promoted to Assistant to the Squad Leader and Fabric Cutter.  *Id*.

c.   Mr. Fletcher received a Certificate of Performance for work performed at the Industries Division.  *Id*.

d.   One of his primary supervisors described Mr. Fletcher as "very conscientious . . . working hard in all of his duties and assignments."  His supervisor remarked that "over the years, [he] saw . . . how [Mr. Fletcher] has matured both in his work ethics and personal character" becoming "an asset to the

squad."  November 3, 2000 Memorandum from Danny Minter, General

Foreman of the Metro Shop, regarding Thaddeus Fletcher, attached as Exhibit

31.

60.     Mr. Fletcher also wrote poetry between October 1998 and September

2000, and received the Editor's Choice Award for Outstanding Achievement in Poetry in

1999.  Mr. Fletcher's 1998-2000 Institutional Accomplishments.

61.     When Mr. Fletcher completed his 24-month set-off period in October

2000, the Commission had paroling authority over all D.C. Code offenders.  *See*

Revitalization Act, Pub. L. No. 105-33 § 11231, 111 Stat. at 745 (codified at D.C. Code

§§ 24-101 *et seq*. (2001 & Supp.2005)).

62.     The Commission did not apply the Board's reparole policy and practice to

Mr. Fletcher at the conclusion of his set-off period in October 2000.

63.     The Commission retroactively applied its reparole regulations to Mr.

Fletcher at the conclusion of his set-off period in October 2000.

64.     The Commission did not grant Mr. Fletcher reparole at the conclusion of

his set-off period in October 2000.

65.     The Commission held a hearing in Mr. Fletcher's case in November 2000.

*See* November 6, 2000 Commission Rehearing Summary; *Fletcher III*, 433 F.3d at 873.

66.     At the November 2000 hearing, instead of applying the Board's reparole

policy and practice, the Commission set Mr. Fletcher's presumptive release date based on

its retroactively applied reparole guidelines.  *Fletcher III*, 433 F.3d at 873.

67.     The Commission's guidelines considered only the severity Mr. Fletcher's

offense (which was calculated according to its guidelines as an eight) and his salient

factor score (which was calculated according to its guidelines as a five).  *See* U.S. Parole

Commission Notice of Action for Thaddeus Fletcher, dated December 12, 2000, attached

as Exhibit 33 [hereinafter "December 12, 2000 Commission Notice of Action"]; *Fletcher*

*III*, 433 F.3d at 873.

68.     The Commission's offense severity category and salient factor score did

not take into account the absence of any bad conduct in Mr. Fletcher's record or his self-

improvement efforts through programming, work, and pursuit of higher education during

his 24-month Board-imposed set-off period.  *Fletcher III*, 433 F.3d at 873.

69.     Based on the numbers calculated for Mr. Fletcher, the Commission was

required to impose a minimum of 180 months of reincarceration.  *See* 28 C.F.R. § 2.20.

70.     In Mr. Fletcher's case, the Commission opted to exceed the 180-month

minimum by 48 months, and set a presumptive release date of October 29, 2010.  *See*

December 12, 2000 Commission Notice of Action; *Fletcher III*, 433 F.3d at 873.

71.     In 2002, the Commission acknowledged that it had miscalculated Mr.

Fletcher's salient factor score.  *See* U.S. Parole Commission Notice of Action for

Thaddeus Fletcher, dated August 14, 2002, attached as Exhibit 35 [hereinafter "August

14, 2002 Commission Notice of Action"]; *Fletcher III*, 433 F.3d at 874.

72.     With his new, recalculated score of 6, Mr. Fletcher's parole prognosis

improved from "fair" to "good."  *See* August 14, 2002 Commission Notice of Action.

73.     Even with this improvement, the Commission was still required to direct

Mr. Fletcher to serve a minimum of 120 months of reincarceration on Mr. Fletcher.  28

C.F.R. § 2.20.

74.     Again, the Commission opted to exceed the minimum set forth in its regulations, and ordered Mr. Fletcher to serve 158 months before his presumptive release date of October 29, 2007.  *See* August 14, 2002 Commission Notice of Action.

75.     On April 25, 2003, Mr. Fletcher wrote a letter to the Chairman of the Commission, Edward F. Reilly, Jr., informing him that he had "satisfied all of the requirements the D.C. Board of Parole. . . [and] was expecting to be reparoled."  April 25, 2003 letter from Thaddeus Fletcher to Office of the Chairman, U.S. Parole Commission at 3, attached as Exhibit 36.

76.     In May 2004, the Commission held an interim hearing for Mr. Fletcher. *See* U.S. Parole Commission Statutory Interim Hearing Summary for Thaddeus Fletcher, dated May 5, 2004, attached as Exhibit 37 [hereinafter "May 5, 2004 Commission Interim Hearing Summary"].

77.     Between Mr. Fletcher's initial hearing before the Commission and his interim hearing in May 2004, Mr. Fletcher had not received any disciplinary reports and had continued to participate in rehabilitative programming.

  a.  Between July 2002 and May 2004, Mr. Fletcher completed 4,000 hours of vocational training as a cook, 662 hours of vocational training in Woodworking Technology, 104 hours of vocational training in Food/Plant Pesticide and 100 hours of vocational training in FCI Serve Safe (a Food Service Special Program).  *See* May 5, 2004 Commission Interim Hearing Summary at 2.

  b.  Mr. Fletcher received certificates in nearly a dozen courses, including Business Math, Computer Fundamentals, and Character Building I and II.  *Id.*

c.   Mr. Fletcher voluntarily participated in and completed a series of didactic, self-help psychology groups, including Stress Management, Anger Management and Communication Skills.  *Id.* (noting Mr. Fletcher's "excellent participation in groups and [ ] sincere interest in improving himself").

78.     At the May 2004 interim hearing, the Commission was authorized under its guidelines to advance Mr. Fletcher's presumptive release date by, at most, 24 months. *See* 28 C.F.R. § 2.60; May 5, 2004 Commission Interim Hearing Summary.

79.     The Commission's hearing examiner acknowledged at the May 2004 interim hearing that Mr. Fletcher had "completed a phenomenal amount of programs" and that "this prisoner literally could not have done any more than he has done."  *See* May 5, 2004 Commission Interim Hearing Summary at 2.

80.     At the May 2004 interim hearing, the Commission's hearing examiner recommended giving Mr. Fletcher a full 24-month reduction in his period of reincarceration prior to reparole and opined that this reduction "has been earned."  *Id.*

81.     Following the May 2004 interim hearing, the Commission awarded Mr. Fletcher only a six-month advancement of his presumptive release date.  *See* June 5, 2004 and March 1, 2005 Commission Notices of Action (confirming grant of six-month reduction of Mr. Fletcher's Total Guideline Range for superior program achievement).

82.     With the six-month advancement, Mr. Fletcher was required to serve 152 months in prison prior to his presumptive release date.  *Id.*

83.     With the six-month advancement, Mr. Fletcher's new presumptive release date became April 29, 2007.  *Id.*

84.     The Commission did not "doubt[]" that Mr. Fletcher's programming was "superior."  *See* 30(b)(6) Dep. at 159:16-20.

85.     The Commission based its decision not to give Mr. Fletcher more than a six-month reduction in his period of incarceration prior to reparole on the seriousness of Mr. Fletcher's underlying criminal conviction and revocation conduct. *See id, generally.*

86.     The Commission later suggested that Mr. Fletcher might have received a larger reduction in his presumptive release date had he taken advantage of programming that was focused on alternatives to violence and anger management.  *See id.* at 161:16-25.

87.     Mr. Fletcher had already engaged in programming focused on alternatives to violence and anger management.  *See supra* ¶¶ 57, 76.

88.     Mr. Fletcher's presumptive release date has not changed since 2004.  *See* U.S. Parole Commission Notices of Action for Thaddeus Fletcher, dated August 14, 2006 and August 17, 2006, attached as Exhibit 39 [hereinafter "August 14 and 17, 2006 Commission Notices of Action"].

89.     From the date of revocation to the present, Mr. Fletcher has served 102 months in prison.  *See* October 27, 1998 Board Order.

90.     At no time since 2000 has the Commission given any indication that it would apply the Board's reparole policy and practice to Mr. Fletcher.

91.     In August 2006, the Commission ordered "no change" in Mr. Fletcher's presumptive release date and cited as its primary reason its determination that Mr. Fletcher "ha[d] substantially maintained good institutional adjustment."  *See* August 14 and 17, 2006 Commission Notices of Action.

92.      Including the time served on his Maryland sentence, Mr. Fletcher has been incarcerated for approximately 152 months.  *See* D.C. Board of Parole Parole Determination Record for Thaddeus Fletcher, dated April 20, 1995, attached as Exhibit 26 (noting Mr. Fletcher's arrest on August 12, 1994).

93.      Mr. Fletcher is scheduled to be transferred to a halfway house on April 29, 2007.  *See* August 14 and 17, 2006 Commission Notices of Action (listing residence in a Community Corrections Center as a special condition of Mr. Fletcher's reparole release).

94.      As of this date, Mr. Fletcher is obligated to reside at the halfway house for up to 120 days.  *Id.*

95.      While at the halfway house, Mr. Fletcher will be in the custody of the Commission.  28 C.F.R. § 2.70(e).

96.      Mr. Fletcher's full term date on his underlying paroleable conviction is June 27, 2022.  November 6, 2000 Commission Rehearing Summary at 1.

### The Significant Risk to Mr. Fletcher of Increased Punishment

97.      Had the Board's reparole policy and practice been applied to Mr. Fletcher at the conclusion of his 24-month set-off period, he would have been released in 2000. *See supra* ¶¶ 16-19.

98.      Had the Board's reparole policy and practice been applied to Mr. Fletcher he would have been released before July 20, 2006.  *See* Ogletree Decl. at ¶ 31 (explaining that, out of all of the cases reviewed, the Board did not keep any parolee in prison for a parole violation before granting them reparole as long as the Commission has held Mr. Fletcher); Margaret Quick Deposition, July 20, 2006, excerpts attached as Exhibit 40 at

107:9-14 ("[t]here's nothing else he could do in an institution to change his behavior or risk level . . . he is just doing time now.").

99.     Even with the credit for "superior program performance," Mr. Fletcher was still ordered to serve 152 months in prison before his revised presumptive release date of April 29, 2007.  June 5, 2004 and March 1, 2005 Commission Notices of Action.

100.     Since he completed his Board-imposed set-off period in October 2000, Mr. Fletcher has served an additional 79 months in prison.  *See* August 14 and 17, 2006 Commission Notices of Action.

101.     Pursuant to the Commission's retroactively applied reparole policy and practice, Mr. Fletcher is still incarcerated.  *See id.*

102.     "[T]he Commission's [retroactive] application of its reparole regulations creates a significant risk that Fletcher will linger in prison longer, because he faces a diminished likelihood that he will be reparoled under the new federal regulations." *Fletcher III*, 433 F.3d at 878.


April 5, 2007                                              Respectfully submitted,


                                                          _____
                                                          Timothy O'Toole, D.C. Bar No. 469800
                                                          Catharine F. Easterly, D.C. Bar No. 484537
                                                          Rashida Ogletree, N.Y. Bar Member[2]
                                                          Nina Chernoff, N.Y. Bar Member
                                                          Special Litigation Division
                                                          Public Defender Service
                                                          633 Indiana Ave, NW
                                                          Washington D.C. 20004

_____

[2]  Ms. Ogletree's and Ms. Chernoff's memberships to the D.C. Bar are pending; they have entered an appearance in this case pursuant to LCvR 83.2(g).

Daniel E. Loeb, D.C. Bar No. 386098
Piper M. Hendricks, D.C. Bar No. 490587
FRIED FRANK HARRIS SHRIVER
& JACOBSON LLP
1001 Pennsylvania Ave., NW, Suite 800
Washington, D.C. 20004


Attorneys for Plaintiff Thaddeus Fletcher