D.C. Review Hearing
Page 3

## VI.  REPRESENTATIVE:

No dictation.

## VII.  EVALUATION:

The subject has been in continuous custody on this instant revocation term since 2-7-92 approximately 6 months to the date of this hearing. The Panel notes that the subject has maintained clear conduct and is involved in the institution substance abuse program. The subject receives good work reports, has no detainers and/or outstanding debts to the government. The subject appears to have release resources in terms of employment and residence. Accordingly, the Panel is recommending that the subject be paroled approximately 60 days from this hearing or on 10-11-92.

The Panel anticipates processing this case to require a minimum of 60 days. The Panel will recommend, as previously indicated, the special drug aftercare condition.

## VIII.  RECOMMENDATION:

Parole effective 10-11-92 with the special drug aftercare condition.

SRR:clw/received & typed 8-31-92

# Exhibit 17

### PRE-REVIEW REVOCATION HEARING

NAME: ███████████

HEARING TYPE: Local Revocation
PROJECTED MR DATE (If an estimate is practical): ~~7/27/2007~~ 9-7-2004
FINES/RESTITUTION/COURT ASSESSMENT: No
PRE-REVIEW DATE: 4/13/93

REG. NO. ██████          DOB: 12/19/53
DCDC. NO. ██████
INSTITUTION: US Marshals/DC

REVIEWER: Essex          FTD: 4/7/2007

## I.   PREVIOUS COMMISSION ACTION:

On or about 11/12/80, subject received a 4 year, 6 month to 18 year sentence after being convicted of Bail Reform Act violation in the District of Columbia under DC code via Superior Court.  On 12/8/81, subject received a 5 year, 2 month to 20 year sentence after being convicted of attempted robbery.

Subject was initially paroled on 6/4/86 via federal rules at his initial hearing.  Subject returned as a violator and by NOA dated 5/1/91, subject was found in violation of parole based upon administrative violations, including failure to report.  Subject was reparoled on 8/2/91, with 14 years, 3 months remaining to be served.  The instant PV warrant was issued on 2/14/92 and that warrant was executed on 1/7/93.

A preliminary interview was conducted on 2/4/93 at the Guadalupe County Jail, Seguine, Texas by USPO Donald W. Hanson.  During the preliminary interview, subject denied each of the charges stated on the warrant application.

On 4/2/93, a probable cause letter was forwarded to subject informing him that a local revocation hearing would be conducted on the 4 charges as stated on the warrant application.

We note that subject was represented by an attorney, Bruce Anderson during the preliminary interview.

## II.   REVIEW OF CHARGES:

### Charge #1. Use of dangerous and habit forming drugs.

According to USPO Brennan's letter of 12/2/91, on or about the following dates, subject submitted urine specimens which tested positive at Guide, Inc. drug aftercare program as follows:

        8/12/91-morphine, codeine, hydromorphine
        8/27/91-morphine, hydromorphine
        8/29/91-morphine, codeine
        9/12/91-cocaine, hydromorphine
        9/16/91-codeine, cocaine, morphine, hydromorphine
        9/23/91-morphine, codeine, cocaine

██████████████

### Charge #2. Violation of special condition (DAPS).

According to USPO Brennan's letter of 12/2/91, between 9/2/91 and 10/29/91 inclusive, subject failed to keep regularly scheduled appointments at Guide Inc., for the submission of urine specimens/counseling.

### Charge #3. Failure to report to USPO as directed.

According to USPO Brennan's letter of 12/2/91, on or about 9/10/91, subject failed to report to the USPO as directed.

### Charge #4. Failure to submit supervision reports.

According to USPO Brennan's letter of 12/2/91, subject failed to submit his monthly supervision reports as required for the months of 9/91, 10/91, and 11/91.

The above charges are self-explanatory. Therefore, additional explanations will not be provided.

**III.  COMMUNITY RESOURCES AND PAROLE RISK:**

Subject's release plans as provided to the probation officer during the preliminary interview of 2/4/93 are to reside with his fiancee' ████████ at San Antonio, Texas. He will return to work at Willow Development Center in that city.

**IV.  SALIENT FACTOR SCORE:**

This is a strictly DC code sentence, therefore, a SFS will not be provided. The SFS does not apply to DC cases.

**V.  SENTENCE DATA:**

**VI.  EVALUATION:**

The Parole Violation Behavior is viewed from the DC Board's regulations. Subject had 5 or more years remaining to be served. The behavior involved technical violations only. Therefore, the rehearing schedule is 6-9 months for technical violations.

We note that the re-hearing schedule should be applied to the date that the warrant was executed and not the date that the parole violation hearing was conducted.

REE/dmj/4-15-93

# Exhibit 18

**U.S. Department of Justice**
United States Parole Commission

# Report of the United States Parole Commission

## October 1, 2001 - September 30, 2003



# United States Department of Justice
John Ashcroft, Attorney General

## United States Parole Commission
5550 Friendship Boulevard
Chevy Chase, Maryland 20840
301 492 5990

Edward F. Reilly, Jr., Chairman
Cranston, J. Mitchell, Vice Chairman
John R. Simpson, Commissioner

Thomas W. Hutchison, Chief of Staff
James L. Beck, Research Administrator
Judy I. Carter, Executive Officer
Rockne J. Chickinell, General Counsel
Steven J. Husk, Case Operations Administrator
Shelley L. Witenstein, Case Services Administrator

# CONTENTS

Foreword . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Mission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Jurisdiction of the Commission . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

Program Highlights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Workload and Decision Trends . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Commissioners . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## MISSION

The mission of the United States Parole Commission is to promote public safety and strive for justice and fairness in the exercise of its authority to release and supervise offenders under its jurisdiction. The Commission achieves these goals through a conscientious application of its guidelines to each case, tempered by a willingness to give due regard to individual circumstances. Its guiding principle is to apply the least restrictive sanction that is consistent with public safety and the appropriate punishment of the offense. In making its determinations, the Commission considers information from a variety of sources, including the presentence report, victim of the offense, sentencing judge, prosecutor, defense attorney, prison officials, and offender.

# Exhibit 19

1

# ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
--------------------------------X
THADDEUS FLETCHER,                :
                                  :
          Plaintiff,              :
                                  :
     vs.                          :   Case No.
                                  :   01-CV-0601 (JDB)
U.S. PAROLE COMMISSION, et al.,   :
                                  :
          Defendants.             :
--------------------------------X
--------------------------------X
THADDEUS FLETCHER,                :
                                  :
          Plaintiff,              :
                                  :
     vs.                          :
                                  :   Case No.
EDWARD R. REILLY, JR., Chairman,  :   01-CV-2058 (JDB)
United States Parole Commission,  :
                                  :
          Respondent.             :
--------------------------------X
```

Washington, D.C.

Friday, July 21, 2006

Deposition of
                    STEPHEN J. HUSK
called for oral examination by counsel for
Plaintiff, pursuant to notice, at The Public
Defender's Office, 601 Pennsylvania Avenue, N.W.,
Washington, D.C. 20004, before Cindy L. Sebo, RMR,
CSR, RPR, CRR, Capital Reporting Company,
Notary Public in and for the District of Columbia,
beginning at 10:10 a.m., when were present on
behalf of the respective parties:

ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
REF: 81383

1                          HUSK

2    example of a case would be someone could have been

3    revoked by the D.C. Board of Parole in 1997 --

4         A      Correct.

5         Q      -- and they want -- and set off for a

6    rehearing between let's say 1998 and 2000, and the

7    Parole Commission would have heard that rehearing

8    without having done the revocation?

9         A      Yes.

10        Q      Is that an example of what you're

11   saying?

12        A      Yes.  Just to make -- an example would

13   be a revoke -- a revoked parole by the D.C. Board

14   of -- in June of 1998, considered for reparole by

15   June of '99, the Commission would conduct that

16   June of '99 hearing in that instance.

17        Q      Okay.  And for those cases, did the --

18   did the Parole Commission accept the findings of

19   the revocation hearing?

20        A      Yes.

21        Q      Okay.  And was that always the case

22   when the Parole Commission heard a reparole

23   hearing or -- yeah, conducted a rehearing without

24   having conducted the revocation hearing, did the

25   Parole Commission always accept the findings of

1                              HUSK

2    the Board of Parole?

3        A      Yes.   The Commission's regs say that

4    prior -- prior orders of the Board are -- are --

5    are found valid by the Commission.

6        Q      Okay.   And then -- and then, again,

7    what changed in 2000 and when exactly in 2000?

8        A      August 5th, 2000, the D.C. Board of

9    Parole, in essence, was abolished and stop making

10   decisions about whether to revoke parole or

11   mandatory release.   And at that point, if they had

12   not had revocation hearings, the Parole Commission

13   would conduct the revocation hearing to determine

14   whether the term of release would be revoked.

15       Q      I know this question may be dependent

16   upon time frame, but could you please describe the

17   process of parole revocation and reparole under

18   the Parole Commission's system?

19       A      The -- now or in '98/2000?

20       Q      Both.   And just make it clear which

21   time frame you're talking about.

22       A      If the D.C. Board of Parole had

23   revoked parole between -- any time before August

24   of 2000 and scheduled a rehearing date, the

25   Commission would conduct the rehearing and

1                    HUSK
2  evaluate the behavior, the violation behavior,
3  based upon the record of the file and score a
4  salient factor score to determine the degree of
5  risk and come up with a guideline range for the
6  violations and then would eventually order a
7  reparole -- a reparole determination based upon
8  those guidelines.

9            That was the -- that was the practice
10  when a -- when a D.C. Board of Parole had revoked
11  an order of rehearing.

12      Q    And that date that you just referred
13  to, I think, in this litigation, it's been called
14  the presumptive release date or presumptive
15  reparole date.

16            What do you call it?

17      A    It may not be a presumptive reparole
18  date because it doesn't necessarily have to be a
19  reparole or a discretionary parole.  If the
20  Commission -- if the Commission is ordering parole
21  on a violater term, a parole violater term, it's
22  generally referred to as reparole, presumptive
23  reparole or reparole effective.

24      Q    Could you please define what a parole
25  violater term means?

1                              HUSK

2        A        Yes.   If I can do so by means of an

3   example?

4        Q        Um-hum.

5        A        If a prisoner releases from a 10-year

6   sentence after five years and owes five years on

7   the sentence, when he was rearrested on a reparole

8   violater warrant, he or she has a five-year parole

9   violater term.

10       Q        Okay.

11       A        So the Commission's decision, in terms

12  of parole/reparole, is making a decision on that

13  five-year violater term.   And because they've been

14  paroled before, we generally will refer to it as a

15  reparole decision.

16       Q        Okay.   What are the other options?

17  You said it isn't necessarily a reparole.

18       A        Well, the Commission may order a

19  decision to continue to the expiration of the

20  parole violater term.   In that event, the prisoner

21  would not be given discretionary parole or

22  discretionary release on that violator term.   He

23  or she would release at their mandatory date,

24  which may or may not be the full five years

25  depending on good time accrued, but that's what --

1                              HUSK

2   sentence based upon whatever conduct the

3   Commission found for violation and determine

4   whatever risks they were.  And two years later,

5   the prisoner comes before the Commission and is in

6   a wheelchair and has got six months to live, that

7   might be new and significant information for the

8   Commission to revisit what it previously had

9   determined.

10              The Commission can also reconsider --

11  can consider new information that would include

12  disciplinary conduct, so that if a person was

13  given a presumptive parole date at the previous

14  hearing, either 18 or 24 months earlier, and now

15  has a significant disciplinary infarction that was

16  not obviously there a year and a half or two years

17  earlier, the date can be retarded or rescinded.

18              The Commission can consider, at that

19  time, programming.  If the prisoner has

20  committed -- I mean participated in significant

21  programming beyond what would normally be expected

22  from a prisoner, then the Commission could

23  consider an advancement of the previous decision

24  for superior program achievement.

25              Occasionally, the prisoner is able to

HUSK

2  provide new information about the case.  Perhaps

3  they've been to court when they were heard on a

4  revocation hearing two years earlier and the case

5  has not gone to court, and they've gone to court

6  and been acquitted of the charge that the

7  Commission found them in violence for.

8      The Commission could reconsider, given

9  any new information that the prisoner might have

10  on that that wouldn't necessarily, in court, be

11  binding, but it would be something that could be

12  considered at that time.

13      So, occasionally, there are prisoners

14  who will present new information about substantive

15  findings made by the Parole Commission at the

16  previous hearings.

17      Q      How often are reparole decisions, like

18  the date, the reparole date, how often are changes

19  made to the reparole date as a result of these

20  interim hearings and the information gained?

21      A      I cannot -- I don't have knowledge of

22  statistics on that.  I would say from my

23  experience, the majority of the cases result in no

24  change.

25      Q      Are statistics kept with regard to

63

1                              HUSK

2    these decisions?

3         A      The Parole Commission codes its

4    decisions, so if they're not -- I think they could

5    be made available based upon the Commission's

6    coding of the decisions in each case.

7         Q      And who would know the answer to that

8    question?

9         A      The Commission's research and

10   technology division.

11        Q      Is there a director of that division?

12        A      Yes.

13        Q      Who is that?

14        A      His name is Sheldon Adelberg,

15   A-d-e-l-b-e-r-g.

16        Q      A notice of action, that is issued

17   after this hearing?

18        A      Yes, there is.

19        Q      What is the process of -- from the

20   hearing to the issuance of that notice of action?

21        A      It's pretty much the same process as I

22   described before.  The hearing examiner prepares a

23   summary of the hearing and the information

24   presented, and the summary provides an evaluation

25   and a recommendation, signs an order.  Again, it

1                          HUSK

2       Q       Does that mean there wasn't the right

3    of representation if it's not in a BOP facility?

4       A       They did not have the right to a

5    representative in the D.C. Department of

6    Correction facilities when they were opened.

7       Q       Okay.   What about contract facilities?

8       A       If it was a D.C. Department of

9    Corrections contract facility, the rule still was

10   that the -- there was no representative.   They did

11   have the right, if the -- if the contract was with

12   the Bureau of Prisons, if it was a Bureau of

13   Prisons contract facility.

14      Q       Okay.   The other right of disclosure

15   of materials in advance or documents that were

16   being considered in advance, did that apply to --

17   regardless of what facility?

18      A       That applied to every facility --

19      Q       Okay.

20      A       -- that's my recollection that it did.

21      Q       How many interim hearings are

22   conducted in a year?

23      A       I don't know the answer to that.

24      Q       Would Mr. Adelberg, again, be the

25   person to ask?

1                             HUSK

2        A     Yes, he would.

3        Q     You mentioned earlier something about

4   the possibility of a reparole date being rescinded

5   or retarded.

6        A     Yes.

7        Q     Under what circumstances does

8   something like that happen?

9        A     Normally, that happens if there's been

10  disciplinary infractions within the institution.

11       Q     And do rescind and retard -- are they

12  synonymous?

13       A     Retard -- the Commission can retard a

14  date -- retard generally means done on the record

15  without -- without a hearing.  And I believe

16  it's -- the Commission can retard a date without

17  having a hearing for -- it's either 90 or

18  120 days.

19             Rescind generally applies to a more

20  serious misconduct, and a hearing is conducted.

21  We call it a rescission hearing.  So there's no

22  retardation hearing, but there is a rescission

23  hearing.

24             So to make the distinction, it's

25  really that -- whatever that 90-, 120-day

HUSK

1
2  difference, that retard really can be done on on
3  the record; rescind cannot.
4      Q    And how often does that happen?
5      A    That the date is?
6      Q    Rescinded or retarded.
7      A    It happens fairly frequently, but I
8  don't have statistics on that.
9      Q    And there times that the date may be
10 retarded up to 90 or 120 days based on, like, the
11 lack of release planning?
12     A    Yes.
13     Q    And that was something that you said
14 was -- would be described in the progress report
15 that is received?
16     A    It may be.  Now, that's generally not
17 done at an interim hearing.  Normally, the
18 Commission has a presumptive parole date that is
19 made effective -- made a parole effective date
20 within nine months of the date.
21          So once the date is made effective and
22 then the case manager starts to send the -- the
23 case manager at the institution sends the
24 prisoner's release plan over to the probation
25 authorities or supervision authorities and then

79

HUSK

2    they're told there's no -- this is no good or the

3    prisoner then discusses with them, well, this

4    resident has fallen through, I have nowhere to go.

5         That is generally when the Bureau of

6    Prisons will contact the Parole Commission to ask

7    for the day to be retarded for release planning.

8    So that's usually not done at a hearing.

9         Q    Okay.  How does the date transform

10   from presumptive to effective?

11        A    The Bureau of Prisons, again, sends

12   another progress report.  So, for instance, if --

13   if the prisoner has a hearing in 2002 and is given

14   a 2006 release date and has a statutory interim

15   hearing or an interim hearing in 2004 and there's

16   no change in the 2006 release date, what happens

17   is nine months before that release date, the

18   prison sends in a progress report and, at that

19   point, the Commission converts the presumptive

20   parole date to an effective date if, you know,

21   there's no discipline and everything else looks

22   like there's no reason to change the presumptive

23   date to an effective date.

24        Q    This change from presumptive to

25   effective, how is that recorded and communicated

1                    HUSK

2        Q      You said that D.C. had a salient

3   factor system very similar, but the

4   Parole Commission did not rely on that salient

5   factor score calculated or estimated by the

6   D.C. Board; is that right?

7        A      Well, if the D.C. Board scored a

8   salient factor score, the Commission doesn't --

9   rescores it, but -- let me clarify this to some

10  extent.

11              The D.C. Board, if they heard the

12  initial hearing in the case, okay, and ordered a

13  rehearing -- okay, I'm not talking about

14  revocation hearings -- and they came up with a

15  salient factor score that comprised part of their

16  total score, the Commission generally would carry

17  it over, carry over the score.  So the

18  Commission --

19       Q      But this is initial parole?

20       A      This is initial parole.  If the -- if

21  the D.C. Board scored a salient factor score for

22  whatever reason at any other type of hearing, the

23  Commission doesn't rely upon that; it goes and

24  uses its own salient factor score and does

25  basically a de novo review of what the salient

1                           HUSK

2    factor score is.

3        Q      And why doesn't the Parole Commission

4    rely on the D.C.'s calculation?

5        A      Well, there's not a regulation that

6    explains that other than that the Commission, I

7    believe, wants to make sure that the score is

8    accurate.

9        Q      Is the scoring the same -- the

10   elements that go into it, the same?

11       A      They're similar.  I don't believe

12   every element was the same.  They definitely have

13   the prior convictions and prior commitments of

14   more than 30 days, those elements.  They

15   definitely have whether the prisoner was out for

16   more than three years, and they definitely have

17   whether they were on probation or parole or under

18   supervision.

19              I'm not sure that the age factors are

20   the same.  For instance, I said two of the items

21   had to do with age earlier in the Commissions.

22   I'm not sure it's broken down exactly the same in

23   the D.C. Board of Parole as it is currently with

24   the Commission.

25       Q      And to clarify about the salient

89

HUSK

factor score, is it one of more parts or more --
I'll just say parts -- of one or more several
parts that go into the guideline determination?

    A     Which guideline determination now?

    Q     For reparole.

    A     It's one of, in essence, two parts --

    Q     Okay.

    A     -- the other one is the severity of
the violation.

    Q     With the D.C. decisions, focusing
really on the D.C. revocation -- well, I take that
back.

         The Parole Commission ultimately
inherited, so to speak, all of the D.C. Board of
Parole cases; is that correct?

    A     Yes.

    Q     And that was by, I guess, August 5th
of 2000?

    A     Right.

    Q     And then, prior to that, some
jurisdiction had been transferred to the
Parole Commission on August 5th of 1998?

    A     Yes.

    Q     Had there been any transfer of

HUSK

1
2    jurisdiction over D.C. parolees prior to 1998?

3         A      D.C. parolees?

4         Q      Anything related to D.C. parole

5    decision-making.

6         A      Yeah.   The -- I'm not 100 percent sure

7    on this, because I wasn't in the parole

8    decision-making process or I was not a hearing

9    examiner before 1998; but my recollection is if a

10   prisoner was transferred to a Federal Bureau of

11   Prisons institution serving a D.C. Code sentence,

12   the D.C. Board of Parole delegated, in essence,

13   that authority to the Parole Commission.   The

14   Parole Commission would make a -- conduct the

15   hearings for that person.

16        Q      Do you know when that began?

17        A      Oh, I don't know for sure.   I've seen

18   decisions from the early '90s and mid-'90s, but I

19   can't say when it began.

20             The Commission also did it -- for a

21   period of time, did courtesy hearings for the

22   D.C. Board of Parole prior to 1998.   The one

23   institution that comes to mind is when the

24   Department of Corrections contracted with the

25   private facility out in Youngstown, Ohio and --

132

HUSK

So either he or -- or Jim Beck would probably be the most knowledgable.

Q      In preparation for this deposition, did you review the -- or did you review the Federal Register sections that were promulgated during the rulemaking process in 1998?

A      I believe I did.  Do you have a copy that I can look at?

Q      I do.

Let me just make sure I'm right about the year.  I'll hand them to you and just ask you that you look at the cover of them.  I don't want to go into the details of the Register necessarily.

A      Okay.

Q      They're dated April 10, 1998 and July 21, 1998.

Are those the documents that you reviewed?

A      I believe I reviewed the July 21, '98 one only.

Q      If I may retrieve that from you and take a look at it.

A      Do you want just the July?

133

1                           HUSK

2       Q       Both of them, please.

3               These are obviously -- well, they were

4       the submissions of the Parole Commission regarding

5       the new parole regulations as they relate to the

6       District of Columbia offenders; is that correct?

7       A       Yes.

8       Q       Correct?

9       A       Yes.

10      Q       Do you know who drafted these

11      submissions on behalf of the Parole Commission?

12      A       I don't know for sure who did that.

13      Q       I think, before all of this, we were

14      talking about the salient factor score and the

15      guidelines at 2.20.

16              What is the utility of using salient

17      factor score?

18      A       The salient factor score is a risk

19      predictor.  It estimates the degree of risk that

20      the parole candidate will reengage new conduct.

21      So it's -- it's the level -- the degree of risk

22      and it's based on data, in essence, that the

23      number of times that -- more times one's been

24      convicted, the more likely they will be convicted

25      in the future; and more times they've served a

134

1                              HUSK

2    prison term of more than 30 days, more than likely

3    they're going to get involved in new activity.

4               It's based on data that there's a

5    burnout as individuals get older.  Thus, the --

6    age 26 and Item (c) and Item (f) of the salient

7    factor score that I discussed before, it's based

8    on data that if someone is under supervision

9    already, that they -- when they commit an offense,

10   they will likely do it in the future, a similar

11   thing.

12              So it's a way that the Commission can

13   predict the risk, not just going in blindly and

14   make a decision about whether to parole somebody.

15        Q     Why aren't rehabilitative factors or

16   programming achievement given any weight in the

17   salient factor score?

18        A     Well, it's just one -- it's one

19   item -- it isn't put in the salient factor score,

20   but that doesn't mean it's not involved in the

21   decision-making.  I'm not sure exactly why it's

22   not in the salient factor score and -- but it's

23   not -- necessarily not in the decision simply

24   because it's not in the salient factor score.

25        Q     The guideline ranges that are used in

1                          HUSK

2   but doesn't have anything else to show for it; or

3   goes to a Narcotics Anonymous or a one-time

4   seminar, which they offer a lot in the prisons, on

5   a particular subject.

6              So it's sustained programs that last

7   for a long time and really allow the prisoner to

8   better themselves.

9       Q      Was Section 2.60 applied to

10  Mr. Fletcher's case?

11      A      Yes, it did apply to his case.

12      Q      In the review of his record, it

13  appears that the hearing examiner -- at least one

14  hearing examiner recommended that 24 months'

15  credit be awarded to Mr. Fletcher under this

16  section.

17              Did that happen?

18      A      He did not get -- he did not get a

19  24-month reduction, no.

20      Q      Why not?

21      A      The Commission, in the end, determined

22  that that was not the proper award given the

23  circumstances of his case.

24      Q      Which circumstances?

25      A      Well, in essence, it appears that the

HUSK

Commission was weighing the level of programming

that he completed and trying to indicate whether

it was predictive of a change in life-style when

he was released.

And his programming, from my review of

the cases, would be certainly considered superior,

but the Commission weighed that against the public

safety.  The superior program achievement award

does indicate or at least the notes and procedures

indicate the granting of a reward -- at

2.60.01(a), the granting of a reward for superior

program achievement is not mandatory, and it is

the intent of the Commission that the granting of

such award not threaten the public safety.

And the programming -- in

Mr. Fletcher's case, I don't think the Commission

doubted it was superior; it was whether the

granting of an award would threaten the public

safety.

And, in his case, there was a notion

that he had previously been a prisoner before he

was released the first time who had programmed

quite well, including receiving an Associate's

degree and then getting a lot of college credits,

1                          HUSK

2   you know.  And then, while -- after being paroled,

3   nevertheless, committed another violent crime

4   while armed, which was similar, in terms of the

5   armed nature of it, to the original crime.

6              So the predictive nature of the

7   superior program achievement, in the end, the

8   Commission determined didn't warrant the full

9   award that he was eligible under these prescribed

10  guidelines and mainly due to the weighing, again,

11  the superior nature of the -- of the programming

12  versus whether -- how much it would -- the award

13  would threaten public safety.

14       Q    When was Mr. Fletcher's original

15  conviction?

16       A    I believe that his original conviction

17  was 1976 or 1977.

18       Q    And how old was he?

19       A    Eighteen or 19 -- 18, I believe.

20       Q    And the parole violation, when was

21  that?

22       A    I believe that was in 1994.  Parole

23  violation was 8/12 -- I'm sorry, 7/18/94.  He was

24  about 35 at that time.

25       Q    And the Parole Commission agreed that

HUSK

1

2       his program was superior --

3            A       Right.

4            Q       -- his programming achievement?

5                    Is there anything that he can do to

6       demonstrate rehabilitation or otherwise to receive

7       any more credit than the six months that the

8       Parole Commission awarded him previously?

9            A       Yeah -- I don't know that.  I would --

10      he hasn't had a hearing now in two years, so

11      without seeing what programs he might have

12      completed since then -- he still is eligible for

13      up to 18 months more, but I don't -- I don't know

14      without seeing what kind of programs he may have

15      completed.

16           Q       What kind of programming could he

17      complete that would sufficiently weigh against the

18      risk factors that you identified to justify, for

19      the Parole Commission, an increased award?

20           A       The only thing -- things that I can

21      think of would be in terms of decision-making,

22      significant programs in terms of alternatives to

23      violence and control of anger.  Those are the only

24      things that I can think of, but I don't know that

25      there's a program.

HUSK

I can't say that there's a program within the Federal Bureau of Prisons or anybody else that would convince the Commission.  Just based upon my assessment of the types of things in terms of making recommendations, those would be the type of things that would be beneficial to him.

Q     The first one you listed was decision-making.  What does that mean?

A     Making correct decisions in terms of dealing with problems, problem solving.

Q     Albeit within the prison setting -- you mean in the prison setting, right?

A     That's the only place he can get that right now.

Q     What would be evidence of making correct decisions in the prison setting?

A     Well, I'm not saying that -- they would have to have evidence that he makes decisions, that he's participated in a program that will ready him to make better decisions when he gets out in the community.

Q     There appeared some confusion -- confusion at one time about the application of

# Exhibit 20

**U.S. DEPARTMENT OF JUSTICE**
United States Parole Commission

# UNITED STATES

# PAROLE COMMISSION

# DESK BOOK OF TRAINING

# AND

# REFERENCE MATERIALS



**June 1, 1995**

# CHAPTER SEVEN:  PREDICTING RECIDIVISM

## I. INTRODUCTION

1. <u>Predictive Judgments and the Salient Factor Score</u>.  One of the criteria for parole in the federal system is that the prisoner's release must not ". . . jeopardize the public welfare."  18 U.S.C. § 4206(a)(2) (1976).  To this end, Congress has authorized the U.S. Parole Commission to consider the ". . . incapacitative aspect of the use of imprisonment which has the effect of denying the opportunity for future criminality, at least for a time."  2 U.S. Code Cong. and Admin. News at 358 (1976) (<u>Joint Explanatory Statement of the Committee of Conference</u>).  In order to make rational determinations as to how long a prisoner should be incarcerated to prevent future criminality, the Commission must begin by assessing the statistical probability that the prisoner would violate the law if paroled.  The Salient Factor Score at 28 C.F.R. § 2.20 (SFS) gives the Commission a reliable research basis from which to make such predictive judgments.  Reliance on the Salient Factor Score is in keeping with Congressional intent that the Commission should make its predictions based upon ". . . comparisons of the offender with other offenders who have similar backgrounds", and that the Commission should only rely upon factors ". . . that have demonstrated their usefulness in making determinations of probability over a substantial period of time".  <u>Id</u>., at 359.

2. <u>The Use of Clinical Judgment to Override the Salient Factor Score</u>.  The term "clinical evaluation of risk" (or "clinical judgment") describes a method of decision-making by which the Parole Commission identifies unusual factors in the prisoner's background that are not accounted for by the SFS, and that are deemed to be so strongly predictive of the prisoner's probable future behavior as to justify an override of the statistical prediction provided by the SFS.  However, the "clinical evaluation of risk" authorized by 28 C.F.R. § 2.20(e) always weighs the predictive value of such factors *by reference to the SFS as a baseline*.  It is exercised only in atypical cases.  The Commission makes decisions within the guidelines for all cases that are typical for each combination of offender type and Salient Factor Score.

3. <u>The Purpose of this Training Manual</u>.  The purpose of this Training Manual is to explain the decision-making principles that must be applied whenever the Commission decides to make a clinical evaluation of risk.  The Training Manual begins with a basic explanation of the Salient Factor Score  This will be followed by a comprehensive explanation of the use of clinical judgment to account for both probability and likely seriousness of recidivism in rendering decisions outside the guidelines. The manual will conclude by explaining the use of clinical judgment under the Early Termination Guidelines at 28 C.F.R. §2.43.

June 1, 1995

7.1

## II. THE SALIENT FACTOR SCORE

4. <u>Actuarial Decision-making in Federal Parole</u>. Parole decision-making from the 1930's to the 1960's relied heavily (at least in theory) upon the prisoner's behavior in prison and response to correctional training programs. By the late 1970's, a decade of behavioral research culminated in an important publication by the National Academy of Sciences concluding that success in treatment programs is not, given the present state of knowledge, a reliable basis for making rationally supported predictions as to how a prisoner will behave once given his liberty. See L. Sechrest, S. White and E. Brown, <u>The Rehabilitation of Criminal Offenders</u>: <u>Problems and Prospects</u> (1979). The conclusion that "behavior in a cage" is no clue to behavior in free society was also the central premise of Professor Norval Morris in <u>The Future of Imprisonment</u> (University of Chicago Press, 1974). For their part, federal parole officials were already convinced that the uncertainty and game-playing associated with release decisions keyed to rehabilitative program performance actually had an adverse effect on genuine efforts by prisoners at self-reform. <u>Hoffman and Stover, Reform in the Determination of Prison Terms</u>, 7 Hofstra Law Review 89, at 92 (1978).

On the other hand, there is strong evidence that actuarial predictions of recidivism based on prior record are consistently more accurate, over the long run, than predictions based entirely on individual judgment or prison performance. See Gottfredson and Gottfredson, <u>Behavioral Prediction and the Problem of Incapacitation</u> (1994).

The result was that the U.S. Parole Board began to develop an actuarial table that would permit the reliable prediction of recidivism. The goal was to give parole officials a statistical basis for evaluating each individual parole applicant by reference to the collective post-release record of prisoners sharing similar background characteristics. Actuarial tables have long been used in the insurance industry as a way to manage the industry's exposure to financial risk, and this methodology was now adapted to parole decision-making. A team of researchers came up with an actuarial table specifically for federal prisoners, which the U.S. Board of Parole officially adopted in 1973 as the Salient Factor Score.

5. <u>The Salient Factor Score (SFS 81)</u>. The version of the Salient Factor Score currently used by the U.S. Parole Commission is set forth below. It contains six items that produce a score from 0 to 10 points. Although the risk of recidivism rises

---

\* For example, if unmarried drivers under 25 have a higher aggregate rate of accidents than older drivers, they all pay higher premiums (including those in the risk group who are, in fact, safe drivers). Such drivers, <u>as a group</u>, have a higher probability of getting into an accident than other drivers.

June 1, 1995

incrementally with each drop in a prisoner's point score, the scores are grouped into four "parole prognosis" categories for use in the parole guideline table. (See 28 C.F.R. § 2.20). A score of 10 to 8 gives a "very good" parole prognosis, a score of 7 to 6 gives a "good" parole prognosis, a score of 5 to 4 gives a "fair" parole prognosis, and a score of 3 to 0 gives a "poor" parole prognosis.

## SALIENT FACTOR SCORE (SFS 81)

**Item A:**  PRIOR CONVICTIONS/ADJUDICATIONS
(ADULT OR JUVENILE)

None ................... = 3
One  .................... = 2
Two or Three....... = 1
Four or More....... = 0

**Item B:**  PRIOR COMMITMENT(S) OF MORE THAN THIRTY DAYS
(ADULT OR JUVENILE)

None ................... = 2
One .................... = 1
Three or More...... = 0

**Item C:**  AGE AT CURRENT OFFENSE/PRIOR COMMITMENTS

26 years of age or more ........... = 2
20-25 years of age ................... = 1
19 years of age or less.............. = 0

**\*\*\*Exception:**  If five or more prior commitments of more than thirty days (adult of juvenile), place an "X" here _____ and score this item ...................... = 0

**Item D:**  RECENT COMMITMENT FREE PERIOD (THREE YEARS)

No prior commitment of more than thirty days (adult or juvenile) or released to the community from last such commitment at least three years prior to the commencement of the current offense ............................ = 1

Otherwise ..................................... = 0

June 1, 1995

7.3

Item E:    PROBATION/PAROLE/CONFINEMENT/ESCAPE STATUS
           VIOLATOR THIS TIME

   Neither on probation, parole, confinement,
   or escape status at the time of the current
   offense; nor committed as a probation, parole,
   confinement, or escape status violator this
   time............................................. = 1

   Otherwise .................................. = 0

Item F:    HEROIN/OPIATE DEPENDENCE

   No history of heroin/opiate
   dependence.................................. = 1

   Otherwise.................................... = 0

TOTAL SCORE............................................. = _____

6.  How the Salient Factor Score was Constructed.  The initial construction of the Salient Factor Score was based on samples drawn from 2,483 federal prisoners released in 1970, using a two-year follow-up period.  The researchers correlated the frequency of "unfavorable outcome" to various background factors, (e.g., criminal history, education, drug use history, etc.) that could be readily determined from presentence reports.  The definition of "unfavorable outcome" that was considered to be the most relevant to the concerns of parole officials was:  (1) an arrest that results in a jail term of 60 days or more; (2) a return to prison as a parole violator; (3) an outstanding parole violation warrant; or (4) death while committing a crime.

The outcome of this research was the adoption of the original eleven-item Salient Factor Score as a pilot project in 1972.  It provided the first reliable means for predicting the post-release behavior of federal prisoners.  The SFS has been validated on subsequent samples of released prisoners, and revised several times.  In 1981, it was adjusted to the six-item score that appears above, which has improved predictive accuracy (SFS-81).

7.  What the Salient Factor Score Predicts.  Each parole prognosis category in the Salient Factor Score is a statement that, for any group of prisoners in that category, that group can always be expected to show a predictable percentage of "unfavorable outcome" over a given period of time.  For example, any group of released prisoners in the "good" prognosis category who have an SFS of 6 will show something approximating a 25% failure rate over a two-year period.  This does not mean that any individual member of the group will or will not violate parole in the future, but

June 1, 1995

7.4

it does justify the statement that there is a 25% statistical probability of "unfavorable outcome" for each individual in that group.

The following table will show the average percentage of "unfavorable outcomes", over a two-year period, for each of the four categories in a typical SFS validation study (SFS-81). "Unfavorable outcome" is defined as explained above. This table can be taken as reflecting the basic recidivism rate that can be expected for each prognosis category, *regardless of the type of crime committed*:

## Table 1
## Outcome by Salient Factor Score (SFS-81)

| Category | Percent Unfavorable Outcome |
|---|---|
| Very Good Risk Category | 11% (Total) |
| 10 | 5.5% |
| 9 | 10.0% |
| 8 | 17.5% |
| Good Risk Category | 24% (Total) |
| 7 | 22.0% |
| 6 | 25.5% |
| Fair Risk Category | 38% (Total) |
| 5 | 35.5% |
| 4 | 40.5% |
| Poor Risk Category | 52.5% (Total) |
| 3 | 42.0% |
| 2 | 50.0% |
| 1 | 51.5% |
| 0 | 52.5% |

The recidivism rate goes up (as high as 68% for the poor risk category) if arrests are included in the definition of "unfavorable outcome," but arrest rates are less reliably correlated to behavior for which parole can actually be revoked.

8. Limits of the Predictive Design of the SFS. In every prognosis category there will be a significant percentage of released prisoners who are "false positives," i.e.,

June 1, 1995

prisoners who have all the characteristics that point to recidivism, *but who will not commit a new crime or violate parole.* Because the Salient Factor Score was not intended as a specific predictor for individual cases, its use in a guideline system to make individual parole decisions requires the decision-maker to be aware of this design limitation. An important purpose of clinical judgment is to provide a screening mechanism by which the decision-maker can attempt to identify "false positives" by reference to factors that suggest that the SFS is overpredicting the true risk of recidivism for a particular offender. This purpose is just as important as the use of clinical judgment to identify prisoners who are poorer risks than the SFS predicts, i.e., "false negatives" for whom the SFS underpredicts the true risk of recidivism.

9. <u>Justifying Incapacitation</u>. Some corrections experts deny that we have the moral right to incapacitate offenders based on statistical probabilities, because mistakes of overprediction are unavoidable, and we end up unnecessarily incarcerating some offenders for what they <u>might</u> do in the future. On the other hand, we can argue that it is fairer that offenders with criminal records suggesting recidivism be required to bear the risk of such a mistake than to tell victims of recidivism that <u>they</u> had to bear the risk. (The SFS is based on factors related to the offender's criminal record.) Moreover, because use of the SFS is an effective way to manage the aggregate risk of recidivism presented by federal prisoners, it is a rational social policy.

10. <u>Validation Studies</u>. Over the years, the Salient Factor Score has been validated several times by studying new groups of released federal prisoners. It has been re-validated by the U.S. Bureau of Prisons as recently as 1994. The results obtained indicate that the Salient Factor Score is very reliable. In other words, we can continue to depend on the predictions of the SFS to be consistent for prisoners who are scored in the future. Although with each sample group of prisoners the results will fluctuate to some extent (preventing us from ever having an exact recidivism rate for each prognosis category), the similarity of results from study to study over twenty years is very satisfactory from a statistician's point of view.[**] Thus, the decision-maker who is contemplating a clinical override of the SFS must do so with a large measure of respect for the validity of its predictions.

11. <u>Changes in the Salient Factor Score and Duplicative Predictors</u>. Over the years, changes were made to the Salient Factor Score to eliminate "social" factors that were difficult to score reliably, and that prompted criticism of unintended discrimination based on factors beyond the individual's personal control. For example, the original SFS included such factors as "verified employment for a total of at least six months

---

[**]   Revalidation is necessary because ". . . the fact that a prediction instrument has demonstrated a particular degree of accuracy in respect to the samples on which it was constructed and originally validated does not ensure that it will retain predictive accuracy over time." Hoffman (1994).

during the last two years in the community," and "release plan to live with spouse and/or children", which were shown to be valid predictive factors.

Although the Commission eliminated these "social" factors, it was able to refine the remaining factors (all related to criminal behavior) so as to retain the original predictive validity of the score. This brings us to an extremely important point. *Not every background item that has predictive power (i.e., that can be correlated with a significant probability of "unfavorable outcome") improves the prediction already made by the prisoner's SFS.*

Thus, the fact that a prisoner's SFS fails to reflect some obviously predictive factors in the prisoner's background does not necessarily make the prisoner a poorer risk than the SFS already indicates. A dismal employment history, or inability to achieve a stable family life, are beyond question valid indicators of risk, but their presence does not mean that the salient factor score fails to reflect the true degree of risk. *They are "duplicative" factors because they duplicate the prediction made by the SFS.* Such redundant predictions are frequently encountered, and are inevitable. For example, most prisoners with an SFS of 3-0 could not have accumulated their low scores without committing several parole and probation violations along the way, so the fact that a prisoner with an SFS of 3-0 has "multiple release violations" does not necessarily make him a poorer risk than the SFS indicates. Even the items that are included in the SFS have considerable overlap. For example, prior commitments (Item B) have some obvious overlap with prior convictions (Item A). Research showed, however, that prior commitments also add predictive power to the SFS. Other examples of "duplicative factors" may not be so obvious, and depend on the Commission being prepared to ask the right research questions:

Example A:   A prisoner has no prior history of opiate use, but he admits to having used cocaine on a regular basis. Is he as poor a risk as if he had lost a point under Item F for past opiate (e.g., heroin) use? The answer is no. A recent (1994) study by the Bureau of Prisons found that, although a cocaine user is a poorer risk than a non-cocaine user, the factor of prior cocaine use does not move the offender to a higher risk category than that in which his Salient Factor Score already places him. *In other words, based on the available evidence, prior cocaine use is predictive by itself, but does not add to the predictive power of the SFS. It would not justify a finding that the prisoner is a poorer risk than his SFS indicates.*

12.  Prison Misconduct.  If success in prison programs is not predictive, what about prison misconduct? A 1994 study by the Bureau of Prisons found that misconduct by itself (all types of misconduct) does predict recidivism, but when we control for Salient Factor Score, it does not. In other words, a prisoner with a misconduct record is statistically no worse a risk than any other prisoner with the same SFS. Although these findings do not preclude the possibility that some criminal behavior in prison (like a new crime on parole) is an indicant of increased risk, the Commission normally

June 1, 1995

7.7

responds to such misconduct by adding the rescission guideline range to the previous presumptive parole date. See 28 C.F.R. § 2.36. The SFS is recalculated only in the case of new criminal behavior by a prisoner at large in the community, and in cases where a crime committed in prison results in victims on the outside (e.g., a mail fraud scheme carried out by inmates). For these cases, the recalculated SFS accounts for the increased risk. See 28 C.F.R. § 2.36(a)(3).

13. <u>Parole Violations</u>. Parole violations are highly predictive. The research shows that with each revocation of parole and new prison commitment, the risk of recidivism measurably increases. Hence, when a prisoner who is paroled is subsequently returned as a violator, the SFS is recalculated downward by treating the conviction and commitment from which the offender was released as if it were a prior conviction and commitment. 28 C.F.R. §2.21(b). This recalculation always accounts for the basic increase in risk, because it applies each time parole is revoked.

## III. SERIOUSNESS AND DEGREE OF RISK

14. <u>Seriousness of Risk Distinguished from Degree of Risk</u>. Before beginning our discussion of decisions to override the guidelines based on the risk presented by individual offenders, it is important to distinguish between the concepts of "degree of risk" and "seriousness of risk." The risk predicted by the SFS is the statistical probability of "unfavorable outcome", i.e., the risk of any parole violation. However, the SFS does not predict the nature of the parole violation the prisoner is likely to commit. "Unfavorable outcome" might be absconding from supervision, drug use, a repeat of the current offense, or some altogether different type of crime. Hence, the SFS is said to predict the <u>degree</u> of risk, but not the seriousness of the risk. However, if the crimes on the prisoner's prior record are typical for a prisoner with his current offense and SFS, the guideline range is presumed to account for both the degree and the seriousness of the risk in that case. This point is illustrated by the following examples:

<u>Example B</u>: This prisoner is a parole violator: a case of shoplifting and forged checks with a Category Two offense severity rating. His SFS is 0, so he is in the "poor" parole prognosis category. (His original federal crime involved a stolen check-cashing conspiracy.) His prior record consists of similar crimes (petty larceny, forgery, etc.) and supervision failures. This is a case with a high degree of risk, but a low seriousness of risk. The guidelines adequately account for this combination by giving the prisoner a "poor" parole prognosis category and a low (Category Two) offense severity rating.

<u>Example C</u>: This prisoner's current offense involved his participation as a principal in a Category Seven cocaine distribution conspiracy (8-9 kilograms over a five-month period). His SFS is 6, so he is in the "good" parole prognosis category. His only prior

conviction resulted from his involvement in another large, inner-city cocaine distribution ring. The seriousness of the risk in this case is clearly high. Nonetheless, the SFS predicts a reasonably good statistical probability (74.5%) that this prisoner will not violate the parole at all. (See Table 1.) The guidelines adequately account for both the degree and the seriousness of the risk in this case, by giving the prisoner a "good" parole prognosis category, but a high offense severity rating. (As indicated by Table 2 infra, drug offenders have a high degree of specialization, so drug crimes are what we expect to see on this offender's prior record.)

Note: A more obvious example of low risk/high seriousness would be a 40-year-old man with no criminal record who murders his brother-in-law after a deadly quarrel. He has an SFS of 10 and a Category Eight OSR. However, the likelihood of a repeat murder is so low that the Commission's focus is clearly going to be on punishment (i.e., whether release would "depreciate the seriousness of the offense") under 18 U.S.C. §4206(a)(1).

15. Why the Guidelines Account for Seriousness of the Risk in Ordinary Cases. How can we tell from the current offense and the prior record what "seriousness of the risk" to expect for the typical offender? The basic principle is that the most recent crime (the "current offense") has a significant possibility of repetition, but the lack of specialization of most criminal offenders means that repetition of the "current offense" is not the dominant statistical probability. Table 2 illustrates the fact that recidivism is usually spread out among different types of crime, with a repetition of the current offense only one significant possibility:

### Table 2

### Range of Seriousness for Repeat Offenses

| Current Offense | Repeat Offenses After Release from Prison | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Assaultive | Robbery | Property | Drugs | Fraud | Traffic | Misc. | P.V. |
| Assaultive | 22.50% | 2.50% | 32.50% | 7.50% | 0% | 5.00% | 12.50% | 17.50% |
| Robbery | 12.30% | 18.85% | 17.21% | 22.96% | 0.82% | 0.82% | 12.50% | 17.50% |
| Property | 6.21% | 3.59% | 37.58% | 14.71% | 13.07% | 1.31% | 13.93% | 13.11% |
| Drugs | 7.46% | 0.37% | 8.21% | 47.03% | 5.97% | 1.31% | 12.09% | 11.44% |
| Fraud | 8.53% | 1.55% | 20.16% | 13.95% | 17.83% | 5.22% | 10.07% | 15.67% |
| Misc. | 9.62% | 3.85% | 19.87% | 22.44% | 8.33% | 5.43% | 17.05% | 15.50% |

This table is from a 1994 BOP study (by Harer) of the relationship between the prior offense with the longest sentence of incarceration and repeat offenses over a three-year follow-up period. The study cautions that most of the repeat assaultive crimes

June 1, 1995

7.9

(crimes against the person) were simple assaults. For guideline decision-making purposes, we may predict the range of offenses listed under "Repeat Offenses After Release from Prison" as typical for each type of "Current Offense" listed.

This table shows, for example, that when a drug offender with an SFS of 4 commits a new crime after release from prison, there is a 47% chance of that behavior being another drug offense (i.e., 47% of the 40% who recidivate commit new drug offenses). Drug offenders are also the least likely to commit assaults and robberies. This tells us that drug offenders have a high degree of specialization, so the guidelines must be presumed, in most drug cases, to account for prior drug offenses on the prior record. This is typical drug offender behavior. On the other hand, if the current offense is a robbery, the offender will have only an 8% chance of committing another robbery (i.e., 19% of the 40% who recidivate if the SFS is 4). If we include assaults, the probability of any violent crime is still only 12% (i.e., 31% of the 40% of robbers who recidivate if the SFS is 4). Hence, such "violent offenders" are still more likely to be arrested for some non-violent crime than for a violent one. We therefore expect to see some prior assaultive behavior on the record of a violent offender who has a low SFS, but if we see a pattern of serious assaultive crimes, the case is atypical and a decision outside the guidelines may be warranted.

16. <u>Decisions Outside the Guideline Range</u>. Because an appropriate offense severity rating in each case results in a guideline range that presumptively accounts for the typical range of crimes for each type of offender, any override based on the "seriousness of the risk" requires a finding that the offender has a greater likelihood of committing a specific type of serious offense (e.g., violent assault) than is typical for others with his OSR.

<u>Example D</u>: It would not be appropriate to override the guideline range, in the case of a Category Five bank robber with a prior record that includes a single prior conviction for a robbery, by arguing that his guideline range does not account for the likelihood of another bank robbery being committed in the future. The case still falls within the normal range of probabilities, i.e., most bank robbers with a prior record are likely to have one prior conviction for robbery (given the 19% probability of that occurrence) or even a serious assault (given the 12% probability of that occurrence). However, if there is a low SFS coupled with an unusual offense history pattern (current offense a bank robbery and two or more prior robbery/assault crimes), then it could be said that the probability of the next parole failure being another bank robbery (or serious assault) is greater than in the ordinary case. In such a case, the prisoner is a more serious risk than indicated by the guidelines because his criminal history displays an unusual degree of specialization: e.g., two prior bank robberies and current offense that is a bank robbery.

In sum, it is always necessary to be clear about whether a guideline override using clinical judgment is based on degree or seriousness of the risk. As will be illustrated

June 1, 1995

below, overrides based on degree of risk usually focus on some special predictive factor in the prisoner's background that is analogous to a factor included in the SFS. For example, a prior parole revocation for a major felony that did not result in a conviction countable under Item A of the SFS, is just as valid for predictive purposes as a conviction would be. So the offender is a poorer risk than his SFS indicates. Overrides based on seriousness of the risk usually focus on some pattern of behavior that indicates the offender's propensity for an especially serious type of crime. For example, a current offense and prior record consisting of repeated, serious assaults on female victims is indicative of an unusually serious risk. The offender is a more serious risk than his guidelines indicate.

# IV.  USING CLINICAL JUDGMENT TO OVERRIDE THE GUIDELINES

17.  <u>Threshold Criteria</u>.  When a decision to exercise clinical judgment is proposed, the reasonableness of a departure can be tested by asking: (1) how often the proposed distinguishing characteristic occurs in other cases (<u>i.e.</u>, is it really unusual?); and (2) whether using that characteristic as a reason to override the guidelines is a precedent the Commission is prepared to follow in other cases. It should always be presumed that frequently-occurring case factors were included in the SFS research base, and do not add to the prediction made by the SFS.

Furthermore, if there is no research evidence that the unusual factor to be relied upon is a valid (non-duplicative) predictor of recidivism, then a logical argument for that factor being predictive should be accepted only if there is no equally plausible argument to the contrary. (See the discussion of "duplicative factors" in the preceding section of this manual.) *A clinical prediction of risk without research evidence should be considered only if the factor is so unusual that an adequate research sample could not be constructed.*

<u>Example E</u>:  A drug conspirator refuses to discuss his participation in what law enforcement officials know was an extensive, well-organized cocaine importation ring. Moreover, the prisoner was clearly in a position to know a lot about the operation. The hearing examiner proposes to go above the guidelines because the prisoner is viewed as a poorer risk than his SFS (8) would indicate, given his obduracy about refusing to cooperate and his presumed loyalty to his confederates. The examiner's logic is not inherently wrong, but the result is questionable. Neither research evidence nor logic compels the conclusion that this offender's behavior is predictive of future recidivism. Many offenders refuse to tell all they know, and their motives may include fear of retaliation. The Commission could not consistently override the guidelines by calling *all* such offenders "poorer risks." A decision above the guidelines is not warranted.

18.  <u>Providing Reasons</u>.  Decisions to exceed the guidelines must be explained "with

June 1, 1995

particularity." 18 U.S.C. § 4206(c).  This means that the notice of action given to the prisoner must clearly explain: (1) the Commission's conclusion (e.g., that the prisoner is a poorer or more serious risk than indicated by the guidelines), and (2) what specific facts support that conclusion.  *If it is not self-evident as to why the facts support the conclusion stated, the Commission must always explain by what "logical path" it reached its conclusion.*  See <u>Marshall v. Lansing</u>, 834 F. 2d 933 (3d Cir. 1988).

19.  <u>Common Errors</u>.  Although "clinical judgment" is a necessary part of the decision-making process, there are always possibilities for error.  The four main errors are:  (1) not being specific as to what is being predicted; (2) ignoring the prediction already made by the SFS; (3) making predictions based upon illusory correlations derived from the limited personal experience of the decision maker; and (4) overreacting to positive indicators of recidivism (e.g., a serious criminal history) at the expense of several negative indicators (e.g., old age and bad health).  Here is an example of some of these errors:

<u>Example F</u>:  An applicant for parole with an SFS of 5 is reported to be a member of a prison gang known as the Mexican Mafia.  He admits this, but claims that his association with members of the "Mexican Mafia" has been for his own protection while confined in various state and federal prisons.  The hearing examiner recommends a decision above the guidelines on the ground that this prisoner is a poorer risk than indicated by his SFS because of his "admitted association with the Mexican Mafia."  If no further explanation appears on the notice of action, we cannot determine by what logic the examiner has concluded that membership in the Mexican Mafia makes this prisoner a poorer risk than anyone else with an SFS of 5.  We cannot tell whether the examiner thinks that prison gang membership directly leads to gang-related criminal behavior on the outside, or just indicates a confirmed criminal outlook (i.e., the examiner is not "specific about what is being predicted").  The examiner may also be relying upon an illusory correlation of prison gang membership with recidivism, and is probably ignoring the prediction already made by the prisoner's SFS.  A decision above the guidelines is not really justified.

As the above example illustrates, the personal experience of the decision-maker can be both a resource and a limitation in attempting to predict risk in individual cases.  Hearing examiners tend to see more parolees who fail than parolees who succeed, so factors associated with violators (e.g., employment instability and prison gang membership) may receive inflated predictive significance.  This means that the decision-maker should always be aware of, and account for, the tendency to draw conclusions from personal experience that might not be justified by the research.

Finally, making predictions of "dangerousness" requires specificity as to exactly what the danger is:

<u>Example G</u>:  An offender was convicted of multiple firearms offenses in 1974.  He was

June 1, 1995

7.12

paroled in 1978.  He is arrest-free for 15 years until he commits a minor assault on his common-law wife and her lover in 1993.  A few months later, he meets the same lover in a back alley.  A quarrel ensues and the lover is killed.  The parolee is convicted of voluntary manslaughter.  The examiner finds no reason to disregard the jury's verdict, but concludes that the offender's violent behavior makes him a more dangerous (i.e., serious) risk.  But what exactly is the "danger" being predicted?  The offender is clearly a danger to any unfaithful wife and her lover (if such a situation arises again), but not more so than in any other Category Seven voluntary manslaughter case.  His fifteen-year arrest-free history suggests that he is not a danger to the public in general.  The guidelines must be presumed to account for the low statistical probability of another Category Seven voluntary manslaughter.

20.  <u>BOP Psychological Reports as an Aid to Clinical Judgment</u>.  Professional psychiatric/psychological reports are generally of limited predictive value, even for inmates with diagnosed mental conditions.  For example, a 1977 Patuxent Institute study (Steadman) found (over a three-year follow-up period) a 41 percent recidivism rate for inmates who were released by court order against psychiatric staff advice, as opposed to a 31 percent recidivism rate for inmates released because the staff recommended them as safe.  Hence, the psychiatric staff were more accurate in their release decisions than the judges were, but not by an impressive margin.  Psychiatric reports are therefore only one element in the exercise of clinical judgment, to be balanced against the Salient Factor Score and all other predictive factors.  For example, a BOP psychiatric report finds a significant possibility of organic brain damage resulting from the prisoner's past heavy use of hallucinogenic drugs.  The Commission may conclude that the prisoner's threatening (and delusional) letters to his ex-wife need to be taken as a serious indicant of his long-term dangerousness, particularly if the SFS is low and some assaultive crimes appear on the prior record.

21.  <u>The Preponderance Test</u>.  A distinction must be made between the standard of persuasion by which the Commission establishes the facts upon which a prediction is made, and the predictive judgment itself.  The allegations of fact that indicate unusual risk may be disputed by the prisoner under 28 C.F.R. § 2.19(c), and the Commission must determine whether the preponderance of the evidence supports the allegations before making a predictive judgment.

22.  <u>Establishing Sufficient Probability to Justify Additional Incarceration</u>.  Once the facts are established, what is the standard of persuasion for making a clinical judgment about the probability of recidivism?  The salient factor score obviously will keep an offender in prison upon less than a 51/49 percent probability of "unfavorable outcome."  For example, although Category Five bank robbers in the "good" parole prognosis category have only a 24% failure rate (versus an 11% failure rate for those in the "very good" category), this is deemed significant enough for the base guideline range of 24-36 months (for a Category Five bank robbery) being increased to 36-48 months.  In other words, the need to protect the public safety is measured on a sliding

June 1, 1995

scale of prison time to be served, with prison time above the guidelines being increased in reasonable proportion to both the seriousness and degree of risk predicted. Thus not every prisoner who is a poorer or more serious risk than his guidelines indicate is necessarily continued to the expiration of his sentence. *How far above the guidelines to place the prisoner's release date is a function not only of how serious the risk is deemed to be, but also of how certain we are that the risk will materialize.*

## V. DECISIONS BASED UPON POORER RISK

23. Factors Equivalent to the Items in the SFS. Although not every recurring factor in criminal cases has been the basis for research, the Commission may decide that certain behaviors are logically equivalent to behaviors that are counted in the SFS, and treat the prisoner as if the SFS in his case had been scored accordingly. In these cases, the SFS fails to account for a predictive factor *because of a definitional limitation in the score itself.* For example, the SFS subtracts one point if the prisoner was on probation, parole, confinement, or escape status at the time of the current offense. If the current offense was committed while the prisoner was on bail, the prisoner may be treated as a poorer parole risk, *but only if the deduction of a point on Item E would move him to the next lower category.* See Walker v. United States, 816 F.2d 1313 (9th Cir. 1987). The same would apply if the offender had no prior convictions, but did have a mental hospital commitment (after being found incompetent to stand trial), and was released through a process similar to parole before committing the current offense. The prisoner can then be treated as if he had a prior conviction (Item A), and a prior commitment (Item B), and was a "parole violator this time" (Item E).

24. Using the Guidelines for Reference Purposes. Even when the predictive factor relied upon does not have an exact analog in the SFS (as in the examples given above), the selection of an appropriate date has to be made by reference to the guidelines for prisoners with the same offense rating but lower salient factor scores. Thus, if a prisoner in the "good" category displays factors indicating a higher degree of risk than is typical for that category, the Commission should decide whether the increased risk makes the prisoner the equivalent of a prisoner in the "fair" or "poor" risk category who has the same current offense, before establishing an appropriate release date.

25. Decisions to Override the "Very Good" Risk Category. A decision below the lower limit of the "very good" risk category is not permitted, because the lower limit of the guideline range for prisoners in the "very good" risk category is always ". . . set upon the presumption that an individual with a salient factor score of ten will not recidivate." However, individual case factors could indicate a higher degree of risk than is usual for the average first offender:

June 1, 1995