**Example H**:  In the case of a proven organized crime member serving his first prison sentence on a conviction for extortion and racketeering, the record warrants a finding that he has been a career offender for many years.  He is less likely than the ordinary first offender to change his mode of living when released.  The notice of action would explain that he is a poorer risk than his SFS of 10 indicates because of his career involvement with organized crime in specified criminal activities (e.g., his leadership role as an "enforcer" in extortionate debt collecting for the past 20 years).  Such an offender could even be deemed the equivalent of an offender in the "poor" prognosis category if his age upon release, high-level crime family connections, and lack of lawful employment prospects make extremely likely he will return to crime after he is released.

26.  **Decisions to Override the "Poor" Risk Category**.  A decision above the upper limit of the guideline range for a prisoner in the "poor risk" category (SFS 3-0) may be warranted in certain extreme cases, e.g., where the prisoner has an even longer prior record of convictions, commitments, and parole violations than the typical case with a SFS of 0.  However, the Procedures Manual points out that prisoners in the "poor risk" category usually have prior criminal records that are significantly worse than the minimum necessary to be placed in that category, without thereby being statistically poorer risks:

> ". . . the majority of prisoners with a salient factor score of zero have 8-12 prior convictions and 6-9 prior commitments.  Prior negative parole histories are also frequent.  A decision above the upper limit of the "poor risk category" on the basis of "poorer risk" should be considered only where such cases can logically be distinguished from the typical case with a score of zero.

Some other predictive factor should be present, or there should be more than 8-12 convictions, to justify overriding an SFS of 0.  The decision-maker should also avoid punishing the offender as if he had already committed a more serious crime than the decision-maker is intending to prevent (i.e., the continuance should be in reasonable proportion to the seriousness of the risk).

**Example I**:  This offender has a long history of crime that is clearly related to his alcoholism.  His intoxication directly results in mail theft, vandalism, simple assaults, and DUI.  He has an SFS of 0.  Age has not slowed him down.  He has just violated parole after failing yet another alcohol treatment program and sustaining a serious reckless driving/DWI conviction (high speed chase).  His alcoholism is a predictive factor that adds to the prediction made by the SFS because there is an obvious causative connection between his on-going alcoholism and his criminal behavior.  The prisoner is a poorer risk for parole than his SFS indicates because future criminality appears inevitable so long as alcoholism dominates the prisoner's behavior.  The continuance that is ordered should be commensurate with the guideline range for the

June 1, 1995

most serious type of crime the prisoner is likely to commit (e.g., vehicular homicide).

27. <u>Repetitive Patterns of Criminal Behavior</u>. The Commission has gone above the guidelines on the ground that the SFS does not account for the fact that the prisoner's prior convictions constitute a repetitive series of frauds, thefts, drug dealing, etc. <u>See McGee v. Aaron</u>, 523 F.2d 825 (7th Cir. 1974) (repetitive auto theft convictions) and <u>Bialkin v. Baer</u>, 719 F.2d 590 (2d Cir. 1983) (pattern of fraud offenses). These decisions are based on the idea that persistence in a particular type of crime as a <u>modus vivendi</u> is a valid predictive factor. For example, an offender who repeatedly returns to the same type of counterfeiting scheme after multiple convictions and imprisonments may be an offender who can be counted on to continue making his living in the same way no matter how inevitable arrest and punishment may be. Repetitive fraud offenders can fall into this category as well (e.g. professional confidence men). These offenders are deemed to be poorer risks than other prisoners with the same SFS if the Commission finds that their pattern of repeated crimes reveals *a professional livelihood practiced with much more frequency than the general repeat offender does.*

<u>Note</u>: This type of case can be distinguished from the "more serious risk" cases because it is the high probability of sustained criminal activity (as a livelihood) that is the consideration rather than the seriousness of the offense. Repeated crimes of violence are more appropriately considered under the heading of "more serious risk."

28. <u>Multiple Parole Failures</u>. A common problem is that of the offender who has repeatedly violated parole on the current sentence. Because multiple parole violations on the same sentence result in a downward recalculation of the SFS each time parole is revoked, the parolee's new SFS should be accepted as indicating the risk for most cases. Hence, it would not be appropriate to exceed the guidelines automatically in every case involving multiple parole revocations. Even if the SFS is already 3-0 indicating a "poor" parole prognosis, an override based on "poorer risk" would not be justified unless the total number of convictions and revocations *over the prisoner's entire career* is in excess of what is typical for prisoners with an SFS of 3-0. A clinical override might be appropriate if the frequency of violations is atypical (e.g., each time the prisoner is released, he rapidly commits an unusual array of violations involving new crimes and other infractions). The use of incapacitative imprisonment above the guidelines would also be justified if the Commission found "more serious risk", e.g., the crimes being committed are escalating in seriousness. Moreover, any repeat parole violator who has made unusual efforts to frustrate attempts to supervise him may be held in custody over the guidelines to protect the integrity of the parole system. The Commission could state that ". . . you are a poorer risk than your salient factor score indicates because you have demonstrated an unusual degree of resistance to efforts to make your supervision a success, including calculated attempts to dece  e your U.S. Probation Officer, despite a previous revocation of parole on this sentence."

June 1, 1995

What about habitual drug users? Repeated failure to succeed in drug treatment programs does not automatically make the offender a poorer risk for parole than the guidelines indicate. This is true even when an addicted parolee who is otherwise reporting for supervision, etc., is resisting treatment efforts and concealing his drug use. This chronic relapsing behavior is part of the problem that requires treatment.

Example J: This example comes in two versions.

(A) The parolee was originally convicted of distributing heroin. He has now violated parole three times on this sentence, each time failing a drug treatment program through on-going drug use, frequent missed appointments, and disruptive behavior (non-violent). The first two revocations also involved petty crimes, but the most recent revocation did not. The SFS is now 2. Is the prisoner a poorer risk for reparole than his SFS indicates? Even predicting specifically for future program failure, the answer is no. The correct approach is to reparole at the top of the guidelines and try another treatment modality unless the parolee has clearly indicated his opposition to any program his U.S. Probation Officer deems appropriate, or has refused drug treatment programming within the BOP.

(B) The parolee's original conviction was for bank robbery. He has a prior history of robbery and assault, and his SFS was already 0 when he was last paroled. The parolee has now sustained three revocations for drug treatment failure over the course of ten years, but he has committed only one petty offense (shoplifting) during that time. The parolee is still not a worse risk than anyone else with an SFS of 0. His case could not be analyzed as a case of poorer (or more serious) risk without some indication in his recent supervision history that threatens a resumption of his prior crimes (e.g., prohibited association with other ex-felons who are currently charged with bank robbery).

29. Sophistication in the Current Offense. In the case of an offender who commits a crime in a manner that betrays extraordinary professional planning and criminal sophistication (e.g., a partner in a well-planned kidnapping), a departure from the guidelines may be warranted on the ground that the offender is a more serious risk than his salient factor score indicates. A sophisticated violent offender (such as an organized crime hit man) is presumptively capable of doing more harm over the course of his criminal career than an unsophisticated offender (who should be easier to arrest and convict). In all cases, the Commission should consider whether the guidelines already account for the degree of sophistication shown. For example, extremely large scale drug and financial crimes are, by definition, sophisticated offense behaviors, whereas murders, assaults, bank robberies and burglaries are not. Moreover, "leadership role" is better handled as an aggravating offense behavior than as a predictor of degree or type of recidivism.

30. Length of Time in Current Offense. Is a major marijuana importer a poorer risk

June 1, 1995

7.17

than his SFS indicates if he spent a longer time than average (e.g. ten years) successfully importing marijuana and running a large operation before getting caught? There is no evidence that recidivism rates for any type of crime are correlated with "length of time in current offense." This is not a rarely-occurring factor suitable for clinical judgment. We could just as easily argue that the offender who imports large amounts of marijuana in a short period of time is the more determined and efficient criminal who is likely to try again. However, if the marijuana offender continually returned to his importation business after repeated arrests that resulted in his failure to appear in court, a finding would be justified that he is a poorer risk than his SFS indicates. Such behavior strongly suggests the offender's unusual lack of ability to learn from law enforcement intervention.

31. <u>Current Mental Condition</u>. In <u>Dunn v. U.S. Parole Commission</u>, 818 F.2d 742 (10th Cir. 1987), the Commission exceeded the guidelines because the prisoner was deemed an especially serious risk for parole given his prior acquittal of murder by reason of insanity some fifteen years earlier. The court reversed, holding that the Commission's decision failed to address the prisoner's current mental condition. The Commission reheard the case, and again denied parole, explaining the aspects of the offender's post-acquittal career (including a bizarre kidnapping offense) that justified its continued concern as to the offender's future behavior. This was the proper outcome. A comparable case involved an offender who in 1981 ignited kerosene he had poured on a state mental hospital employee. Parole was denied in 1993 because recent episodes of prison misconduct (including suicide threats) justified a finding that the prisoner continued to pose a serious risk of violent behavior. (See the above discussion under "BOP Psychological Reports as an Aid to Clinical Judgment.")

32. <u>Rapidity of Return to Crime</u>. Although the rapidity with which a released prisoner returns to another serious crime may be somewhat predictive of "poorer risk", a single episode does not justify a guideline override (as in the case of a pattern of frequently-committed crimes).

<u>Example K</u>: A youthful offender has committed a bank robbery. With a SFS of 10, he is paroled at the bottom of the guideline range. Yet, within two weeks, he commits another bank robbery and is returned as a parole violator after serving an intervening sentence of imprisonment. The second bank robbery is now treated as the "current offense" and the original robbery as a prior conviction and commitment. His SFS is recalculated, and his parole prognosis drops from "very good" to "good". 28 C.F.R. § 2.21. Does the fact that he returned to the same behavior almost immediately upon release make him a poorer risk than anyone else in the "good" prognosis category? The answer is no, because the rapidity of rearrest in any case may depend more on the quality of law enforcement efforts than on the parolee's own behavior. It cannot be supposed that the degree of risk is significantly higher than for any other first offender who repeats the same offense while on parole, and has his

June 1, 1995

SFS adjusted accordingly.   (The SFS says that he still has a "good" chance of desisting from crime next time.)

## VI. DECISIONS BASED UPON MORE SERIOUS RISK

33.   <u>Repetitive Assaultive or Other Dangerous Behavior</u>.   A decision above the guidelines because the prisoner is a more serious parole risk than accounted for by the guideline range is most frequently appropriate when there is an unusual history of repetitive violent behavior and the present offense behavior continues that pattern. See <u>Evenstad v. U.S. Parole Commission</u>, 783 F. Supp. 1297 (D. Kan. 1992) (parolee with a SFS of 3 found to be a "more serious risk" because he had two previous robbery convictions and was on parole from the last such conviction when he committed yet another armed robbery).   What constitutes an unusual pattern of repetition for a "more serious risk" finding depends on the nature of the current offense plus the prior criminal behavior.

The following table offers a useful guide to "more serious risk" findings that can be justified by reason of the case being well outside the average spread shown in Table 2.   Table 3 should not be treated as a guideline, but strictly as a starting point for analysis.   Any case may present special considerations that will justify a different decision than indicated below.

<u>Table 3</u>

### <u>Assaultive Crimes</u>

### <u>Departures Based on More Serious Risk</u>

| <u>Current Offense</u> | <u>Prior offense(s)</u> |
|---|---|
| Category 6-8 (e.g., homicide, kidnapping, assault) | at least 1 Category 6-8 (violent crime) |
| Category 6-8 (e.g., homicide, kidnapping, assault) | 2 or more Category 5 (violent crime) |
| Category 5 (e.g., robbery, assault) | 2 or more Category 5,6,7, or 8 (violent crime) |

<u>Note 1</u>:  The higher the offense severity rating, the lower the probability that the offender will have committed another crime as serious as the "current offense." Thus, two Category Six violent crimes are sufficient to constitute an unusual pattern

June 1, 1995

indicating a special propensity to commit serious crimes of violence. Although (as discussed above) two Category Five robberies do not present an unusual pattern, a "more serious risk" finding would nonetheless be justified if another predictive factor were identified, e.g., a significant pattern of arrests on serious assault charges that were repeatedly dismissed due to the suspicious disappearance of material witnesses.

Note 2:  Each prior offense must be separated by an intervening conviction and commitment to be valid for predictive purposes. This rule conforms to the "learning theory" principle that a past conviction and commitment is predictive only if the offender was released from prison, and was given the opportunity to demonstrate his ability to be deterred from recidivating before he failed.

The following examples illustrate the issues involved in Table 3:

Example L:  The offender is paroled from a sentence for a Category Five offense that involved his illegally manufacturing homemade handguns. He violates parole by possessing a homemade pipe bomb, another Category Five offense. His SFS is recalculated, and he faces a higher guideline range. Is he a more serious risk because of the similarity of his crimes? No. Another Category Five offense is within the standard range of probabilities, and the guidelines adequately account for the case, which is not atypical. However, if his prior record also includes a Category Six arson, a sufficient pattern of potentially fatal crimes is present to justify a finding of "more serious risk."

Example M:  The offender is convicted of kidnapping for ransom, a Category Eight offense. He has three prior convictions and commitments, including a conviction for a Category Seven extortion offense that involved holding the victim hostage for a period of time. Is the offender a more serious risk? Yes, the offender is a more serious risk because of the pattern of violent offenses of this degree of seriousness.

34.  Cases Where Only the Prior Record is Serious.  Most of the Commission's "serious risk" predictions focus on determining whether or not there is an unusually high probability of the prisoner repeating the "current offense," especially in cases of violent crime. More rarely there will be a case in which the current offense is not serious, but a prior record of violent crimes warrants an override based on "seriousness of the risk." In such cases, the decision should be justified by a logical nexus between the circumstances of the current offense and the risk that is found. For example, if the offender has twice committed murder on an Indian reservation while heavily intoxicated, a parole revocation for alcohol treatment failure may justify a guideline override because there is a high risk of another alcohol-indicted murder. On the other hand, when a convicted kidnapper violates parole fifteen years after the crime by failing to report an arrest for possession of a firearm, the nexus is not so clear. His prior record would cancel out any factors in mitigation (e.g., good employment history), but does not provide a reason to exceed the applicable

guidelines. In other words, "current offense" is still a better indicator of the type of violation to expect in the future.

35. <u>Sex Offenders</u>. Although there is no evidence that sex offenders in general are more serious (or poorer) risks than the guidelines account for, child molesters are different. Pedophilia is a long-term behavior that is not adequately measured by a 2 or 3-year follow-up period. But the risk of a repeat offense can be reduced by intensive treatment programs (such as the sex offender program at FCI Butner). These programs cannot "cure" the offender; they are only designed to help the offender control his tendencies. See W.L. Marshall & H.E. Barbaree, <u>Handbook on Sexual Assault: Theories and Treatment of the Offender</u> (1990). Thus, for the average child molester, the fact that he falls into a high-risk group of repeat offenders must be balanced against his successful participation in a prison treatment program, and the availability of continued treatment after release on parole. *Resistance to (or avoidance of) treatment warrants the conclusion that the SFS underestimates the risk, both as to degree and seriousness.* See, e.g., <u>Walrath v. United States</u>, 803 F. Supp. 444 (N.D. Ill. 1993).

36. <u>Requirement for Personal Participation</u>. It is important to avoid a risk-based decision to go above the guidelines in reliance upon prior criminal conduct that signals an unusual tendency toward violence if the offender's involvement was not direct and personal. For example, in <u>Montoya v. U.S. Parole Commission</u>, 908 F.2d 635 (10th Cir. 1990), it was held that the Parole Commission abused its discretion in deciding that participating in a prior murder made the prisoner a more serious risk for parole. The murder conviction was based only on the felony murder rule, and there was no showing that the prisoner personally instigated or helped to carry out the murder.

# VII. DECISIONS BELOW THE GUIDELINES BASED ON BETTER RISK

37. <u>Overpredictive Salient Factor Score</u>. A prisoner can always argue that his SFS makes him a "false positive" because it does not account for the fact that his prior convictions are all for trivial offenses. Moreover, the situational nature of an offender's past convictions could also make the offender a better risk than his SFS would indicate.

<u>Example N</u>: The offender is a doctor who has been twice convicted of unlawfully prescribing controlled substances. The second time he committed this offense (the current offense), he was on probation from the first conviction. He also sustained a DWI conviction while on probation, and had a serious alcohol abuse problem that rendered him increasingly unfit to practice medicine. He has completed an alcohol treatment program, but his license to practice medicine has now been revoked. Realizing that this would happen, the offender and his wife began a travel service which his wife continued after he went to prison. The travel service continues to be

June 1, 1995

a modest success. The prisoner urges the Commission to regard his SFS, and his two prior convictions, as an unreliable indicant of the true risk of recidivism in his case. (His SFS is 7.) He points out that he will no longer be in a position to commit the same crimes, since he cannot practice medicine, and he has a strong community resource. The conclusion would be justified that he is a "better risk than indicated by his salient factor score." (He could be paroled within the guidelines for an SFS of 8-10.)

38. The Age Factor and "Burn-Out". A major consideration in any case involving a mature offender with a violent prior record is the "burn-out" factor that diminishes the violence of many criminal careers as the offender ages. A study by the Rand Corporation (Petersilia et al., 1977) found that habitual offenders typically committed an average of 3.2 serious crimes per month as juveniles, 1.5 per month as young adults, and 0.6 per month as adults. Moreover, there is no evidence that crime seriousness usually escalates over the course of a typical criminal career. See Gottfredson and Gottfredson, Behavioral Prediction of Incapacitation (1994).

This does not mean that every maturing offender with a violent prior record, who is returned as a parole violator for petty larceny, has therefore embarked upon a less violent criminal career. As Table 2 indicates, there is a significant degree of non-specialization among offenders, whereby today's petty larceny defendant may have been involved in a past robbery case and might be the subject of a future homicide prosecution or simple assault arrest. (See Monahan, The Clinical Prediction of Violent Behavior, in Volume IV of Federal Parole Decision-Making Selected Reprints.) Nonetheless, the aging process catches up with many offenders, and some cases may display a definite pattern of decreasing violence and frequency of criminal episodes, correlated with the aging of the offender.

In a study published by the Parole Commission Research Unit in 1984, it was found that recidivism rates decline with age, even controlling for Salient Factor Score. For prisoners who were released at age 41 and older, there was a favorable outcome rate approximately six percentage points higher than predicted by the SFS. (See Burnout - Age at Release From Prison and Recidivism by Hoffman & Beck, in Volume V of Federal Parole Decision-Making Selected Reprints.) This warrants treating an offender whose current offense was committed at age 41 or older, as if he had an extra point on the SFS. This adjustment would produce a more accurate prediction for such cases. For example, a decision below the guidelines might be found warranted because ". . . you are a better risk than your SFS indicates because the current offense was committed after age 41, and the Commission finds that your criminal career has been diminishing in frequency and seriousness with age."

The available studies also suggest that an offender who is a poor risk for parole when he enters prison may become a better risk if he is incarcerated long enough for the aging process to catch up with him. (Note: length of incarceration alone does not

June 1, 1995

change the prediction made by the SFS.) More research is needed to resolve this issue, but the Commission should still make a reasonable attempt to account for a prisoner's age and health.

Example Q: This offender began his career early, with a violent robbery and shoot-out with police at age 17. In his twenties, there were two more robberies, and a conviction for assault. At age 35, he was convicted of "felon in possession of a firearm." After that, he became involved in small-scale narcotics distribution, drifted in and out of jobs, and was convicted twice on drug charges. The offender is now 58, having spent much of the last 20 years in prison or on parole. His SFS is 3, and his current offense (peripheral role in a cocaine importation conspiracy) was committed after age 41. There is no history of recent assaultive behavior, either on parole or in prison. Moreover, he is now experiencing some serious health difficulties (high blood pressure and a paralyzed left arm). This is clearly not a case in which a violent prior record argues for a decision above the guidelines based upon the offender being a "more serious risk." Moreover, the prisoner's age has probably made him less dangerous and less likely to recidivate than his SFS indicates.

Example P: The prisoner is 70 and in serious ill-health. He is, however, a career organized crime figure who planned and directed a major narcotics conspiracy while in prison on an earlier sentence. Age and health are clearly not factors that make him a better risk. Even if he is suffering from terminal illness he is probably still a threat to society.

Example Q: The parolee has a history of repetitive assaultive behavior that consists of a conviction for aggravated assault and a conviction for armed robbery before age 25. The current offense involved an unarmed burglary at age 40. The parolee hid in the bushes while the occupants left the house, and then entered through a rear window and stole valuables. The parolee contests the suggestion that he is presently a "more serious risk" than the typical offender with his SFS, claiming that his youthful days as a violent offender are over. A decision above the guidelines is nonetheless may be appropriate because of the repetitive pattern of assaultive prior offenses plus the current offense of residential burglary (which always carries some potential for confrontation with the victim).

## VIII.  THE EARLY TERMINATION GUIDELINES

39. Development of the Early Termination Guidelines. The Salient Factor Score is also the basis for the Parole Commission's Early Termination Guidelines at 28 C.F.R. § 2.43 (1981). Under § 2.43, supervision of a parolee in the "very good" risk category (SFS of 8-10) is to be discontinued after two years on parole "free from any indication of new criminal behavior or serious parole violation." A parolee in any other risk category (SFS 0-7) must complete three continuous years on parole "free from any

June 1, 1995

indication of new criminal behavior or serious parole violation." A decision to continue the parolee past the indicated period may be made on the basis of a clinical judgment:

> Decisions to continue the parolee under supervision past the period indicated above may be made where case-specific factors justify a conclusion that continued supervision is needed to protect the public welfare. Such case-specific factors may relate to the current behavior of the parolee (for example, a parolee whose behavior begins to deteriorate as the normally expected time for termination approaches) or to the parolee's background (for example, a parolee with a history of repetitive assaultive conduct or substantial involvement in large scale or organized criminal activity). In such cases, an additional period of supervision prior to termination of jurisdiction may be warranted. 28 C.F.R. § 2.43(e)(2).

Such clinical judgments should be made in the light of the research that these guidelines reflect. Using the four risk categories of the SFS, the Commission studied the histories of releasees for a period of six years following the date of their release from prison. The following table shows the decline in arrest rates for each year on supervision, with arrest rates for all categories declining to 10 percent or lower after the third year:

### Table 4

### Post-Release Arrest Experiences of Federal Offenders

| Year After Release | | | | | | |
|---|---|---|---|---|---|---|
| | First | Second | Third | Fourth | Fifth | Sixth |
| Poor Risk SFS=0-3 | 49.4 | 31.0 | 18.5 | 10.0 | 6.7 | 10.3 |
| Fair Risk SFS=4-5 | 36.4 | 28.0 | 21.4 | 7.7 | 12.2 | 8.8 |
| Good Risk SFS=6-8 | 24.2 | 19.1 | 12.2 | 8.8 | 4.2 | 6.2 |
| Very Good Risk SFS=9-11 | 9.1 | 9.7 | 6.1 | 4.1 | 3.0 | 2.6 |

As the table indicates, after the third year on parole, even parolees in the "poor" risk category had an arrest rate nearly equal to the rate for first offenders. All other types of parolees had even lower arrest rates. Continued supervision is not justified

June 1, 1995

7.24

when the arrest rate is that low. ***

40.  <u>Decisions to Override the Early Termination Guidelines</u>.  Decisions to override the guidelines must be based on factors that indicate that the parolee is a higher risk than an ordinary parolee, or that the seriousness of the risk is exceptionally high.

<u>Note</u>:  A parolee who has engaged in prohibited associations or other activity that indicates possible "new criminal behavior" has not met the applicable guideline in the first place.  An "override" of the guideline is when the parolee is found to be a continued risk (based on his history and characteristics) despite the absence of overt indications of "new criminal behavior or serious parole violation."

<u>Example R</u>:  A parolee in the "poor" risk category (with five prior convictions and three previous prison terms) has done remarkably well under supervision for three years.  His living situation is stable and he has been employed the whole time.  His U.S. Probation Officer recommends early termination.  However, his prior record is unusual in one respect; each time he committed a new crime following release from prison, *more than three years had elapsed without an arrest*.  It would be reasonable to hypothesize that this individual has behavioral characteristics that make him more of a longer-term risk than the ordinary offender.  Continued supervision would be justified.  The seriousness of the risk (<u>i.e.</u>, the type of crime we are trying to prevent), as well as the case history, would determine how long supervision is to be maintained.

## IX.  CONCLUSION

41.  This training manual has provided an overview of the basic rules of predictive decision-making for the U.S. Parole Commission.  It cannot be over-emphasized that the purpose of the "clinical judgment" provision at 28 C.F.R. § 2.20(e) is not to justify frequent decisions above the guidelines.  *The guidelines still give the best prediction for the great majority of cases*.  The Commission's current decision-making practices conform to this expectation.  In a study of all initial parole decisions from October of 1989 to March of 1994, it was found that the Commission exceeded the guidelines in 11.6% of the cases.  Half of these departures were for a risk-related reason (<u>e.g.</u>, poorer risk, multiple parole failures, and unusually serious risk).  Decisions below the guidelines were seen in 3.2% of the cases.  These figures bear out the conclusion that "clinical judgment" overrides are for cases that are genuinely atypical.

---

*** The Commission supervises "very good" risk parolees for at least two years despite arrest rates below 10 percent from the outset.  This has more to do with the Congressional expectation that <u>all</u> offenders shall receive <u>some</u> supervision, than with a statistically-based allocation of resources.  See 18 U.S.C. § 4211(b) (1976).

June 1, 1995

<u>Note</u>: Nothing in this Training Manual is intended to give any prisoner the right to a parole based on the apparent similarity or applicability of any explanation or example contained herein to the circumstances of a particular case. Actual cases often involve complex factors not appropriate for inclusion in Training Manual examples. All explanations and examples are approved by the Commission for discussion and information only; they are not statements of policy. Moreover, in a particular case, the need to satisfy accountability for the seriousness of the current offense under 18 U.S.C. § 4206(a)(1) may require denial of parole notwithstanding any consideration as to the degree or seriousness of the risk under § 4206(a)(2).

June 1, 1995

7.26

# Exhibit 21

# ORIGINAL

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
------------------------------:
THADDEUS FLETCHER,            :
                              :
      Plaintiff,              :
                              :
      v.                      :
                              :   Case No.:
U.S. PAROLE COMMISSION,       :   01-CV-0601 (JDB)
                              :
      Defendant.              :
                              :
------------------------------:
```

Washington, D.C.
July 27th, 2006

Deposition of:

JASPER CLAY,

Called for oral examination by counsel for
Plaintiff, pursuant to notice, at the offices of The
Public Defender Service, 633 Indiana Avenue, N.W.,
Washington, D.C., beginning at 10:30 a.m., before
Teague Gibson of Capital Reporting, a Notary Public.

\*   \*   \*   \*   \*

ELLEN GRAUER COURT REPORTING CO. LLC
126 East 56th Street, Fifth Floor
New York, New York 10022
212-750-6434
REF: 81398

1                             CLAY

2        MS. OGLETREE:  I may be done, but let me take a

3   quick break to make sure.

4                    (Off the record)

5   BY MS. OGLETREE:

6        Q    I just have one more question for you, I

7   wanted to clarify something about your work history.

8   Did you ever conduct hearings at the U.S. Parole

9   Commission?

10       A    Yes.

11       Q    During what period was that, what time

12   period?

13       A    You mean -- I did -- I acted as a hearing

14   examiner during the period that I was as a

15   correctional trustee.  I was on loan to the U.S.

16   Parole Commission as a hearing examiner, so we did

17   revocation hearings only.  I did only revocation

18   hearings only there, too, in fact Mike Green and I

19   were assigned and they were really D.C. cases at the

20   D.C. Jail.  It was not the federal cases.  We didn't

21   do those, just -- and I was not acting as a board

22   member but as a hearing examiner making

23   recommendations, I could not make the final

24   decision.  Final decision was made by the board

25   members or commissioners.

CLAY

1

2    Q    And what regulations were you --

3    A    I used the regulations of the U.S. Parole

4 Commission.

5    MS. OGLETREE:  That's it, thank you.

6 BY MS. RUSSELL:

7    Q    I just have a few quick questions.

8 Mr. Clay, are you familiar with the term "interim

9 hearing" as used by the U.S. Parole Commission?

10   A    Yeah, it's the statutory interim hearing.

11 Yes, I am very much, yeah.

12   Q    And what is that?

13   A    Well, that is a hearing in between the

14 initial hearing and the release -- the presumptive

15 release date and that is done, I guess it depends on

16 the particular case, every two years or something

17 like that, 24 months or depending on the presumptive

18 release date how far away it is.

19   Q    And what is the purpose of an interim

20 hearing?

21   A    The purpose of the interim hearing was to

22 determine I think whether there should be some

23 modification to the presumptive release date.  It

24 could be.  But it's to make sure that the individual

25 I guess doesn't get lost in the system and they kind

CLAY

1

2    of review what he has -- he or she has done during

3    that time from the initial hearing to the

4    presumptive release date.

5        Q    You mentioned what the individual has

6    done, so are there certain factors that are

7    considered at an interim hearing?

8        A    I think so, but from my experience there

9    weren't too much modification from the presumptive

10   release date.  I don't recall too many dates that

11   have been -- were changed during that time.  It was

12   just -- I guess it was just a statutory requirement

13   that we review the cases at a certain period of time

14   during the -- so it wouldn't get lost really.

15       Q    What factors were you looking at when you

16   undertook an interim hearing?

17       A    I guess what may have happened with the

18   individual from the time of the initial hearing up

19   to that point and whether if there need to be, if

20   there are think changes that need to be made with

21   the release date.

22       Q    When you say what may have happened, are

23   you talking about their institutional conduct?

24       A    Yeah, institutional conduct, whether

25   there's been any infraction and I think those

CLAY

sometimes can weigh against maybe there is -- or any
other additional information that need to be looked
at in deciding whether this particular release date
is appropriate, if there need to be a change in the
guideline.

Q     In that regard are you familiar with the
regulation on superior programming achievement?

A     Yes.

Q     And what is that?

A     Well, if the individual has participated
in certain kinds of programs he could get a
reduction on the presumptive release date on that.

MS. RUSSELL:  That's all I have.

BY MS. OGLETREE:

Q     Mr. Clay, how many interim hearings have
you conducted?

A     Well, see, that's a hearing examiner's
responsibility and how many have I reviewed and made
decisions on?

Q     Did you conduct any while you did have
hearing examiner responsibilities?

A     No, that's not a -- no, when I was a
hearing examiner.

Q     Only revocation?

CD-46

# Superior Court of the District of Columbia

### CRIMINAL DIVISION

## JUDGMENT AND COMMITMENT ORDER

United States of America

vs.

Case Number _____

PDID Number _____

**FILED**

MAR - 1 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WHEREAS the above-named defendant having entered a plea of

☐ Not Guilty                                                    ☐ Guilty

to the charge(s) of _____

_____

and having been found guilty by

☐ Jury                                              ☐ the Court

and a pre-sentence investigation and report having been

☐ requested and considered.                      ☐ not requested

IT IS HEREBY ADJUDGED that the defendant has been convicted of and is guilty of the offense(s) charged.
The defendant having been given an opportunity to make a statement in his own behalf, and the government
having had the opportunity to reply thereto, it is hereby

ORDERED that the defendant be committed to the custody of the Attorney General or his authorized representative

_____

Judge

A TRUE COPY OF ORDER DELIVERED TO THE U.S. MARSHAL OR HIS DEPUTY

A

TF002343

# Exhibit 23

DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
FACE SHEET No. 2

| | | | | | | | Date Prepared |
|---|---|---|---|---|---|---|---|
| C Number **191841** | Name *(Last, First, Middle)* **FLETCHER, THADDEUS A.** | | | | | | **April 1, 1980** *(Mo., Da., Yr.)* |

| Height | Weight | Build | Eyes | Hair | Age | Birth Date **10-23-59** | Place of Birth | Race **B** | Sex **M** |
|---|---|---|---|---|---|---|---|---|---|

| | Total Sentence: 12 yrs to 36 yrs less 580 days |
|---|---|
| Offense | Rape |
| Case Number | F4272-78M |
| Sentence *(Yrs., Mos., Days)* | 12-36 yrs |
| Warrant Executed / Sentence Begins *(Mo., Da., Yr.)* | 3-25-80 |
| Full Term Date *(Mo., Da., Yr.)* | 8-22-2014 |
| Short Term / M.R. Date *(Mo., Da., Yr.)* | ~~10-24-2002~~ 10/18/2002 |
| Parole Eligibility Date *(Mo., Da., Yr.)* | ~~8-21-1980~~ 7/5/89 |
| Max. Supervision Date *(Mo., Da., Yr.)* | FT MGKY's 2-23-2014 |
| Statutory Good Time Rate / Month | 4320 days |
| Plea | guilty |
| Committing Judge | Shuler |
| Defense Attorney | |
| Initialed By: | ep |

## DETAINERS

| Date Filed | For | Action |
|---|---|---|
| | | |

## CONDUCT CREDITS

| Date | Credits | Forfeit | Restore | Balance |
|---|---|---|---|---|
| 11/8/88 | 6dr. 867 | | | |

## JAIL CREDIT DATES

| From and Including | To and Including |
|---|---|
| 8-23-78 | 3-24-80 = 580 days |

## REMARKS

A-2

TF002344

# Exhibit 24

PB-18
(Revised 10/81)

# BOARD OF PAROLE
## DISTRICT OF COLUMBIA
## CERTIFICATE OF PAROLE
Certificate-Adult-8354-90

### ADULT

**FILED**

MAR - 1 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

The DISTRICT OF COLUMBIA BOARD OF PAROLE, having been advised that

Fletcher, Thaddeus _____ D.C.D.C. _____ 191-841 ___ is eligible to be

PAROLED, and it being the opinion of the BOARD OF PAROLE that the above-named will

remain at liberty without violating the law and that the release of the individual to supervision

is not incompatible with the welfare of society, it is ORDERED by the BOARD that the above-

named be PAROLED on _____ October 23, _____, 19__90__ and that said person remain under

supervision within the limits of the _____ Washington Metro Area ___ (including the District of

Columbia; Prince Georges and Montgomery Counties of Maryland; Arlington and Fairfax

Counties of Virginia, including the cities of Alexandria, Fairfax and Falls Church, Virginia)

until _____ August 22, _____, 19 2014; unless or until other action is taken by the District

of Columbia BOARD OF PAROLE.

This action is subject to the above-named individual's signing an agreement to abide

by and comply with all of the conditions of parole as shown on the reverse side of this

CERTIFICATE.

Given under the hands and seal of the BOARD this _____ 25, _____ day

of _____ June _____, 19__90__

The above-named was released on

the _____ day of _____, 19_____

61- P5804

TF002345

## STATEMENT OF THE CONDITIONS UNDER WHICH YOUR PAROLE IS GRANTED:

1. I will report immediately upon my release to _____ Jeff Covel 1339 Green Court, N.W. _____
   Department of Corrections, Room _____, for my final instructions.   Washington; D.C.
   Phone: 673-6810

2. I will not go outside the parole limits fixed in the Certificate of Parole without first obtaining the approval of my Parole Officer.

3. I will not visit or frequent any illegal establishments including places where alcoholic beverages are unlawfully sold, dispensed or used.

4. I will not illegally possess, use, sell, or purchase any narcotic drug, controlled dangerous substance or related paraphernalia. Nor will I frequent or visit places where any narcotic drug, controlled substance or related paraphernalia is illegally sold, dispensed, used or given away.

5. I will not own, possess, use, sell or have under my control any deadly weapon or firearms.

6. I will make diligent efforts to find and maintain legitimate employment and will support myself and legal dependents to the best of my ability.

7. I will keep my Parole Officer informed at all times as to where I reside and work; and, in the event that I lose my employment or change my place of residence, I will immediately notify my Parole Officer.

8. I will not enter into any agreement to act as an informer or special agent for any law enforcement agency.

9. I will obey all laws and will personally report to my Parole Officer, at my earliest opportunity, any arrest or other involvement with law enforcement authorities.

10. I will cooperate fully with the Board and those responsible for my supervision. I will carry out the instructions of my Parole Officer and report as directed, knowing that failure to do so may, at the discretion of the Board of Parole, be sufficient to cause my return to the institution.

Special Conditions: Narcotics Surveillance and Out-patient Mental Health Counseling.

I have read or had read to me the conditions of my release and understand that my failure to comply with any one of them may be considered a violation of my release for which I am subject to be returned as a violator. I hereby agree to abide by and comply with all of the conditions of parole as stated above.

_____        _____        _____
Signature of Witness                    Title                                         Date

TF002346

# Exhibit 25

CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND

Located at 14735 MAIN STREET, UPPER MARLBORO, MD 20772

MD Relay Telephone No. (301) 952-4786
1-800-735-2258

State of Maryland

Case No(s) CT941427X

249122

Defendant THADDUS ANDRE FLETCHER 10/23/59

Case No. CR4E00003126

ID No. (Baltimore City Only)

Date Sentence Imposed 2/27/95

## COMMITMENT RECORD

TO: ☒ Commissioner of Correction ☐ Warden/Sheriff ☐ Jail/Detention Center

YOU ARE DIRECTED to receive the above named Defendant who has been sentenced and is hereby committed to your custody by JUDGE CASULA The Defendant has been found guilty as to:

Case/Count Offense No. CT.1 Charge ASSAULT WITH INTENT TO MURDER Art. Sec.

Sentence 10 years ☐ Concurrent with ☐ Consecutive to

Case/Count Offense No.

☐ Parole Eligibility Restrictions Art. Sec. (Provide Details in Additional Sentencing Information)

Case/Count Offense No. CT.3 Charge USE A HANDGUN IN A FELONY OR CRIME OF VIOLENCE Art. Sec.

Sentence 5 years ☒ Concurrent with ☐ Consecutive to

Case/Count Offense No. count 1

☐ Parole Eligibility Restrictions Art. Sec. (Provide Details in Additional Sentencing Information)

Case/Count Offense No. Charge Art. Sec.

Sentence ☐ Concurrent with ☐ Consecutive to

Case/Count Offense No.

☐ Parole Eligibility Restrictions Art. Sec. (Provide Details in Additional Sentencing Information)

Split Sentence ☐ All but period of is/are suspended and the defendant is placed on probation for a commencing upon (check one):
☐ 1. Release of Defendant from physical incarceration.
☐ 2. Release of defendant from parole, or mandatory supervision pursuant to Art. 41, §4-612.

The total time to be served is 10 years to run:

Select Only One
☐ A. concurrent with any other outstanding or unserved sentence and begin on 1/16/95
☐ B. consecutive to the last sentence to expire of all outstanding and unserved Maryland sentences.
☐ C. consecutive to the sentence imposed in case No.

The defendant has been awarded 42 days credit for time served prior to and not including date of sentence (Art. 27, §638C).

ADDITIONAL SENTENCING INFORMATION PROVIDE PAROLE ELIGIBILITY RESTRICTIONS OR PAROLE RECOMMENDATIONS
sentence of 5 years mandatory under the provisions of Article 27, Sec. 36B(d) and the defendant shall not be eligible for parole except in accordance with the provisions of Article 31B 11.

$ 145.00 court cost(s) have been waived due to indigency.

☐ Commitment is for execution of previously suspended sentence after Defendant was found in violation of probation.

☐ Sentencing modification. This commitment supersedes commitments issued on:

☐ Order for Reimbursement of Legal Defense; ☐ Copy of Other DISTRIBUTION: SENTENCING GUIDELINES

TRULY taken from the record of the proceedings of said Court
WITNESS my Hand and the Seal of said Court

☐ Appeal Bond set at $

2/28/95 RH

Distribution: White - Custodian · Canary - Court File · Pink - Defendant

TF002347

# Exhibit 26

### DISTRICT OF COLUMBIA BOARD OF PAROLE
### PAROLE DETERMINATION RECORD
### NONHEARING DETERMINATION RECORD
### ANALYSIS OF REPORT OF ALLEGED VIOLATIONS

RE: Fletcher, Thaddus                191-841        281-366
    Subject's Name                    DCDC#          PDID#

BIRTHDATE: 10/23/59            BOP DOCKET #_____

TYPE OF REPORT:☒ RAV ☐ RAV UPDATE   DATE OF REPORT: 4/20/95

LOCATION: Parole              OFFENDER STATUS:☐ Youth ☒ Adult

ANALYST: F. Holloman            PREPARATION DATE: 5/2/95

PAROLE OFFICER:   S. Jackson            UNIT:    SSU

PAROLE OFFICER'S RECOMMENDATION:  Warrant

DATE LAST PAROLED: 10/23/90        FTD: 8/22/2014

UNDERLYING OFFENSES: RAPE

_____

_____

CASE ANALYSIS: Arrested on 8/12/94 in P.G. County, Maryland and
charged with AWITC/Murder, CT-941427X. He plead guilty on
1/19/95 and was sentenced on 2/27/95 to 10 yrs. for AWITC/Murder
and 5 yrs. for the Use of A Handgun. He will serve this time
concurrently. He is presently incarcerated in Upper Marlboro
Jail.

Prior to this incarceration, he lived at 7016 Barton Rd,
Hyattsville, Md.   He was employed with the National Children's
Center at 6200 2nd St., NW; his last office visit was 12/7/94.
He was instructed to report back on 2/7/95, he failed to report.
The subject was named one of Special Supervision's parolees' of
the month in July, 1994.

. . . . . subject is incarcerated, this analyst recommends a . . . . .

PENDING CASES:

PDS.208 2/25/93                 1

# Exhibit 27

IN THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY, MARYLAND
STATE OF MARYLAND

|   |   |   |
|---|---|---|
| V. | : | |
| THADDEUS ANDRE FLETCHER | : | CT 941427X |
|   | : | |

## ORDER OF COURT

Upon consideration of the defendant's Motion for Reconsideration of Sentence, Supplement to Motion for Reconsideration of Sentence and State's Answer filed in the above captioned case and a hearing having been held, it is this 27th day of January, 1997, by the Circuit Court for Prince George's County, Maryland,

ORDERED, that the Motion for Reconsideration of Sentence be and the same hereby is GRANTED; and it is further,

ORDERED, that the ten year sentence imposed on Count 1, be and the same is hereby reduced to five years running concurrent with the sentence imposed on Count 3; and it is further,

ORDERED, that all other conditions remain as previously imposed.

JOSEPH S. CASULA, JUDGE

Copies Mailed To:

Office of the State's Attorney
Courthouse
Upper Marlboro, Maryland 20772

Fred Warren Bennett, Esquire
Catholic University Law School
Cardinal Station
Washington, D.C. 20064

Beatrice J. Garcia, Adm. Asst.

FILED

MAR - 1 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TF002348

# Exhibit 28

Tape _____ at _____

# DISTRICT OF COLUMBIA BOARD OF PAROLE
## PAROLE DETERMINATION RECORD
### REVOCATION HEARING

RE: _Fletcher, Tahddeus_
    Subject's Name

BIRTHDATE: _10-23-59_

                            _191-841_         _281-366_
                            DCDC#             PDID#

LOCATION: _Occoquan_

    BOP DOCKET #: _N9810 - OWG_

    CONSIDERATION DATE: _____

OFFENDER STATUS: ☐ Youth Act   ☒ Adult

PAROLE OFFICER: _Jackson_         UNIT: _____

☐ Order to Appear--Issued: _____

☑ Warrant--Issued: _5-10-95_ Executed _8/29/98_ Served: _____

ANALYST: _J.S._         Executed _8/29/98_   Served: _9/16/98_

                            PREPARED: _____

HEARING OFFICERS: _____

SUPERVISION REPRESENTATIVE: _____

ATTORNEY: _Mr. Bennett_

WITNESSES: _Ethen Covington + Bimo_

OTHERS PRESENT: _____

☐ HEARING NOT HELD, REASON: _____

    ☐ Reschedule By _____

                              ☐ Do Not Reschedule

OFFENSES ON WHICH CURRENT SENTENCE IS BASED:
_Rape, 12 to 36 Yrs._

PENDING CASES: _____

## POST HEARING QUALITY ASSURANCE

ANALYST: _____         DATE: _____

PDS.202 11/16/94         1

RE: <u>Fletcher, Thaddeus</u>
    Subject's Name

<u>191-041</u>
DCDC#

<u>281-366</u>
PDID#

|  | IF NOT REVOKED | IF REVOKED |
|---|---|---|
| FULL TERM DATE: | 8-22-14 | 6/27/22 |
| MANDATORY RELEASE DATE: | 10-18-02 | 8/28/14 |
| DATE ORIGINAL SENTENCE BEGAN: | 3-25-80 | |

PAROLE RELEASES THIS SENTENCE: _____

LAST PAROLE WAS: ☐ Mandatory   ☐ Discretionary   ☐ Reparole

SPECIAL CONDITIONS: _____

_____

_____

DETAINERS OR CONSECUTIVE SENTENCES: _None_

FACTS OF NEW CRIMINAL OFFENSES: _Convicted in Maryland of Assault with intent to Commit Murder, use of a Handgun. 10 Yrs. + 5 Yrs. Conc._

HO: _____

_____

_____

ANALYSIS OF CRIMINAL HISTORY, SUBSTANCE ABUSE, MENTAL HEALTH PROBLEMS, AND TREATMENT ATTEMPTS:

_____

_____

_____

_____

_____

PDS.202 11/16/94

2

Fletcher, T_____s
Subject's Name

191-_____  )
DCDC#

281-366
PDID#

HO: _____

_____

PERFORMANCE DURING LAST RELEASE ON PAROLE: _____

in Maryland of AWI to Murder
Use of a Handgun. Served time in
Upper Malboio Jail.

HO: _____

_____

PERFORMANCE UNDER ANY PREVIOUS COMMUNITY SUPERVISION: _____

_____

_____

ANALYST'S REMARKS

_____

_____

_____

_____

_____

_____

_____

Noncriminal Violation
    less than 5 yrs remain
    5 or more years remain
Misdemeanor Charge or Conviction
    less than 5 yrs remain
    5 or more years remain
Felony Charge or Conviction
    less than 5 yrs remain
    5 or more years remain

SETOFF GUIDELINE RECOMMENDATIONS

    within 6 mos.
    within 6-9 mos.

    within 6-9 mos.
    within 9-15 mos.

    within 9-15 mos.
    within 15-24 mos.

PD:3.202  11/16/94

Subject's Name

191-    )
DCDC#         )

281-366
PDID#

## NATURE AND NUMBER OF VIOLATIONS ALLEGED

——   1.   Failure to report to Supervision immediately upon
release.

——   2.   Travel without approval from Parole Officer.

——   3.   Visit to illegal establishment, including where
alcoholic beverages are illegally sold, dispensed, or
used.

——   4.   Illegal possession, use, sale, or purchase of any
narcotic drug, controlled substance, or related
paraphernalia, or visit to place where any such item is
illegally sold, dispensed, used, or given away.

——   5.   Ownership, possession, use, sale, or control of any
deadly weapon or firearm.

——   6.   Less than diligent efforts to find and maintain
legitimate employment; support of self and legal
dependents not commensurate with ability.

——   7.   Failure to keep Parole Officer informed of place of
residence and work, or to notify of loss of employment
or change in residence.

——   8.   Agreement to act as informer or agent for any law
enforcement agency.

——   9.   Failure to obey laws, or to report at the earliest
opportunity any arrest or other involvement with law
enforcement officials.

——   10.   Failure to cooperate with Board and Supervision, to
carry out Parole Officer's instructions, or to report
as directed, knowing that such failure may cause re-
incarceration by the Board.

——   11.   Failure to abide by special conditions: _____
_____

**3**

**TOTAL NUMBER OF ALLEGATIONS**

## REVIEW OF RIGHTS

[ ]   Subject was advised of procedural rights and understood
them.

[ ]   Subject elected to proceed with hearing.

[ ]   Subject requested postponement of hearing.

[ ]   Subject waived hearing and completed Waiver of
Revocation Hearing form.

Fletcher, T_____g
Subject's Name

<u>191</u>
DCDC#

<u>281-366</u>
PDID#

Allegation # <u>1</u> : Subject committed a ☒ noncriminal ☐ criminal
violation of Parole Condition # <u>0500</u> by the following
alleged conduct on or about_____ 199_ : Mr Fletcher
illegally used a firearm as evidence
By his arrest on August 12, 1994
changed into Assault with intent to com___
to com___

Evidence: ☐ Police Report  ☒ Field Sheet  ☐ Other_____
Case # C T-9414272    Status: Murder.

| Findings of Fact | Evidence |
|---|---|
| Charges officer to overcharged. No evidence of my intent to commit murder. | AC#  State he tried a gun all people asked beaten him into he prevented the for taking his car. It was the attacker's gun. No one was hit |

### CONCLUSION

☒  Parole Violation Sustained

☐  Parole Violation Not Sustained

☐  No Finding

Fletcher, T~   ~us
Subject's Name

<u>191-</u>
DCDC#

<u>281-366</u>
PDID#

Allegation # <u>2</u> :  Subject committed a ☐ noncriminal ☑ criminal
violation of Parole Condition # <u>0901</u> by the following
alleged conduct on or about _____ 199_: *Mr. Fletcher*
*failed to obey all laws, as violated*
*By his arrest on August 12, 1994*
*charged with Assault with intent*
Evidence: ☐ Police Report  ☐ Field Sheet  ☐ other: *to commit*
Case # *C-1-94937L*  Status: *Murder. 10 yrs. ✝ S*
                                                              *co*

| Findings of Fact | Evidence |
|---|---|
| | *Abb* |
| | *see #1* |

### CONCLUSION

☑  Parole Violation Sustained

☐  Parole Violation Not Sustained

☐  No Finding

Fletcher, Ti___us
Subject's Name

191·
DCDC#

281-366
PDID#

Allegation # _3_ : Subject committed a ☑ noncriminal ☐ criminal
violation of Parole Condition # _0 402_ by the following
alleged conduct on or about_____199_ : _Mr. Fletcher_
_failed to report his August 12, 1994_
_arrest to his Parole Officer on_
_Dec. 7, 1994._

Evidence:  ☐ Police Report  ☑ Field Sheet  ☐ Other:_____

Case #_____

Status:_____

| Findings of Fact | Evidence |
|---|---|
|  | _Admit_ |
|  | _Denial_ |

CONCLUSION

☑ Parole Violation Sustained

☐ Parole Violation Not Sustained

☐ No Finding

PDS.202  11/16/94

Fletcher, F. _____ 19
Subject's Name _____

<u>191</u>
DCDC     )

<u>281-366</u>
PDID#

Allegation #_4_: Subject committed a ☑ noncriminal ☐ criminal
violation of Parole Condition #_1002_ by the following
alleged conduct on or about_____199_: Mr. Fletcher
failed to cooperate with those
responsible for his supervision, as
evidenced by his last office visit on
12/07/94,
Evidence: ☐ Police Report ☑ Field Sheet ☐ Other:
Case #_____

Status: which he was
instructed to return on
2/07/95

| Findings of Fact | Evidence |
|---|---|
|  |  |

CONCLUSION

☑ Parole Violation Sustained

☐ Parole Violation Not Sustained

☐ No Finding

PDS.202 11/16/94

Subject's Name: _____

<u>191</u>
DCDC,

<u>281-366</u>
PDID#

MITIGATING FACTORS: _____

_[handwritten text, illegible]_

_[handwritten text, illegible]_

AGGRAVATING FACTORS: _____

OTHER CONSIDERATIONS: _____

_[handwritten text, illegible]_

_[handwritten text, illegible]_

Parole Plan Information: _____

Fletcher, T. ____
Subject's Name ____

_191_     ____
DCDC.

_281-366_
PDID#

## HEARING OFFICIAL'S CONCLUSION

Violations Sustained:   # ____      ☐ Noncriminal ☐ Misdemeanor ☐ Felony

                        # ____      ☐ Noncriminal ☐ Misdemeanor ☐ Felony

                        # ____      ☐ Noncriminal ☐ Misdemeanor ☐ Felony

                        # ____      ☐ Noncriminal ☐ Misdemeanor ☐ Felony

                        # ____      ☐ Noncriminal ☐ Misdemeanor ☐ Felony

        Other: _____      ☐ Noncriminal ☐ Misdemeanor ☐ Felony
        _____

Is Revocation Appropriate?   ☐  Yes   ☐   No

Is Reincaration Appropriate?  ☐  Yes   ☐   No

If Continued, is incarceration pending continuation appropriate?

                ☐  Yes   ☐   No

Comments: _____

_____

_____

_____

_____

_____

PDS 202 11/16/94

RE: ___Fletcher, T___ Id ___
   Subject's Name

___191___          ___281-366___
DCDC#             PDID#

## HEARING OFFICIAL'S RECOMMENDATION

DISPOSITION: ___Revtale & C + NC violations;___
___Recession 2/20/99___

Disposition Codes: ___RV 01 71___

SPECIAL INSTRUCTIONS/CONDITIONS:

Code: ___CK   Program___

Code: ___

Others: ___

Disposition is Inside Guidelines      ☐ Yes       ☐ No
Setoff is Inside Guidelines           ☐ Yes       ☐ No

COUNTERVAILING FACTOR CODES: ___24___ ___23___

STAFF FOLLOW UP ACTIONS: ___

BY: ___                                    DATE: ___10/6/98___
   Hearing Official

CONCURRENCE:  Based on examination of the relevant information in this case,
the Board concurs with the disposition recommended by the Hearing Official, and
hereby orders the issuance of the appropriate implementing documents.

Board Member: ___
                                        Date: ___10/6/93___

Board Member: ___
                                        Date: ___

Board Member: ___
                                        Date: ___

## NONCONCURRENCE--See Attached Form BOP.902

☐ Margaret Quick   ☐ Polly Nelson      ☐ Michael Green

"BOP.903 11/16/94

## DISPUTED CASE
### CONCURRING BOARD MEMBERS' COMMENTS

_____
_____
_____
_____
_____

### NONCONCURRING MEMBERS' COMMENTS AND ALTERNATIVE DISPOSITIONS

**#1 BOARD MEMBER:** Margaret Quick

**Date:** 10/26/98

Subject is a very violent offender whose
violence escalated from rape to attempted
murder.

**Alternative Disposition:** Revoke Parole for criminal
and non criminal violations, reconsider 8/29/00

**Codes:** RK 01 -71

**Special Instructions/Conditions:** OS Program

**Countervailing Factors:** _____

**#2 BOARD MEMBER:** _____

☑ Agree with # 2 The maximum guideline set-off

**Date:** 10-27-98

should be imposed based on the seriousness
of the criminal violation behavior.

**#3 BOARD MEMBER:** _____

☐ Agree with # ___

**Date:** _____

_____
_____
_____

# Exhibit 29



# The Board of Parole

*of the*

## District of Columbia



### NOTICE OF BOARD ORDER

In reference to:

**DCDC** 191-841

**DOB** 10/23/1959

**DOCKET** H9810-0009

**NAME** THADDUS A FLETCHER

**SSN** 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

Order # 1 of 1

**LOCATION** OCCOQUAN FACILT

**CONSIDERATION TYPE** H:REVOCATION

The District of Columbia Board of Parole issues the following **ORDER**:

**REVOKE PAROLE FOR CRIMINAL AND NONCRIMINAL VIOLATIONS;
CONSIDER FOR REPAROLE BY 08/29/2000**

Implementation of this Order shall include the following:
Special Instructions for Reconsideration

**PROGRAM PARTICIPATION**

Remarks:

**USED A FIREARM
FAILED TO OBEY ALL LAWS
FAILED TO REPORT ARREST TO PO
FAILED TO COOP W/ RESP FOR SUPV**



10/27/1998
Date

*Margaret Quick* - 1

Chairman
on behalf of the Board of Parole

Seal

NOA Date 10/30/98  by NG

[ Parole Determination File ]
JACKSON, S

# Exhibit 30

# University of the District of Columbia

**Be It Known That**

By virtue of the authority vested in the Board of Trustees and
upon recommendation of the faculty in recognition of the successful
completion of the requisite course of study
the Board of Trustees confers upon

## Thaddeus Andre Fletcher

the degree of

**Bachelor of Arts**

in Urban Studies

In testimony whereof, we have affixed our signatures
this 13th day of May, two thousand.

Paul B. Woods
*Chairman of the Board of Trustees*

Julius F. Nimmons Jr.
*President*

# THIS IS TO CERTIFY THAT

Thaddeus Fletcher

is hereby awarded this

# Certificate of Performance

in

*Metro Bus and Rail*
*Upholstery Fabrication and Assembly*

from the Government of the District of Columbia

Department of Corrections

Industries Division

for work performed at the Industries Division

Assistant Director,
Industrial Services

Grade [ 1 ]

Machines used FABRIC CUTTER, SPRAY GUNN, CRAFTMAN-12" BANDSAW, EASTMAN-BLUE STREAK II BLADE, H
DRILL, HAND GRINDER, STAPLE GUN, PALLET JACK, STEAMER, IBM WHEELWRITER 35 & IBM SELECTRI
TYPEWRITER, ETC.

Training completed by: MR. BACOM STACY &
WILBERT SOWELL

Tools and Instruments used SCISSORS, RULER, VINYL, VELCRO LOOP, DOT FASTENERS-(SOCKET & EYELETS),
GRIP, ADJUSTABLE WRENCH, SPRAY GUN WRENCH, CHANNEL LOCK PLIERS, C CLAMP, NUT DRIVER, RIVET GU
SPOT WELDER TIPS, TACK CHISELS, BOX CUTTER, SCREWDRIVERS, HAMMERS, RUBBERMALLOT, ETC.

Skills Acquired

|  | Hours |
|---|---|
| CLERK | |
| TYPING | |
| FILING | |
| BOOKKEEPING | 1,920 |
| INVENTORY WORK ORDERS: (BUS, RAIL, PAN SECTIONS) | 1,440 |
| ORDERING STOCK ITEMS | 1,200 |
| FABRIC CUTTER: (BUS, RAIL, PAN SECTIONS) | 1,080 |
| LOADING & UNLOADING DILVERY TRUCK | 840 |
| QUAILTY CONTROL LEADMAN: (1984-1990) | 480 |
| UPHOLSTERER: (1980-1990) & (1999-2000) | 960 |
| ASST. TO SQUAD LEADER | 720 |
| FOAM CUTTING | 4,320 |
| | 14,400 |
| | 1,800 |
| | 600 |
| TOTAL: | 29,760 |

## RELATED TRAINING

LEARNING METRO SHOP TOTAL OPERATION
HOURS IN SAFETY IN THE WORK PLACE
HOURS IN SAFETY OF HANDLING TOOLS
BUS SECTION INVENTORY
RAIL SECTION INVENTORY
PAN SECTION INVENTORY
UPHOLSTERY SECTION INVENTORY
QUAILTY CONTROL SKILLS
ASST. TO SQUAD LEADER SKILLS
LEADERSHIP SKILLS
LEADMAN SKILLS
STRIPPING SECTION INVENTORY
MANAGEMENT SKILLS & SHOP MAINTENANCE
FOAM CUTTING SECTION

R. FLETCHER CONTINUES TO SHOW INTEREST, DEPENDABILITY, PRODUCTVITY, AND RESPONSIBILITY, HE'S
VERSATILE, HAS A EXCELLENT ATTITUDE, HE GET ALONG WITH STAFF AND HIS PEERS VERY WELL, HE'S
HELPING OUT WHEN HE'S CALLED UPON, ALSO HE'S A VERY EXPERIENCED UPHOLSTERER! AND DOES NOT

SHOP WORK - Rating

Quanity of Work   EXCELLENT
Quality of Work   EXCELLENT

Dependability        EXCELLENT
Aptitude for Trade   EXCELLENT

RATING CODE: E-Excellent — S-Satisfactory — U-Unsatisfactory

Total hours of shop practice   25,440
Entered   3/7/1980

Total hours of related training   4,320
Date completed   9/19/00

DANNY MINTER, GENERAL FOREMAN